16-55286

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**JACOB GREGOIRE,**

                              Plaintiff-Appellee,

   v.

**CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES,**

                 Defendants - Appellants.

---

On Appeal from the United States District Court
for the Southern District of California

No. 3:14-cv-01749-GPC-DHB
The Honorable Gonzalo P. Curiel,
United States District Judge

### APPELLANTS' EXCERPTS OF RECORD – VOL. 2 OF 2

XAVIER BECERRA
Attorney General of California
KRISTIN G. HOGUE
Senior Assistant Attorney General
RICHARD F. WOLFE
Supervising Deputy Attorney General
DOUGLAS E. BAXTER
Deputy Attorney General
State Bar No. 201351
 600 West Broadway, Suite 1800
 San Diego, CA 92101
 P.O. Box 85266
 San Diego, CA 92186-5266
 Telephone: (619) 738-9567
 Fax:        (619) 645-2581
 Email:  Douglas.Baxter@doj.ca.gov
*Attorneys for Defendants - Appellants*
*California Highway Patrol and Sergio*
*Flores*

INDEX OF APPELLANTS' EXCERPTS OF RECORDS VOL. 2 of 2

| DOCUMENT | TRIAL COURT DOCKET NO. | AER PAGES |
|---|---|---|
| Order Re Defendants' Interlocutory Appeal on Issue of Qualified Immunity | 61 | 26-29 |
| Notice of Appeal | 52 | 30-31 |
| Declaration of Douglas E. Baxter in Support of Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment | 42-2 | 32-37 |
| Defendants' Objections to Plaintiff's Evidence Offered in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 42-1 | 38-46 |
| Plaintiff's Separate Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication of Claims | 35-1 | 47-71 |
| Declaration of Thomas D. Luneau Re: Plaintiffs' Opposition to Motion for Summary Judgment Filed by Defendants California Highway Patrol | 35-2 | 72-93 |
| Declaration of Justin Hutton | 35-3 | 94-96 |
| Declaration of Autumn Mitchell FKA Korri E. Mitchell | 35-4 | 97-98 |
| Declaration of Joshua Rees | 35-5 | 99-101 |
| Defendants' Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims | 25-2 | 102-118 |
| Declaration of Douglas E. Baxter in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims | 25-3 | 119-179 |

| | | |
|---|---|---|
| Declaration of Eliazar Colunga in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims | 25-4 | 180-185 |
| Declaration of Sergio Flores in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims | 25-5 | 186-196 |
| Notice of Removal of Action Under 28 U.S.C. § 1441(a) [Federal Question] | 1 | 197-199 |
| Answer to Complaint | 1-2 | 200-203 |
| Complaint | 1-1 | 204-211 |
| District Court Docket | | 211-217 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB GREGOIRE, | CASE NO. 14CV1749-GPC(DHB) |
| Plaintiff, | **ORDER RE DEFENDANTS' INTERLOCUTORY APPEAL ON ISSUE OF QUALIFIED IMMUNITY** |
| v. | |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES; and DOES 1 to 20, | |
| Defendants. | |

On February 16, 2016, the Court granted in part and denied in part Defendants' motion for summary judgment. (Dkt. No. 46.) Specifically, the Court denied Defendants motion for summary judgment on the unlawful arrest and excessive force claims based on qualified immunity as to Defendant Sergio Flores. (Id. at 18, 20.) On February 25, 2016, Defendants filed a notice of appeal of the Court's summary judgment order on its ruling on qualified immunity. (Dkt. No. 52.) On February 29, 2016, the Court vacated the pretrial conference date and set a briefing schedule for the parties to address whether the appeal is frivolous. (Dkt. No. 55.) Plaintiff filed a brief on March 11, 2016. (Dkt. No. 56.) On March 24, 2016, Defendants responded. (Dkt. No. 60.)

## Discussion

The United States Supreme Court has recognized a narrow exception that allows

[14CV1749-GPC(DHB)]

AER 026

1   an interlocutory appeal of a denial of summary judgment based on qualified immunity.

2   Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  A valid appeal from the denial of

3   qualified immunity automatically stays the district court proceedings unless the district

4   court certifies that the appeal is frivolous.  Chuman v. Wright, 960 F.2d 104, 105 (9th

5   Cir. 1992) (interlocutory claim that is immediately appealable divests district court of

6   jurisdiction to proceed to trial); Behrens v. Pelletier, 516 U.S. 299, 310 (1996)

7   (endorsing the district court's power to certify a defendant's interlocutory appeal of the

8   denial of qualified immunity as frivolous).  A district court's order denying qualified

9   immunity, to the extent it turns on an "issue of law," is immediately appealable.

10   Mitchell, 471 U.S. at 530.

11        A qualified immunity claim may be certified as frivolous if it is "so baseless that

12   it does not invoke appellate jurisdiction."  Marks v. Clarke, 102 F.3d 1012, 1017 n. 8

13   (9th Cir. 1996) (citation omitted).  "An appeal is frivolous if the results are obvious,

14   or the arguments of error are wholly without merit."  In re George, 322 F.3d 586, 591

15   (9th Cir. 2003) (citation omitted).

16        Plaintiff argues that Defendants' appeal is frivolous and not appealable because

17   the Court's order denying summary judgment was based on disputed material issues

18   of fact and they are not raising a "purely legal issue."  (Dkt. No. 56 at 2-4 (citing

19   Johnson v. Jones, 515 U.S. 304, 319-20 (1995)).  In response, Defendants assert there

20   is no jurisdictional bar to the Ninth Circuit hearing their appeal, and their appeal is not

21   frivolous.  Defendants contend that they seek to appeal the issue of  whether Flores

22   violated clearly established law even while accepting Plaintiff's version of disputed

23   material facts. (Dkt. No. 60 at 14.)  Because even if the court accepted Plaintiff's facts,

24   Defendant has still failed to show a violation of clearly established law.  (Id.)  In

25   particular, Defendant argues that there is no clearly established law on probable cause

26   to arrest based on the parties' conflicting interpretations on various state statutes

27   concerning the role of law enforcement officers and firefighters at an emergency traffic

28

[14CV1749-GPC(DHB)]

AER 027

1   incident.   (Dkt. No. 60 at 10 n. 3.)

2        The doctrine of qualified immunity protects government officials from liability

3   for civil damages "unless a plaintiff pleads facts showing (1) that the official violated

4   a statutory or constitutional right, and (2) that the right was 'clearly established' at the

5   time of the challenged conduct." Ashcroft v. al–Kidd, 563 U.S. 731, 735 (2011).

6        Since there were material issues of fact underlying the claims of unlawful arrest

7   and excessive force claims, the Court denied summary judgment on qualified immunity

8   based on the first prong of whether there was a violation of a constitutional right. (Dkt.

9   No. 46.)  The Court did not address the second prong of whether the constitutional

10  rights were clearly established.  (Id.)

11       In Behrens, the Court clarified the holding in Johnson v. Jones, concerning when

12  a denial of summary judgment on qualified immunity is properly subject to an

13  interlocutory appeal,

14           *Johnson* held, simply, that determinations of evidentiary sufficiency at
             summary judgment are not immediately appealable merely because
15           they happen to arise in a qualified immunity case; if what is at issue in
             the sufficiency determination is nothing more than whether the
16           evidence could support a finding that particular conduct occurred, the
             question decided is not truly 'separable' from the plaintiff's claim, and
17           hence there is no final decision . . . . *Johnson* reaffirmed that summary
             judgment determinations *are* appealable when they resolve a dispute
18           concerning an 'abstract issu[e] of law' relating to qualified immunity
             . . . -typically, the issue whether a federal right allegedly infringed was
19           'clearly established.'

20
21  Behrens, 516 U.S. at 313 (citations omitted).  In following Behrens, the Ninth Circuit

22  held that it has "jurisdiction over an interlocutory appeal from the denial of qualified

23  immunity where the appeal focuses on whether the defendants violated a clearly

24  established law given the undisputed facts, while [it does] not have jurisdiction over

25  an interlocutory appeal that focuses on whether there is a genuine dispute about the

26  underlying facts."  Knox v. Southwest Airlines, 124 F.3d 1103, 1107 (1997).  The

27  Ninth Circuit further explained that "[e]ven if disputed facts exist about what actually

28  occurred, a defendant may still file an interlocutory appeal if the defendant's alleged

[14CV1749-GPC(DHB)]

AER 028

1    conduct in any event met the standard of objective legal reasonableness under clearly

2    established law regarding the right allegedly infringed." Id. (citing Behrens, 516 U.S.

3    at 313).

4           Contrary to Plaintiff's argument that Defendants did not preserve the issue on

5    appeal, Defendants summarily raised the issue on summary judgment concerning

6    whether the law was "clearly established" such that a reasonable officer would have

7    known his conduct of arresting Plaintiff was unlawful. (Dkt. No. 25-1 at 27) ("Plaintiff

8    cannot point to any well-established body of law stating that Officer Flores' exercise

9    of his authority under California Vehicle Code section 2410, California Penal Code

10   section 409.3, and California Health and Safety Code section 1798.6(c) was unlawful

11   under the circumstances he confronted.") (see also Dkt. No. 25-1 at 27 n.2; Dkt. No.

12   42 at 1-2.)   Therefore, because Defendants have raised a legal issue whether the

13   constitutional rights were clearly established, the Court concludes that the Ninth

14   Circuit has jurisdiction to hear the interlocutory appeal and Defendants' appeal is not

15   frivolous.

16                                    **Conclusion**

17          Based on the above, the Court concludes that Defendants' appeal of the Court's

18   order on qualified immunity is not frivolous.

19          IT IS SO ORDERED.

20

21   DATED:  May 13, 2016

22

23                                    HON. GONZALO P. CURIEL
                                      United States District Judge

24

25

26

27

28

AER 029

1   KAMALA D. HARRIS
    Attorney General of California
2   RICHARD F. WOLFE
    Supervising Deputy Attorney General
3   DOUGLAS E. BAXTER
    Deputy Attorney General
4   State Bar No. 201351
     600 West Broadway, Suite 1800
5    San Diego, CA 92101
     P.O. Box 85266
6    San Diego, CA 92186-5266
     Telephone: (619) 645-2034
7    Fax:        (619) 645-2012
     E-mail: Douglas.Baxter@doj.ca.gov
8   *Attorneys for Defendants State of California*
    *(by and through the California Highway*
9   *Patrol) and Sergio Flores*

10              **IN THE UNITED STATES DISTRICT COURT**

11          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

14  | | |
    |---|---|
15  | JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
16  | Plaintiff, | **NOTICE OF APPEAL** |
17  | v. | Judge:          The Honorable Gonzalo P. Curiel |
18  | CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | |
19  | | |
20  | Defendants. | |
21

22          Notice is hereby given that Defendants State of California (by and through the

23  California Highway Patrol) and Sergio Flores hereby appeal the District Court's

24  February 16, 2016, Order Granting in Part and Denying in Part Defendants' Motion

25  for Summary Judgment (Dist. Ct. ECF Doc. 46), which included the District

26  Court's denial of Defendant Sergio Flores' qualified immunity defenses.

27  Defendants appeal the District Court's Order denying Defendants' Motion for

28

                                    1

AER 030

1  Summary Judgment.  This appeal of the District Court's ruling is to the United

2  States Court of Appeals for the Ninth Circuit.

3  Dated:  February 25, 2016                    Respectfully submitted,

4                                              KAMALA D. HARRIS
                                               Attorney General of California
5                                              RICHARD F. WOLFE
                                               Supervising Deputy Attorney General
6

7
                                               s/DOUGLAS E. BAXTER
8                                              DOUGLAS E. BAXTER
                                               Deputy Attorney General
9                                              *Attorneys for Defendants State of*
                                               *California (by and through the*
10                                             *California Highway Patrol) and*
                                               *Sergio Flores*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  DEB:JLH
    SD2014707454
28  81277291.doc

                                    2

                    NOTICE OF APPEAL (14-cv-01749-GPC (DHB))

1 | KAMALA D. HARRIS
Attorney General of California
2 | RICHARD F. WOLFE
Supervising Deputy Attorney General
3 | DOUGLAS E. BAXTER
Deputy Attorney General
4 | State Bar No. 201351
  600 West Broadway, Suite 1800
5 | San Diego, CA 92101
  P.O. Box 85266
6 | San Diego, CA 92186-5266
  Telephone: (619) 645-2034
7 | Fax:         (619) 645-2012
  E-mail: Douglas.Baxter@doj.ca.gov
8 | *Attorneys for Defendants State of California*
*(by and through the California Highway*
9 | *Patrol) and Sergio Flores*

10 | **IN THE UNITED STATES DISTRICT COURT**

11 | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

| | |
|---|---|
| 14  JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
| 15                             Plaintiff, | **DECLARATION OF DOUGLAS E. BAXTER IN SUPPORT OF DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| 16  v. | |
| 17  CALIFORNIA HIGHWAY PATROL, | |
| 18  an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | Date:        February 19, 2016 |
| 19                             Defendants. | Time:        1:30 p.m. Courtroom: 2D |
| 20 | Judge:       The Honorable Gonzalo P. Curiel |
| 21 | |

22 |     I, Douglas E. Baxter, hereby declare as follows:

23 |     1.    I am an attorney duly licensed to practice law in the State of California

24 | and authorized to appear before the above-entitled Court.  I am employed as a

25 | Deputy Attorney General for the California Attorney General's Office.  I am

26 | assigned to represent Defendants State of California (by and through the California

27 | Highway Patrol) and Sergio Flores.

28

1

AER 032

1      2.    Attached herewith as Exhibit A are true and correct copies of page 121 of

2   the Deposition of Defendant Sergio Flores, the cover to that deposition, and the

3   court reporter's certification.  As indicated on page 6 and footnote 5 of the

4   Defendants' Reply to Plaintiff's Opposition to Motion For Summary Judgment, this

5   page was omitted from Document 35-2 of Plaintiff's opposition papers.  The page

6   was among those cited by Plaintiff as evidence with regard to Fact 95 of the

7   Separate Statement of Undisputed Material Facts.  Specifically, Plaintiff cited pages

8   120 – 122:15 of Officer Flores's Deposition for SSUMF 95, but the middle page

9   was erroneously omitted from the excerpts provided to the Court in Plaintiff's

10   opposition papers.  Defendant is providing it as indicated on page 6 and footnote 5

11   of Defendants' Reply to Plaintiff's Opposition to Motion For Summary Judgment.

12      I affirm under penalty of perjury under the laws of the State of California and

13   of the United States that the foregoing information is true and correct of my own

14   knowledge and that this declaration is being executed on this <u>2nd</u> day of February

15   2016.


17                    s/DOUGLAS E. BAXTER

18                    Douglas E. Baxter



SD2014707454

28                                        2

DECL. OF DOUGLAS E. BAXTER IN SUPPORT OF DEFS.' REPLY TO PLNT.'S OPP. TO
DEFS.' MOTION FOR SUMMARY JUDGMENT  (14-cv-01749-GPC (DHB))

AER 033

EXHIBIT A

Volume II             **Confidential - Pursuant to Protective Order**
Sergio Flores                                Gregoire vs. California Highway Patrol

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4
     JACOB GREGOIRE,
5

6               Plaintiff,
                                    Case No.:
7               vs.                 14-cv-1749-GPC(DHB)

8    CALIFORNIA HIGHWAY PATROL, an
     agency of the State of
9    California; SERGIO FLORES, and
     DOES 1 to 20,
10
                Defendants.
11

12   _____

13

14       VIDEOTAPED DEPOSITION OF SERGIO FLORES

15              SAN DIEGO, CALIFORNIA

16           TUESDAY, NOVEMBER 10, 2015

17      VOLUME II, PAGES 93 through 189, INCLUSIVE,

18

19

20

21

22

23   Reported By:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No.: 10020170

**CERTIFIED ORIGINAL**

**Page 93**

Volume II                          Confidential - Pursuant to Protective Order
Sergio Flores                                          Gregoire vs. California Highway Patrol

1    Q.    Okay.  There were two injured people at the

2    scene, correct, when you arrived?

3    A.    I believe there was one -- well, there were

4    two occupants.  I believe one of them was the one that

5    was injured.  I don't believe the other one was injured.

6    Q.    Is it your recollection that two people were

7    actually put on gurneys and taken from the scene because

8    of the rollover incident?

9    A.    I don't recall.  I don't remember if I was

10    even there when they were transported.

11    Q.    Okay.  So sitting here today, you have no

12    information as to how many people were injured in the

13    rollover?

14    A.    I --

15          MR. WOLFE:  Misstates his testimony.

16    BY MR. LUNEAU:

17    Q.    If you know.

18    A.    I believe there was one person that was

19    injured, and the other person was not injured.  I

20    remember having to go to the hospital later on and found

21    out that only -- there was only one injury.

22    Q.    Okay.  So your information is, is that -- let

23    me back up.

24          How many people in the car collision were

25    taken away on gurneys, if you know?

Page 121

Volume II                     **Confidential - Pursuant to Protective Order**
Sergio Flores                                    Gregoire vs. California Highway Patrol

```
 1   STATE OF CALIFORNIA )
                         )
 2   COUNTY OF SAN DIEGO )

 3

 4        I, Linda E. Marquette, a Certified Shorthand

 5   Reporter, do hereby certify:

 6        That prior to being examined, the witness in the

 7   foregoing proceedings was by me duly sworn to testify to

 8   the truth, the whole truth, and nothing but the truth;

 9        That said proceedings were taken before me at the

10   time and place therein set forth and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision;

13        I further certify that I am neither counsel for,

14   nor related to, any party to said proceedings, nor in

15   anywise interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my

17   name.

18

19

20   Dated: November 20, 2015

21

22   _____
     Linda E. Marquette
23   RPR, CLR, CSR No. 11874,

24

25
```

**Page 185**

1  KAMALA D. HARRIS
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  DOUGLAS E. BAXTER
   Deputy Attorney General
4  State Bar No. 201351
    600 West Broadway, Suite 1800
5  San Diego, CA 92101
   P.O. Box 85266
6  San Diego, CA 92186-5266
   Telephone:  (619) 645-2034
7  Fax:          (619) 645-2012
   E-mail:  Douglas.Baxter@doj.ca.gov
8  *Attorneys for Defendants State of California*
   *(by and through the California Highway*
9  *Patrol) and Sergio Flores*

10           **IN THE UNITED STATES DISTRICT COURT**

11         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

| | |
|---|---|
| 14  JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
| 15                    Plaintiff, | **DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE OFFERED IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 16         v. | |
| 17 | |
| 18  CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | |
| 19 | Date:        February 19, 2016 |
| 20                    Defendants. | Time:        1:30 p.m. |
| | Courtroom: 2D |
| 21 | Judge:       The Honorable Gonzalo P. Curiel |

22  **I.      DECLARATION OF ROGER CLARK**

23          The Declaration of Roger Clark was filed under seal.  ECF Docs. 39 & 40.

24  Therefore, the specific testimony or document at issue will not be quoted below;

25  rather, it will be cited by page, line numbers, and exhibit numbers.  As noted in the

26  Defendants' Reply Memorandum, all of Clark's opinions are insufficient to create a

27  genuine issue of material fact on the officers' conclusions at the scene as to the

28

                                              1

AER 038

1   reasonableness of their conduct. *City and County of San Francisco v. Sheehan*, ___

2   U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189

3   (9th Cir. 2002).

4

| TESTIMONY/<br>DOCUMENT | OBJECTIONS |
|---|---|
| 1.  Clark Decl., p. 3, lns. 8-11 and entirety of Exhibit 1 to Clark Decl. | 1(a)  Clark's cited information and Exhibit 1 are irrelevant.  Fed. R. Evid. 401 & 402.<br><br>____  Sustained<br><br>____  Overruled |
| | 1(b)  Clark's cited information and Exhibit 1 constitute improper character evidence.  Fed. R. Evid. 404(a) & (b); *Hudson v. Dist. Of Columbia*, 558 F.3d 526, 532 (D.C. Cir. 2009).<br>____  Sustained<br><br>____  Overruled |
| | 1(c)  Material is inadmissible hearsay, and expert witness cannot serve as backdoor conduit to admit such hearsay. Fed. R. Evid. 801 & 802;  *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-1262 (9th Cir. 1984); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir. 1995).<br>____  Sustained<br><br>____  Overruled |
| 2.  Information in Clark Decl., p. 3, lns. 12-13.  No document is attached, but, even it was, it would be subject to same objections as the cited information. | 2(a)  Irrelevant.  Fed. R. Evid. 401 & 402.<br>____  Sustained<br><br>____  Overruled |
| | 2(b)  Improper character evidence.  Fed. R. Evid. 404(a) & (b); *Hudson v. Dist. Of Columbia*, 558 F.3d 526, 532 (D.C. Cir. 2009).<br>____  Sustained<br><br>____  Overruled |

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION
TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| | 2(c)  The material is inadmissible hearsay, and expert witness cannot serve as backdoor conduit to admit such hearsay.  Fed. R. Evid. 801 & 802;  *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-1262 (9th Cir. 1984); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir. 1995). <br><br> ____ Sustained <br><br> ____ Overruled |
| 3.  All information referenced by Clark on page 3, lines 17-28 and page 4, lines 1-2; also, all documents attached as Exhibit 2 to Clark Decl. | 3(a) Clark's cited information and all of Exhibit 2 are irrelevant.  Fed. R. Evid. 401 & 402. <br><br> ____ Sustained <br><br> ____ Overruled |
| | 3(b)  Clark's cited information and all of Exhibit 2 are improper character evidence.  Fed. R. Evid. 404(a) & (b); *Hudson v. Dist. Of Columbia*, 558 F.3d 526, 532 (D.C. Cir. 2009) <br><br> ____ Sustained <br><br> ____ Overruled |
| | 3(c)  The material is inadmissible hearsay, and expert witness cannot serve as backdoor conduit to admit such hearsay.  *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-1262 (9th Cir. 1984); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir. 1995). <br><br> ____ Sustained <br><br> ____ Overruled |

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

AER 040

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 4. Clark's opinion at page 4, lines 3-4. | 4(a)  This is a new opinion not previously disclosed. Fed. R. Civ. Proc. 37(c)[1].  Therefore, there was no prior opportunity to raise *Daubert* objections prior to these objections.  Improper expert opinion.  Fed. R. Evid.  702 & 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993);  *Guidroz-Boult v. Missouri Pacific R. Co.,* 254 F.3d 825, 829 (9th Cir. 2001); based on speculation and conjecture; lacks foundation and reliability; Clark lacks qualifications and factual predicates to render the opinion.<br><br>____ Sustained<br><br>____ Overruled |
|  | 4(b)  Improper character evidence.  Fed. R. Evid. 404(a) & (b); *Hudson v. Dist. Of Columbia*, 558 F.3d 526, 532 (D.C. Cir. 2009).<br><br>____ Sustained<br><br>____ Overruled |
|  | 4(c)  Irrelevant.  Fed. R. Evid. 401 & 402.<br><br>____ Sustained<br><br>____ Overruled |
| 5.  Clark's opinions in paragraph 10 of his declaration regarding scene danger and patient care. | 5.  Irrelevant.  Fed. R. Evid. 401 & 402; *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); lacks foundation; Clark is no more qualified than officers on scene to make this assessment and his after-the-fact assessment does not create genuine dispute as to the reasonableness of their conclusions at the time.<br><br>____ Sustained<br><br>____ Overruled |

---

[1] Defendants reserve all Rule 37(c) objections to new opinions offered in Mr. Clark's declarations.

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

AER 041

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 6.  Clark's opinion in paragraph 11 of his declaration. | 6(a)  Irrelevant.  Fed. R. Evid. 401 & 402; *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); lacks foundation; Clark is no more qualified than officers on scene to make this assessment and his after-the-fact opinion does not create genuine dispute as to the reasonableness of their conclusions at the time.<br><br>____  Sustained<br><br>____  Overruled |
| | 6(b)  Improper legal conclusion.  *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 & 1059 (9th Cir. 2008).<br><br>____  Sustained<br><br>____  Overruled |
| 7.  Clark's opinion in paragraph 12 of his declaration. | 7(a)  Improper expert opinion.  Fed. R. Evid.  702 & 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993); *Guidroz-Boult v. Missouri Pacific R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); based on speculation and conjecture; lacks foundation and reliability<br><br>____  Sustained<br><br>____  Overruled |
| | 7(b)  Irrelevant.  Fed. R. Evid. 401 & 402; *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); also irrelevant because overbroad and lacks foundation; generalized opinion not specific to any circumstances; incomplete hypothetical.<br><br>____  Sustained<br><br>____  Overruled |

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 8. Clark's opinion in paragraph 13 of his declaration. | 8  Improper legal conclusion.  *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 & 1059 (9th Cir. 2008); also irrelevant (Fed. R. Evid. 401 & 402) because overbroad and lacks foundation; generalized opinion not specific to any circumstances; incomplete hypothetical.<br><br>____ Sustained<br><br>____ Overruled |
| 9. Clark's opinions in paragraph 14 and 15 regarding whether truck should be moved, protection priorities, and scene issues. | 9  Irrelevant.  Fed. R. Evid. 401 & 402; *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); lacks foundation; Clark is no more qualified than officers on scene to make this assessment and his after-the-fact opinion does not create genuine dispute as to the reasonableness of their conclusions at the time.<br><br>____ Sustained<br><br>____ Overruled |
| 10.  All factual information relayed by Clark in paragraphs 10, 14-20 of his declaration. | 10(a)  The material is inadmissible hearsay, and expert witness cannot serve as backdoor conduit to admit such hearsay.  *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-1262 (9th Cir. 1984); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir. 1995).<br><br>____ Sustained<br><br>____ Overruled. |
| | 10(b)  Clark lacks personal knowledge.  Fed. R. Evid. 602; Fed. R. Civ. Proc. 56(c)(4).<br><br>____ Sustained<br><br>____ Overruled. |

6

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

AER 043

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 11. Clark's opinions in paragraphs 18 - 20. | 11. Irrelevant. Fed. R. Evid. 401 & 402; *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); lacks foundation; Clark is no more qualified than officers on scene to make this assessment and his after-the-fact opinion does not create genuine dispute as to the reasonableness of their conclusions at the time.<br><br>____ Sustained<br><br>____ Overruled |
| 12. Clark's information in paragraphs 21 – 24. | 12(a) Irrelevant. Fed. R. Evid. 401 & 402; see *Michigan v. DeFillipo*, 443 U.S. 31, 36 (1979).<br><br>____ Sustained<br><br>____ Overruled. |
| | 12(b) The material is inadmissible hearsay, and expert witness cannot serve as backdoor conduit to admit such hearsay. *Paddock v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-1262 (9th Cir. 1984); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 533 (7th Cir. 1995).<br><br>____ Sustained<br><br>____ Overruled. |
| | 12(c) Clark lacks personal knowledge. Fed. R. Evid. 602; Fed. R. Civ. Proc. 56(c)(4).<br><br>____ Sustained<br><br>____ Overruled. |

/ / /

/ / /

/ / /

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

AER 044

1

## II.   Justin Hutton Declaration

2

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 1.  Hutton Decl., p. 7, lns. 12-13: "The Latino CHP officer never consulted with any firemen or EMTs about the status of patient care before affecting this arrest." | 1  Lacks foundation, insufficient facts to show personal knowledge of what CHP officers did during entirety of incident. Fed. R. Evid. 602; Fed. R. Civ. Proc. 56(c)(4). <br><br> ____ Sustained <br><br> ____ Overruled |
| 2.  Hutton Decl., p. 2, ¶ 9, lns. 24-25: "I have been an EMT for three years and estimate that I have been on hundreds of calls and have never seen anything like this before." | 2.  Irrelevant.  Fed. R. Evid. 401 & 402. <br><br> ____ Sustained <br><br> ____ Overruled |

16

17

## III.   Joshua Rees Declaration

18

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| 1.  Rees Decl., p. 2, ¶ 6: "I was shocked to see this occur.  I have been a Firefighter/ Emergency Medical Technician for over 15 years and been to over 400 similar injury calls and have never seen a peace officer obstruct and delay patient care like the officer who | 1  Irrelevant.  Fed. R. Evid. 401 & 402. <br><br> ____ Sustained <br><br> ____ Overruled |

8

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION
TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

AER 045

| TESTIMONY/ DOCUMENT | OBJECTIONS |
|---|---|
| arrested Jacob Gregoire." | |
| 2. Rees Decl., p. 2, ¶ 7, lns. 17-18: "The patient himself stated, 'Are you going to fucking leave me here? Are you?'" | 2(a)  Irrelevant.  Fed. R. Evid. 401 & 402. <br> ____  Sustained <br> ____  Overruled <br><br> 2(b)  Inadmissible hearsay.  Fed. R. Evid. 801 & 802. <br><br> ____  Sustained <br><br> ____  Overruled |
| 3. Rees Decl., p. 2, ¶ 7, lns. 20-22: "Equally troubling was the fact that the CHP officer never consulted with any of the paramedics or firefighters/EMTs prior to arresting Jake Gregoire." | 3.  Lacks foundation, insufficient facts to show personal knowledge of what CHP officers did during entirety of incident.  Fed. R. Evid. 602; Fed. R. Civ. Proc. 56(c)(4). <br><br> ____  Sustained <br><br> ____  Overruled |

Dated:  February 2, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
RICHARD F. WOLFE
Supervising Deputy Attorney General

s/Douglas E. Baxter
DOUGLAS E. BAXTER
Deputy Attorney General
*Attorneys for Defendants State of California (by and through the California Highway Patrol) and Sergio Flores*

SD2014707454
81257670.doc

9

DEFS.' OBJECTIONS TO PLNT.'S EVIDENCE OFFERED IN SUPPORT OF OPPOSITION
TO DEFS.' MOTION FOR SUMMARY JUDGMENT (14-cv-01749-GPC (DHB))

1  Daniel M. Gilleon (SBN 195200)
   *dmg@mglawyers.com*
2  Steve Hoffman (SBN 237466)
   *shoffmanlaw@gmail.com*
3  **THE GILLEON LAW FIRM**
   1320 Columbia Street, Suite 200
4  San Diego, CA 92101
   Tel: (619) 702-8623/Fax: (619) 702-6337
5
   David S. Casey, Jr., SBN 060768
6  *dcasey@cglaw.com*
   Thomas D. Luneau, SBN 145804
7  *tdl@cglaw.com*
   **CASEY GERRY SCHENK**
8  **FRANCAVILLA BLATT & PENFIELD, LLP**
   110 Laurel Street
9  San Diego, CA  92101
   Tel: (619) 238-1811/Fax: (619) 544-9232
10
11 Attorneys for Plaintiff Jacob Gregoire
12
13              **UNITED STATES DISTRICT COURT**
14            **SOUTHERN DISTRICT OF CALIFORNIA**
15

| | |
|---|---|
| 16 JACOB GREGOIRE, | CASE NO. 14-cv-1749-GPC (DHB) |
| 17          Plaintiff, | Judge:  Hon. Gonzalo P. Curiel<br>Dept:  2D |
| 18 v. | **PLAINTIFF'S SEPARATE** |
| 19 CALIFORNIA HIGHWAY PATROL, an<br>agency of the State of California; | **STATEMENT OF UNDISPUTED**<br>**MATERIAL FACTS IN OPPOSITION** |
| 20 SERGIO FLORES, and DOES 1 to 20, | **TO DEFENDANTS' MOTION FOR**<br>**SUMMARY JUDGMENT, OR, IN** |
| 21          Defendants. | **THE ALTERNATIVE, SUMMARY**<br>**ADJUDICATION OF CLAIMS** |
| 22 | |
| 23 | Date: February 19, 2016<br>Time: 1:30 p.m. |
| 24 | |

25          Plaintiff, JACOB GREGOIRE, submits the following Separate Statement of

26 Undisputed Material Facts and reference to supporting evidence in opposition to

27 Defendants' Motion for Summary Judgment, or in the alternative, Summary

28 Adjudication of Claims:

558                                    1                        14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 047

## I.   ISSUE 1: THE FIRST CAUSE OF ACTION UNDER 42 U.S.C. § 1983 FOR UNLAWFUL ARREST UNDER THE FOURTH AMENDMENT

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1.  During the evening of February 4, 2014, Officer Eliazar Colunga was on duty for the C-watch (5:00 p.m. to 5:30 a.m.) in his employment as a California Highway Patrol (CHP) patrol officer.<br><br>Declaration of Eliazar Colunga in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims [hereafter "Colunga Decl."], p. 1, ¶¶ 1-2. | 1.  Undisputed. |
| 2.  During this time period, Officer Colunga was wearing a tan CHP uniform that bore CHP patches identifying him as a law enforcement officer.<br><br>Colunga Decl., p. 1, ¶ 2. | 2.  Undisputed. |
| 3.  As of the date of February 4, 2014, Officer Colunga had been a CHP patrol officer for approximately 17 years.<br><br>Colunga Decl., p. 1, ¶ 1. | 3.  Undisputed. |
| 4.  During the evening of February 4, 2014, Defendant Officer Sergio Flores was on duty for the C-watch (5:00 p.m. to 5:30 a.m.) in his employment as a California Highway Patrol (CHP) patrol officer.<br><br>Declaration of Sergio Flores in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims [hereafter "Flores Decl."], p. 1, ¶¶ 1-2. | 4.  Undisputed. |
| 5.  During this time period, Officer Flores was wearing a tan CHP uniform that bore CHP patches identifying him as a law enforcement officer.<br><br>Flores Decl., pp. 1-2, ¶ 2. | 5.  Undisputed. |
| 6.  Officer Flores has been a CHP patrol officer since July 1994.<br><br>Flores Decl., p. 1, ¶ 1. | 6.  Undisputed, but plaintiffs' police tactics expert Roger Clark in his declaration indicates there is personnel records that indicate poor judgment, excessive force, and |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 048

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | improper heavy-handed contact with citizens. |
| 7.  Just before 9:30 p.m., Officer Colunga responded to a radio call regarding an overturned vehicle in the area of Interstate 805 and Telegraph Canyon Road.  Colunga Decl., p. 2, ¶ 3. | 7.  Undisputed. |
| 8.  The collisions occurred in the northbound lanes of the I-805, and the vehicle to which Officer Colunga was responding came to rest in a wide construction area between cement k-rail walls that separated the northbound and southbound lanes.  Colunga Decl., p. 2, ¶ 3. | 8.  Undisputed. |
| 9.  Officer Colunga saw no other on-duty emergency responders at the scene when he arrived and parked his patrol car south of the collision in the center construction area (and out of traffic lanes), where the k-rails on the southbound side ended and the center construction area was accessible.  Colunga Decl., p. 2, ¶ 3. | 9.  Undisputed. |
| 10.  Based on his training and experience over nearly 17 years as a CHP Officer, Officer Colunga believed that, as the law enforcement officer on scene, he was the Incident Commander when he arrived.  Colunga Decl., p. 2, ¶ 4. | 10.  Undisputed, but also, Fire Captain Albright radioed in that he was incident commander (IC).  Deposition of Captain David Albright (hereinafter "Albright depo."), pp. 66:10 and 66:18. |
| 11.  Officer Colunga approached the overturned vehicle and made contact with two civilians (one of whom was an off-duty Emergency Medical Technician [EMT]) who had come upon the accident scene after the accident but before Officer Colunga arrived.  Colunga Decl., p. 2, ¶ 5. | 11.  Undisputed. |
| 12.  Officer Colunga observed that both of the occupants of the rollover vehicle were already out of the vehicle and that | 12.  Undisputed. |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| neither of them had required any extraction equipment or on-duty emergency personnel to get them out of the vehicle.<br><br>Colunga Decl., p. 2, ¶ 5. | |
| 13.  Officer Colunga saw that both of the occupants of the rollover vehicle were conscious, with one lying on the ground and the other standing.  During the evening, Officer Colunga was able to communicate with the two occupants.<br><br>Colunga Decl., p. 2, ¶ 5. | 13.  Undisputed. |
| 14.  Seeing that the off-duty EMT was holding the head of the person on the ground in C-spine position and was without equipment, Officer Colunga went to his vehicle to retrieve a first aid bag that would have a C-spine collar.<br><br>Colunga Decl., p. 2, ¶ 5. | 14.  Undisputed. |
| 15.  On the way to his patrol car, Officer Colunga saw an ambulance from American Medical Response (AMR) arrive and park in the center construction area just south of Officer Colunga's patrol car and out of traffic lanes.  The ambulance had its emergency lights activated.<br><br>Colunga Decl., pp. 2-3, ¶ 6; Deposition of Jacob Gregoire [hereafter Gregoire Depo.][1], p. 25, ln. 2 through p. 26, ln. 2; p. 26, ln. 17 through p. 27, ln. 21. | 15.  Disputed.  Captain Albright of the fire department testified that the AMR ambulance was 2-3 feet into the number 1 southbound lane.<br><br>Albright depo., pp. 64:1-65:2. |
| 16.  Seeing the ambulance crew walking to the rollover vehicle with their gear, Officer Colunga determined that it was not necessary for him to retrieve a first aid bag.<br><br>Colunga Decl., p. 3, ¶ 7 | 16.  Undisputed. |

---

[1] Excerpts of the Gregoire Transcript are attached as Exhibit A to the Declaration of Douglas E. Baxter in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication of Claims.  All citations to transcript pages are to the pages in the original transcript.

558                                          4                        14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 050

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 17. Officer Colunga saw three people from the AMR ambulance, and, at the time, he believed all three were paramedics. He did not learn until well after the events of the evening that two of them were paramedics and one was an EMT.<br><br>Colunga Decl., p. 3, ¶ 7. | 17. Undisputed. |
| 18. Based on the presence of the ambulance crew, Officer Colunga concluded that sufficient medical care was now on scene for the two occupants of the rollover vehicle, so he moved on to engage in other scene management and investigation activities.<br><br>Colunga Decl., p. 3, ¶ 7. | 18. Disputed. Independent witness Autumn Mitchell in her declaration stated that no CHP officer at the scene ever asked about the condition of the patients or consulted about how long the firemen were going to need to help the two patients.<br><br>Decl. of Autumn Mitchell, p. 2:13-15. |
| 19. Based on his training and experience as a CHP Officer, Officer Colunga considers a CHP Officer's responsibilities as an Incident Commander at a traffic scene to include assessing the entire scene, making sure that medical care has been summoned for any potentially injured parties, making sure that the people on scene (civilians and first responders) are safe and not in the way of traffic or in any type of hazard. He considers CHP Officers to be responsible for managing the entire scene, which includes controlling where equipment and personnel are located so as to minimize safety hazards to those on scene and to the motoring public nearby or approaching the scene.<br><br>Colunga Decl., p. 3, ¶ 8. | 19. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 20. Soon after the ambulance arrived, fire trucks began arriving. Officer Colunga saw Chula Vista Engine 52 arrive and park in the number 1 lane on the southbound side.<br><br>Colunga Decl., p. 3, ¶ 8; Gregoire Depo., p. 26, lns. 6-9; p. 86, lns. 18-21. | 20. Undisputed. Additional Fact is Firefighter/EMT Jacob Gregoire, Fire Captain Albright and Firefighter/EMT Joshua Rees were on board.<br><br>Rees Decl. p. 1. ¶ 3 |
| 21. Two other fire trucks arrived within short succession and parked behind Engine 52, blocking the number 1 and 2 | 21. Undisputed. |

558                                    5                      14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 051

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| lanes (the lanes closest to the center of the southbound roadway).  A fourth fire truck also came to the scene.<br><br>Colunga Decl., p. 3, ¶ 9. | |
| 22.  Because he believed that the patients were being attended to by paramedics and that there was no collision scene in traffic lanes, Officer Colunga became concerned about fire trucks blocking traffic lanes.<br><br>Colunga Decl., p. 3, ¶ 10. | 22.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 23.  Officer Colunga believed that there were sufficient medical personnel to tend to the patients, that too many fire crews were on scene, and that the trucks should be moved out of lanes.<br><br>Colunga Decl., pp. 3-4, ¶  10. | 23.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005) and not a material fact FRCP 56(c). |
| 24.  Officer Colunga talked to crew members from two trucks and explained that they were not needed and should leave the scene and return to their stations.  These two trucks left the scene within a few minutes.<br><br>Colunga Decl., p. 4, ¶ 10. | 24.  Objection.  Irrelevant FRE 402, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 25.  Officer Colunga subsequently had conversations with members of the other two fire crews to ask them to move their trucks to the center median.<br><br>Colunga Decl., p. 4, ¶ 10 | 25.  Objection.  Irrelevant FRE 402, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 26.  Officer Colunga was concerned about unnecessary placement of fire trucks in traffic lanes, as CHP Officers are taught by CHP, and he also knows from his own personal experience in responding to other traffic accidents, that secondary accidents at collision scenes are a serious risk to the motoring public.<br><br>Colunga Decl., p. 4, ¶ 10; Declaration of Captain Albright [hereafter Albright Depo.][2] p. | 26.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |

_____

[2] Excerpts of the Albright Deposition Transcript are attached as Exhibit B to the Declaration of Douglas E.

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 052

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24] | |
| 27. Officer Colunga knew and believed that placement of emergency equipment at collision scenes creates a serious risk of causing secondary accidents among other motorists approaching the scene.<br><br>Colunga Decl., p. 4, ¶ 10; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. | 27. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 28. Officer Colunga knew and believed that an important part of CHP Officers' duties as incident managers is to take appropriate steps to eliminate possible causes of secondary accidents.<br><br>Colunga Decl., p. 4, ¶ 10. | 28. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 29. For this particular scene, Officer Colunga's analysis of why he believed the placement of the fire trucks was causing a risk of secondary vehicle accidents that could harm the public included the observation that there were four southbound lanes in the immediate area.<br><br>Colunga Decl., p. 4, ¶ 11. | 29. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 30. Officer Colunga's analysis of the risk of secondary accidents also included the observation that, north of the scene, there were no shoulders in the southbound lanes because of the cement k-rail running adjacent to the inner edge of the number 1 lane.<br><br>Colunga Decl., p. 4, ¶ 11. | 30. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 31. Officer Colunga's analysis of the risk of secondary accidents also included the observation that the trucks were blocking the number 1 lane and approximately one-half of the number 2 lane for southbound traffic. | 31. Objection. Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |

Baxter in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication of Claims. All citations to transcript pages are to the pages in the original transcript.

558                                    7                          14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 053

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Colunga Decl., p. 4, ¶ 11. | |
| 32.  Officer Colunga's analysis of the risk of secondary accidents also included the observation that, north of the collision scene, there is a crest in the roadway.  Officer Colunga perceived that this would prevent southbound traffic from having a direct line of sight to see the fire trucks from a long distance.  Officer Colunga believed there was a short distance between the point where cars would come over the crest and the point where the first trucks were stopped, which would not allow a lot of reaction time for southbound vehicles that could be approaching the scene at high speeds.  Colunga Decl., p. 4, ¶ 11. | 32.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 33.  Officer Colunga's analysis of the risk of secondary accidents also included the knowledge that, on a freeway such as the I-805, vehicles typically travel at high rates of speed.  Colunga Decl., p. 4, ¶ 11. | 33.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 34.  Officer Colunga's analysis of the risk of secondary accidents also included the knowledge that, particularly at the beginning of his time at the scene, he could hear people locking their brakes as they approached the scene.  Colunga Decl., p. 4, ¶ 11. | 34.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 35.  Based on his observations at the scene, Officer Colunga formed the opinion that there was a significant risk of secondary collisions from the placement of fire trucks in the lanes.  Colunga Decl., p. 4, ¶ 11. | 35.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 36.  Officer Colunga also perceived that the collision scene was enclosed in the construction area, with cement k-rails blocking off the scene from southbound and northbound traffic.  Colunga Decl., pp. 4-5, ¶ 11; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to | 36.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 054

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Gregoire Depo. | |
| 37.  Officer Colunga determined that there was no debris from the collision in the southbound lanes, as no part of the collision occurred there.<br><br>Colunga Decl., p. 5, ¶ 11. | 37.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 38.  Based on his training and experience and assessment of the scene, Officer Colunga formed the opinion (at the traffic scene) that the placement of the fire trucks in lanes was creating a serious risk to the motoring public without apparent reason.<br><br>Colunga Decl., p. 5, ¶ 11. | 38.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 39.  Based on his analysis and conclusions, Officer Colunga wanted the fire trucks moved out of lanes for public safety, and this was the reason that he asked the crews to move the trucks out of lanes.<br><br>Colunga Decl., p. 5, ¶ 12. | 39.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 40.  Despite his requests to the remaining two Chula Vista Fire crews to move their trucks, the trucks were not moved.<br><br>Colunga Decl., p. 5, ¶ 12. | 40.  Objection.  Irrelevant FRE 402, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material face FRCP 56(c). |
| 41.  After making his initial requests, Officer Colunga went back to the overturned vehicle to try to gather some information from one of the victims.<br><br>Colunga Decl., p. 5, ¶ 12. | 41.  Disputed.  Autumn Mitchell, an independent witness at the scene, in her declaration said that no CHP officer ever came to assess the victims.<br><br>Decl. of Autumn Mitchell, p. 2:13-15. |
| 42.  Officer Colunga subsequently noticed that the two fire trucks were still parked in lanes, so he went back to speak to the fire crews again and request that they move the fire trucks.<br><br>Colunga Decl., p. 5, ¶ 12. | 42.  Disputed.  Autumn Mitchell, an independent witness at the scene, in her declaration said that no CHP officer ever came to assess the victims.<br><br>Decl. of Autumn Mitchell, p. 2:13-15. |
| 43.  It was at this point that Officer Colunga saw Officer Sergio Flores walk up to where Officer Colunga was standing with the fire fighters, close enough to where, in Officer Colunga's opinion, Officer Flores could have | 43.  Undisputed, but irrelevant as to what Colunga believed Flores could hear, not a material fact FRCP 56(c). |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| overheard the conversation. Colunga Decl., p. 5, ¶ 12. | |
| 44.  Officer Colunga wanted the fire crews to move the fire trucks when he asked them to do so, and he expected them to comply with his requests.  They did not move the fire trucks in response to his requests. Colunga Decl., p. 5, ¶ 13. | 44.  Objection.  Irrelevant FRE 402, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material face FRCP 56(c). |
| 45.  Since this collision scene was on Officer Flores' beat, Officer Colunga knew that Officer Flores was taking over Officer Colunga's role as Incident Commander (i.e., in charge of scene management) once Officer Flores arrived. Colunga Decl., p. 5, ¶ 14. | 45.  Disputed.  Fire Captain Albright was Incident Commander upon his arrival at the scene. Albright Depo., pp. 65:21-66:21. |
| 46.  Prior to Engineer Gregoire's arrest, Officer Colunga never witnessed Engineer Gregoire engaging in activities that Officer Colunga perceived to constitute patient care; instead, prior to the arrest, Officer Colunga saw Engineer Gregoire standing with a group of fire fighters in the center median area.  At this time, Engineer Gregoire did not appear to Officer Colunga to be assisting in patient care. Colunga Decl., p. 5, ¶ 15. | 46.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 47.  At no time did Officer Colunga see a fire, see smoke, smell smoke, see or smell any leaking gas from the overturned vehicle, see any movement in the overturned vehicle, see any sparking near the overturned vehicle, or detect any other indications that there was a likelihood of fire occurring at the scene. Colunga Decl., pp. 5-6, ¶ 16. | 47.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |
| 48.  At this scene, Officer Colunga did not form a belief that it would be necessary for the fire trucks to remain blocking lanes in order to protect the pathway of the ambulance when it came | 48.  Objection.  Irrelevant FRE 402, opinion testimony by laywitness FRE 701, see also *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005), and not a material fact FRCP 56(c). |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 056

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| time for it to leave the scene.<br><br>Colunga Decl., p. 6, ¶ 17. | |
| 49.  Officer Flores initially became involved in the rollover collision at approximately 9:30 p.m., when he heard radio traffic regarding a collision on Interstate 805, just south of Telegraph Canyon Road.<br><br>Flores Decl., p. 2, ¶ 3. | 49.  Undisputed. |
| 50.  After clearing a traffic stop in Mission Valley, Officer Flores began driving southbound on the I-805 to respond to the accident scene.<br><br>Flores, Decl., p. 2, ¶ 3. | 50.  Undisputed. |
| 51.  Since the accident was in his beat area, Officer Flores's intent was to follow what he understood to be the normal practice amongst CHP Officers and respond to the collision scene to take over the collision investigation and take over as the incident manager (often referred to as Incident Commander).<br><br>Flores Decl., p. 2, ¶ 3. | 51.  Disputed.  Fire Captain Albright was Incident Commander upon his arrival at the scene.<br><br>Albright Depo., pp. 65:21-66:21. |
| 52.  Upon approaching the scene, Officer Flores perceived that traffic was backing up, so he began a traffic break to bring traffic approaching the scene in slowly.<br><br>Flores Decl., p. 2, ¶ 4. | 52.  Undisputed. |
| 53.  Officer Flores came upon a fire truck that was parked mostly in the number 1 lane (i.e., the lane closest to the center median) and partially into the number 2 lane.<br><br>Flores Decl., p. 2, ¶ 4. | 53.  Undisputed. |
| 54.  Where this fire truck was stopped, Officer Flores could see that there was a cement k-rail (also called a Jersey wall) immediately butting up against the east side of the southbound number 1 lane.  Thus, from the rear of the fire truck and proceeding back (i.e., northbound) along the eastern edge of the southbound I-805 for a substantial distance, there was cement k-rail | 54.  Undisputed. |

558                                  11                      14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 057

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| abutting the number 1 lane.<br><br>Flores Decl., p. 2, ¶ 4. | |
| 55.  Because he saw the fire truck blocking the number 1 lane and part of the number 2 lane, Officer Flores initially believed that the accident must be located in the number 1 lane in front of the fire truck.<br><br>Flores Decl., p. 2, ¶ 5. | 55.  Undisputed, but also irrelevant FRE 402. |
| 56.  Officer Flores therefore stopped his patrol car approximately 100 feet behind this fire truck and proceeded to lay a flare pattern on the road, proceeding from the rear of his patrol vehicle in a diagonal pattern moving southbound toward the number 2 lane.<br><br>Flores Decl., p. 2, ¶ 5. | 56.  Undisputed. |
| 57.  As he moved his flare pattern close to the fire truck, Officer Flores saw that the actual collision scene was to his left in a construction area on the other side of the k-rails.  Officer Flores perceived that the collision scene was between cement k-rails that blocked off a large construction area between the northbound and southbound lanes.<br><br>Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo. | 57.  Undisputed. |
| 58.  Officer Flores concluded that the collision scene was not in any traffic lanes.<br><br>Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo. | 58.  Disputed.  Captain Albright testified that the AMR ambulance was within lane #1 and was protruding approximately 2-3 feet.<br><br>Albright Depo., pp. 64:1-65:2. |
| 59.  Officer Flores saw fire personnel, paramedics, and at least one of the people who had been involved in the collision near the vehicle in this center area. | 59.  Undisputed. |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 058

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl. | |
| 60. Officer Flores determined that the collision had occurred on the northbound side and that the vehicle had come to rest in the construction area.<br><br>Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo; Gregoire Depo., p. 50, ln. 20 through p. 51, ln. 19, and Ex. 4 to Gregoire Depo. | 60. Undisputed. |
| 61. Officer Flores saw paramedics providing medical care to the vehicle occupants.<br><br>Flores Decl., p. 3, ¶ 6. | 61. Undisputed.<br><br>Additional Facts: Flores did not consult with any medical personnel or firefighters about the status of patient care.<br><br>Hutton Decl. p. 2, ¶ 7. |
| 62. Very soon after completing his flare pattern, Officer Flores saw Officer Colunga (who had arrived before Officer Flores) speaking to a group of firefighters.<br><br>Flores Decl., p. 3, ¶ 7. | 62. Undisputed. |
| 63. Officer Flores heard Officer Colunga asking the group why they had not yet moved their fire engine.<br><br>Flores Decl., p. 3, ¶ 7. | 63. Undisputed. |
| 64. Officer Flores heard Officer Colunga say that he had told them several times that they needed to move their fire engine.<br><br>Flores Decl., p. 3, ¶ 7. | 64. Undisputed. |
| 65. Officer Flores heard Officer Colunga state that the collision scene was safely within the construction area and that the truck was not providing any protection.<br><br>Flores Decl., p. 3, ¶ 7. | 65. Disputed. Captain Albright testified that the AMR ambulance was within the #1 lane of traffic approximately 2-3 feet.<br><br>Albright Depo., pp. 64:1-65:2. |
| 66. Based on his training and | 66. Objection. Opinion testimony FRE |

558                                    13                        14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 059

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| experience and his personal observations of the scene, Officer Flores formed the conclusion that having fire trucks parked in lanes was not necessary to protect the scene.<br><br>Flores Decl., p. 3, ¶ 8. | 701, also not a material fact FRCP 56(c). |
| 67. Based on his training and experience with having responded to and investigated multiple traffic collisions, Officer Flores formed the belief that the fire truck was presenting an unnecessary risk to the public.<br><br>Flores Decl., p. 3, ¶ 8. | 67. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 68. Officer Flores knew that CHP Officers were trained that part of their role in managing traffic scenes is to make sure that the placement of vehicles and equipment is done in such a way as to prevent the serious problem of secondary automobile collisions.<br><br>Flores Decl., p. 3, ¶ 8. | 68. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 69. Officer Flores knew that such accidents occur due to the motoring public's surprise and confusion resulting from suddenly encountering lane blockages from emergency equipment in roadways at accident scenes and that this is a particular risk on freeways, where traffic can come upon accident scenes at high speeds.<br><br>Flores Decl., pp. 3-4, ¶8; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. | 69. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 70. Clearing lanes at traffic scenes to protect the public is a key part of CHP Officers' responsibilities as traffic incident managers.<br><br>Flores Decl., p. 4, ¶ 8. | 70. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 71. Officer Flores knew that CHP Officers are responsible for managing the entire scene of a traffic accident to protect the safety of people present at the scene and to protect the motoring public near the scene. | 71. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Flores Decl., p. 4, ¶ 9. | |
| 72. Officer Flores's analysis of the scene management issues at this particular traffic scene also included his perception that the ambulance which had responded to treat patients was parked in the center median area and out of traffic lanes.<br><br>Flores Decl., p. 4, ¶ 9; Gregoire Depo., p. 25, ln. 2 through p. 26, ln. 2; p. 26, ln. 17 through p. 27, ln. 21. | 72. Disputed. Captain Albright of the fire department testified that the AMR ambulance was 2-3 feet into the number 1 southbound lane<br><br>Albright depo., pp. 64:1-65:2. |
| 73. Officer Flores' analysis of the scene management issues at this scene also included his realization that the collision did not occur in any southbound lanes, so there was no debris field in any southbound lanes.<br><br>Flores Decl., p. 4, ¶ 9. | 73. Undisputed. |
| 74. Officer Flores had made these observations by the time he was overhearing the conversation between Officer Colunga and the fire fighters.<br><br>Flores Decl., p. 4, ¶ 9. | 74. Undisputed. |
| 75. Officer Flores formed the belief that having fire trucks parked in lanes was posing a serious risk to the public and that this was not needed to protect the accident scene. He believed the accident scene to be fully shielded in a large center construction area by cement k-rail walls.<br><br>Flores Decl., p. 4, ¶ 9. | 75. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 76. Officer Flores' analysis of the scene management issues at this scene also included the fact that the truck he was trying to get to move was on the I-805, which is a freeway on which people commonly travel at high speeds.<br><br>Flores Decl., p. 4, ¶ 9. | 76. Objection. Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 77. Officer Flores was concerned about | 77. Objection. Opinion testimony FRE |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 061

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| vehicles approaching from the north at high speeds and unexpectedly coming upon stopped emergency vehicles without time to react.<br><br>Flores Decl., p. 4, ¶ 9. | 701, also not a material fact FRCP 56(c). |
| 78.  Officer Flores was concerned about secondary accidents occurring and additional people getting injured or killed.<br><br>Flores Decl., p. 4, ¶ 9; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. | 78.  Objection.  Opinion testimony FRE 701, also not a material fact FRCP 56(c). |
| 79.  Since he believed this to be his accident scene, Officer Flores assumed he was taking the role of managing the scene upon his arrival.<br><br>Flores Decl., p. 4, ¶ 10. | 79.  Objection.  Not a material fact FRCP 56(c). |
| 80.  In his efforts to get the truck moved, Officer Flores called out to a group of fire fighters and asked who was driving the truck.<br><br>Flores Decl., p. 4, ¶ 10. | 80.  Undisputed. |
| 81.  An Engineer (later identified as Jacob Gregoire) stated that he as driving the truck.<br><br>Flores Decl., p. 4, ¶ 10. | 81.  Undisputed. |
| 82.  Officer Flores directed Engineer Gregoire to move the truck.<br><br>Flores Decl., p. 4, ¶ 10. | 82.  Disputed.  Gregoire testified that he was told to go back to the station, not to move the truck from the freeway.<br><br>Gregoire Depo., pp. 66:14-67:8.<br><br>Gregoire Depo., Exhibit 2<br><br>Hutton Decl. p. 2, ¶ 7. |
| 83.  Engineer Gregoire stated that he was not going to move the truck.<br><br>Flores Decl., p. 4, ¶ 10. | 83.  Disputed.  Gregoire told the officer that he was helping patients at the scene.  He was told to move the fire truck off the freeway.  He was not told to move the truck and stay at the scene, but rather was told to leave the freeway and go back to the station.<br><br>Gregoire Depo., pp. 66:14-67:8. |

AER 062

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Gregoire Depo., Exhibit 2 |
| | Hutton Decl. p. 2, ¶ 7. |
| 84. Officer Flores told Engineer Gregoire that he was giving Engineer Gregoire a direct order to move his fire truck because Officer Flores believed it was causing a hazard.<br><br>Flores Decl., p. 4, ¶ 10. | 84. Disputed. Captain Albright testified that the ambulance was protruding 2-3 feet into the #1 lane of southbound I-805. Therefore, the fire truck was not a hazard, but rather was protecting the safety of people at the scene. Flores was delaying patient care as a result of his unlawful order to Gregoire to move the fire truck.<br><br>Albright Depo., pp. 64:1-65:2; Clark Decl.<br><br>Hutton Decl. p. 2, ¶ 7. |
| 85. Despite Officer Flores repeating the direction to move his truck, Engineer Gregoire continued to state that he would not move it.<br>Flores Decl., pp. 4-5, ¶ 10. | 85. Disputed. Firefighter EMT Gregoire stated he could not move his truck because he was in the process of patient care. Also, Gregoire was told to move his fire truck from the freeway.<br>Gregoire Depo., pp. 66:14-67:8.<br>Gregoire Depo., Exhibit 2<br>Hutton Decl. p. 2, ¶ 7. |
| 86. Officer Flores then stated that, if Engineer Gregoire did not move the fire truck, Officer Flores was going to arrest him for disobeying an order and for delaying the officers in their investigation.<br>Flores Decl., p. 5, ¶ 10. | 86. Disputed. Firefighter EMT Gregoire stated he could not move his truck because he was in the process of patient care. Also, Gregoire was told to move his fire truck from the freeway.<br>Gregoire Depo., pp. 66:14-67:8.<br>Gregoire Depo., Exhibit 2<br>Hutton Decl. p. 2, ¶ 7. |
| 87. Engineer Gregoire told Officer Flores to go ahead and arrest him. Engineer Gregoire refused to move the truck.<br>Flores Decl., p. 5, ¶ 10. | 87. Disputed. Firefighter EMT Gregoire stated he could not move his truck because he was in the process of patient care. Also, Gregoire was told to move his fire truck from the freeway.<br>Gregoire Depo., pp. 66:14-67:8.<br>Gregoire Depo., Exhibit 2<br>Hutton Decl. p. 2, ¶ 7. |
| 88. At this point, Officer Flores believed the following: that Engineer Gregoire was capable of driving the fire truck, that Engineer Gregoire was the | 88. Objection. Not a material fact FRCP 56(c). |

558                                17                      14-cv-1749-GPC (DHB)

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 063

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| driver of the fire truck, that Officer Flores had given Engineer Gregoire an order to move the truck pursuant to Officer Flores' duties to manage the traffic scene for public safety, that Engineer Gregoire was refusing to comply with that order despite several requests, that Officer Flores had warned Engineer Gregoire that he would be arrested if he did not comply, and that Engineer Gregoire was continuing to refuse to comply.<br><br>Flores Decl., p. 5, ¶ 11. | |
| 89.  Based on the circumstances, Office Flores formed the belief that Engineer Gregoire was in violation of California Penal Code § 148(a) and California Vehicle Code § 2800(a), believing that Engineer Gregoire was failing to follow Officer Flores' orders and was hindering/delaying Officer Flores' management and investigation of the accident scene.<br><br>Flores Decl., p. 5, ¶ 11. | 89.  Objection.  Not a material fact FRCP 56(c). |
| 90.  Officer Flores directed Engineer Gregoire to step over a k-rail (one that was between the two k-rails on the northbound and southbound sides of the center portion  of I-805).<br><br>Flores Decl., p. 5, ¶ 11. | 90.  Undisputed. |
| 91.  Engineer Gregoire stepped over the k-rail, and Officer Flores placed him under arrest.<br><br>Flores Decl., p. 5, ¶ 11. | 91.  Undisputed. |
| 92.  Officer Flores placed handcuffs on Engineer Gregoire's wrists and walked him back to Officer Flores' patrol car.<br><br>Flores Decl., p. 5, ¶ 11. | 92.  Undisputed. |
| 93.  Prior to arresting Engineer Gregoire, Officer Flores did not see | 93.  Disputed.  Firefighter EMT Gregoire |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 064

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Engineer Gregoire engaging in any activities that Officer Flores perceived to be patient care.<br><br>    Flores Decl., p. 6, ¶ 14. | was engaging in patient care.<br><br>Hutton Decl.; Mitchell Decl.; Rees Decl.; Gregoire Depo., pp. 66:10-66:13.<br><br>Gregoire Depo., Exhibit 2 |
| 94.  To Officer Flores, it appeared that Engineer Gregoire was standing with a group of other fire fighters while others were actually treating patients.  Still shots of new media video images of the scene demonstrate points just prior to the arrest where there were multiple fire fighters present, including a point just prior to Officer Flores calling out for the driver of the truck where Engineer Gregoire appeared to be standing in a group.<br><br>    Flores Decl., p. 6, ¶ 14; Albright Depo., p. 128, ln. 21 through p. 131, ln. 4, and Exhibit D to Albright Depo; Gregoire Depo., p. 96, ln. 24 through p. 99, ln. 24, and Exhibit 8 to Gregoire Depo. | 94.  Disputed.  Firefighter EMT Gregoire was engaging in patient care.<br><br>Hutton Decl.; Mitchell Decl.; Rees Decl.; Gregoire Depo., pp. 66:10-66:13.<br><br>Gregoire Depo., Exhibit 2 |
| 95.  Prior to ordering Engineer Gregoire to move the fire truck, Officer Flores was aware that the patients were being treated by paramedics from an ambulance.<br><br>    Flores Decl., p. 6, ¶ 14. | 95.  Disputed.  Officer Flores testified in his deposition that he did not know how many people were injured, further, that he did not know the extent of their injuries, and the independent witness Mitchell indicates that no CHP officer ever inquired about the status of the patients.<br><br>Flores Depo., pp. 120-122:15; Mitchell Decl. |
| 96.  Given his belief that the patients were being treated by paramedics, Officer Flores did not perceive a reason why Engineer Gregoire could not move his fire truck.<br><br>    Flores Decl., p. 6, ¶ 14;. | 96.  Objection.  Opinion testimony FRE 701, not a material fact FRCP 56(c).  Also, Flores testified at his deposition that the reason he arrested Gregoire so he would know what the consequences were for disobeying an order.<br><br>Flores Depo., pp. 148:20-149:7. |
| 97.  Officer Flores did not see any indication that Engineer Gregoire was engaged in any fire suppression activities, nor did Officer Flores perceive any signs of risk of fire at the scene so as to justify keeping the fire truck in its location.<br><br>    Flores Decl., p. 6, ¶ 14; | 97.  Undisputed. |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 065

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 98.  Engineer Gregoire and Captain Albright acknowledge they were not involved in fire suppression activities and did not perceive signs indicating a risk of the vehicle catching on fire.<br><br>Gregoire Depo., p. 34, ln. 7 through p. 35, ln. 20; Albright Depo., p. 134, ln. 9 through p. 136, ln. 25. | 98.  Undisputed. |
| 99.  Officer Flores' purpose in ordering Engineer Gregoire to move the fire truck was to eliminate a risk that Officer Flores believed it was posing to public safety.<br><br>Flores Decl., p. 6, ¶ 14. | 99.  Objection.  Opinion testimony FRE 701, not a material fact FRCP 56(c).  Also, Flores testified at his deposition that the reason he arrested Gregoire so he would know what the consequences were for disobeying an order.<br><br>Flores Depo., pp. 148:20-149:7.... |

## II.   ISSUE 2: THE SECOND CAUSE OF ACTION UNDER 42 U.S.C. § 1983 FOR EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT

| DEFENDANTS' ALLGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 100.  The force used in arresting Engineer Gregoire began with Officer Flores directing Engineer Gregoire to step over the k-rail, whereupon Officer Flores placed him under arrest.<br><br>Flores Decl., p. 5, ¶ 11. | 100.  Undisputed. |
| 101.  Officer Flores placed handcuffs on Engineer Gregoire's wrists and walked him back to Officer Flores' patrol car.<br><br>Flores Decl., p. 5, ¶ 11; Gregoire Depo., p. 69, ln. 21 through p. 70, ln. 24. | 101.  Undisputed. |
| 102.  In the course of searching Engineer Gregoire before placing him in the patrol car, Officer Flores double-locked the handcuffs.<br><br>Flores Decl., p. 5, ¶ 11. | 102.  Disputed.  Gregoire testified that when he asked Officer Flores to loosen the handcuffs, Officer Flores tightened the handcuffs.<br><br>Gregoire Depo., pp. 71:18-23. |
| 103.  The point in double locking the | 103.  Undisputed. |

558                                    20                          14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 066

| DEFENDANTS' ALLGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| handcuffs is to prevent the handcuffs from tightening.<br><br>Flores Decl., p. 5, ¶ 11. | |
| 104.  At no point did Officer Flores intentionally tighten the handcuffs on Engineer Gregoire.<br><br>Flores Decl., p. 5, ¶ 11. | 104.  Disputed.  Gregoire testified that when he asked Officer Flores to loosen the handcuffs, Officer Flores tightened the handcuffs.<br><br>Gregoire Depo., pp. 71:18-23. |
| 105.  Engineer Gregoire admits that his only two statements he claims to have made to Officer Flores regarding the handcuffs were to ask Officer Flores, in the moments just prior to being placed in the patrol car, whether Officer Flores could loosen the handcuffs.<br><br>Gregoire Depo., p. 71, ln. 14 through p. 74, ln. 18. | 105.  Undisputed. |
| 106.  Engineer Gregoire admits that Officer Flores never said anything like, "No, I'm not going to loosen them?" or "I'm going to tighten them."<br><br>Gregoire Depo., p. 74, lns. 19-24. | 106.  Undisputed. |
| 107.  Engineer Gregoire admits that he does not recall ever checking his wrists between the time of his release from the handcuffs to the next morning to see if there were any marks on his wrists.<br><br>Gregoire Depo., p. 75, lns. 3-11. | 107.  Disputed.  Gregoire testified that he does not recall whether he checked his wrists the following morning.<br><br>Gregoire Depo., pp. 75:3-11. |
| 108.  Engineer Gregoire admits that, between the time of his release from the handcuffs to the time of his deposition on September 16, 2015, he never took any photographs to document any marks that he believed to have been left on either of his wrists from the handcuffs.<br><br>Gregoire Depo., p. 75, lns. 18-23. | 108.  Undisputed. |
| 109.  Engineer Gregoire admits that he never sought any medical care from any type of medical provider for injuries that he attributes to the handcuffs. | 109.  Undisputed. |

558                                   21                    14-cv-1749-GPC (DHB)
PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 067

| DEFENDANTS' ALLGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Gregoire Depo., p. 75, ln. 24 through p. 76, ln. 2. | |
| 110.  Engineer Gregoire admits that he never showed his wrists to anyone after the point of being released to say, "Hey, look, I've got marks from the handcuffs."<br><br>Gregoire Depo., p. 76, lns. 3-7. | 110.  Undisputed. |
| 111.  The only pain that Engineer Gregoire claims to have encountered after the time the handcuffs were released was as follows: "I think they were sore on my walk back, but I had a lot of adrenaline going on from what had just happened, so I may have put it out of my mind at that time.  It was just a relief to have them off."<br><br>Gregoire Depo., p. 76, lns. 8-13. | 111.  Undisputed. |
| 112.  Engineer Gregoire admits that his wrists were not sore the next morning when he woke up.<br><br>Gregoire Depo., p. 76, lns. 14-16. | 112.  Undisputed. |
| 113.  Engineer Gregoire admits that, since the time he was released from the handcuffs up to the time of his September 16, 2015, deposition, he has not experienced any pain in either wrist where the handcuffs had been.<br><br>Gregoire Depo., p. 76, lns. 17-23. | 113.  Undisputed. |
| 114.  Engineer Gregoire admits that no part of his body was physically hurt as a result of Officer Flores' actions from the point of his first physical contact with Engineer Gregoire in the course of the arrest to the point where Engineer Gregoire was released from the vehicle and let go.<br><br>Gregoire Depo., p. 152, lns. 9-18, p. 158, lns. 5-9. | 114.  Undisputed. |
| 115.  Other than his claim that the handcuffs were too tight, Engineer Gregoire admits that Officer Flores did | 115.  Undisputed, but irrelevant as a matter of law, FRE 402, *Headwaters Forest Def. v. County of Humbolt*, 240 F.3d 1185, 1199 (9th |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 068

| DEFENDANTS' ALLGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| not engage in any activity that Engineer Gregoire believed to be improper use of force.<br><br>     Gregoire Depo., p. 157, ln. 25 through p. 158, ln. 4. | Cir. 2001). |
| 116.  Engineer Gregoire remained in custody for approximately 30 minutes before being released.<br><br>     Flores Decl., pp. 6- 7, ¶¶ 15 & 16. | 116.  Undisputed. |

AER 069

**III.    ISSUE 3: THE THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTION 52.1 (BASED ON ALLEGED FALSE ARREST)**

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 99 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | Please see plaintiffs' objections, disputed facts, case law, as well as additional facts above 1-116. |

**IV.    ISSUE 4: THE FOURTH CAUSE OF ACTION FOR BATTERY UNDER CALIFORNIA LAW**

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 116 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | Please see plaintiffs' objections, disputed facts, case law, as well as additional facts above 1-116. |

**V.    ISSUE 5: THE FIFTH CAUSE OF ACTION FOR FALSE IMPRISONMENT UNDER CALIFORNIA LAW**

| DEFENDANTS' ALLEGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' REPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 99 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | Please see plaintiffs' objections, disputed facts, case law, as well as additional facts above 1-116. |

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 070

## VI. ISSUE 6: THE SIXTH CAUSE OF ACTION UNDER CALIFORNIA LAW FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

| DEFENDANTS' ALLGED UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | PLAINTIFFS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 116 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | Please see plaintiffs' objections, disputed facts, case law, as well as additional facts above 1-116. |

Respectfully submitted,

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP

Dated: January 19, 2016

By:  s/Thomas D. Luneau
     THOMAS D. LUNEAU
     *Attorneys for Plaintiff*
     *JACOB GREGOIRE*

THE GILLEON LAW FIRM

Dated: January 19, 2016

By:  s/Steve Hoffman
     STEVE HOFFMAN
     *Attorneys for Plaintiff*
     *JACOB GREGOIRE*

PLAINTIFFS SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

AER 071

Daniel M. Gilleon, SBN 195200
Steve Hoffman, SBN 237466
**THE GILLEON LAW FIRM**
1320 Columbia Street, Suite 200
San Diego, CA 92101
Telephone:  (619) 702-8623
Facsimile:   (619) 702-6337

David S. Casey, Jr., SBN 060768
Thomas D. Luneau, SBN 145804
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile:  (619) 544-9232

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB GREGOIRE, | CASE NO. 14-cv-1749-GPC (DHB) |
| Plaintiff, | Judge: Hon. Gonzalo P. Curiel |
| | Dept:  2D |
| v. | **DECLARATION OF THOMAS D. LUNEAU RE: PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS CALIFORNIA HIGHWAY PATROL** |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | |
| Defendants. | Date:  February 19, 2016 |
| | Time: 1:30 p.m. |

I, THOMAS D. LUNEAU, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California and am attorney in the law firm of Casey Gerry Schenk Francavilla Blatt & Penfield LLP, attorneys of record for plaintiffs herein.

2.      All matters stated herein are personally known to me, and if called as a

1    witness in this matter, I could competently testify thereto.

2          3.      This declaration is being submitted in support of Plaintiffs' Opposition to

3    the Motion for Summary Judgment filed by Defendants California Highway Patrol

4    and Sergio Flores in this case.

5          4.      Attached to this Declaration as Exhibit 1 is a true and correct copy of

6    excerpts from the deposition of Captain David Albright.

7          5.      Attached to this Declaration as Exhibit 2 is a true and correct copy of

8    excerpts from the deposition of Jacob Gregoire.

9          6.      Attached to this Declaration as Exhibit 3 is a true and correct copy of

10   excerpts of the deposition of Sergio Flores.

11         7.      Attached to this Declaration as Exhibit 4 is a true and correct copy of

12   Exhibit 2 to plaintiff Gregorie's deposition.

13         I declare under penalty of perjury that the foregoing is true and correct.

14   Executed this 19th day of January, 2016, at San Diego, California.

15                                      Respectfully submitted,

16                                      CASEY GERRY SCHENK
                                        FRANCAVILLA BLATT & PENFIELD
17

18                                       s/Thomas D. Luneau

19                                      THOMAS D. LUNEAU
                                        *tdl@cglaw.com*
20                                      *Attorneys for Plaintiff*

21

22

23

24

25

26

27

28

633                              -2-                          14-cv-1749-GPC (DHB)
                 DECLARATION OF  THOMAS D. LUNEAU RE; OPPOSITION TO
                         MOTION FOR SUMMARY JUDGMENT

AER 073

```
           IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF CALIFORNIA


JACOB GREGOIRE,                     )

        Plaintiff,                  )

   vs.                              ) Case No.:

CALIFORNIA HIGHWAY PATROL, an       ) 14-cv-01749-GPC (DHB)

agency of the State of              )

California; SERGIO FLORES, and      )

DOES 1 to 20,                       )

        Defendants.                 )

_____    )
```

VIDEO DEPOSITION OF DAVID L. ALBRIGHT

San Diego, California

September 10, 2015

REPORTED BY:  KIMBERLY A. BROADHURST, CSR NO. 13814

Hutchings Number: 587309

Exhibit
AER 074

DAVID L. ALBRIGHT – 9/10/2015

Page 64

1      A.   Correct.

2         Q.   **When you first arrived on scene, were there any**

3   **other first responders present of any agency to your**

4   **knowledge?**

5         A.   Yes.   There was an AMR ambulance.   I believe it

6   was 411.   It was spotted ahead of us.

7         Q.   **When you use the word "spotted," does that have**

8   **significance in your --**

9         A.   Yeah.   I'm sorry.   Spotting in terms of the

10   fire service is where you position your apparatus when

11   you get out.   So you're leaving it in that position that

12   it's spotted in the traffic lane or wherever you put it.

13         Q.   **When you arrived on scene, where was that AMR**

14   **vehicle spotted?**

15         A.   The AMR ambulance was about 50 percent into the

16   dirt shoulder and about 50 percent into the No. 1 or

17   fast lane.   There was construction in the area, so it's

18   kind of hard to picture, but they were on a diagonal,

19   kind of right where the construction was ending sticking

20   front of their ambulance towards the center divide in

21   the dirt and the rear where the gurney came out was

22   facing the No. 1 fast lane.

23         Q.   **So the rear of the ambulance was in the No. 1**

24   **lane?**

25         A.   It was protruding into it, yeah, two or three

DAVID L. ALBRIGHT – 9/10/2015

Page 65

1    feet, the corner of it.  They couldn't get all the way

2    off of -- out of that traffic lane.

3        Q.    All right.  Other than that AMR ambulance, did

4    you notice whether there were any other first responder

5    agencies on scene before you arrived?

6        A.    I did not see anybody.

7        Q.    Have you since learned whether there were any

8    other agencies present besides AMR before you arrived?

9        A.    No.  I don't have any knowledge of that.

10       Q.    You never heard about a CHP being there before

11   you?

12       A.    No.

13       Q.    And when you arrived, did you call out anything

14   on the radio?

15       A.    Well, we always give what's called a size-up.

16   It's basically an on-scene report of what you find.

17           Any time we're responding with another fire

18   engine or not by ourselves, you give an on-scene report

19   to advise of what you find.  So, yes, I did make a radio

20   report to our communication center.

21       Q.    Do you recall what your -- what your report

22   said?

23       A.    Well, the first -- the very first traffic I

24   believe I said was that we were having trouble finding

25   it and I asked for a call back and then at that point

DAVID L. ALBRIGHT – 9/10/2015

Page 66

1    Jake said, I think I see it in the center divide.

2          And so once we located it and we found it, then
3    I gave an on-scene report of I believe it was an
4    overturned vehicle into the construction site in the
5    middle of the freeway, unknown injuries, but I think
6    there was -- there was two patients laying or sitting
7    outside of the vehicle next to where it had flipped
8    over.

9          And so I gave that report, said Unknown patient
10   count.  Establishing 805 IC, and I think investigating
11   because that's typically what we do, we go investigate
12   to see what's going on.

13        Q.   Now, when you made these reports, were you
14   still in your vehicle or were you using some sort of
15   body radio?

16        A.   The initial part that I just described would
17   have been from in the vehicle.  And then once we spot
18   and get out, then I'm on a mobile radio as the IC
19   walking around.  So there's a transition where I'm
20   getting out of the fire engine, all of us are, and going
21   to work.

22        Q.   But the initial part that you just summarized
23   for me, that was all made while you were still in the
24   vehicle?

25        A.   Yes, from the front seat where I -- where I

DAVID L. ALBRIGHT - 9/10/2015

Page 81

1    to the CHP.

2         Q.    That's your belief?

3         A.    That's my belief.

4         Q.    Based on your training and experience?

5         A.    Unless they come up on one of our channels.  We

6    don't have CHP channels.  I know for a fact we don't

7    have CHP channels in our radio.  There may be a mutual

8    channel that we can talk to each other on, but I've

9    never been shown what that channel is.

10        Q.    And when you arrived on the scene and made your

11   call out that you were IC 805 --

12        A.    Right.

13        Q.    -- do you have an opinion as to whether or not

14   you were on a channel that CHP could have heard that?

15        A.    I doubt that I would be.

16        Q.    Okay.  And once you -- you're still in the

17   seat -- when you're still in the seat, the front right

18   seat, is that when you made the call out, I'm 80 -- I'm

19   IC?

20        A.    Yes, before I exit the vehicle.  It's part of

21   the size up.  Size up, spot the vehicle and then we exit

22   to go -- to go work.

23        Q.    All right.  Can you describe for me the

24   sequence in which the three of you exited the vehicle?

25        A.    After the vehicle was spotted into the position

DAVID L. ALBRIGHT – 9/10/2015

Page 82

1    we described, I got out, and the firefighter that sits

2    right behind me.  So our doors are on the same side of

3    the apparatus.  We both got out and started walking it

4    would be northbound toward the back of our engine up to

5    where the vehicle was.

6            I can't speak to when Jake got out.  I did see

7    him out of the vehicle shortly after, but I didn't

8    physically watch him open the door and get out.

9            Typically he's doing those things we just

10   discussed, inverter, brakes, lights, and it takes the

11   engineer normally a little bit longer to get out than it

12   would the other crew.

13   Q.   Did you make any assessments at the time of

14   doing your size-up as to whether or not the Engine 52

15   could have parked anywhere in the center divider area?

16   A.   The only place in the center divide we could

17   have parked, and it was not part of my thought process,

18   but thinking about it now, we could have parked in front

19   of the AMR ambulance 2- or 300 feet or yards ahead of

20   them and gotten -- because the construction came to an

21   end at that point.

22            But I'm the one that made the call to put it

23   behind the ambulance as per these classes that we have

24   about Traffic Incident Management and blocking and

25   protecting the scene.

DAVID L. ALBRIGHT – 9/10/2015

Page 83

1            So, yes, it could have been placed further up,

2    but I'm the one that told Jake to put it where we did,

3    and that's typically how it works.  It ultimately is

4    the -- he's driving, but it's the captain's call on how

5    many lanes we're going to take out, typically, where do

6    you want me to put it and what do you want me to do.

7        Q.   All right.  Do you recall where in relation

8    to -- can you describe for me the layout of the scene

9    where the car was found?

10       A.   So southbound 805, northbound 805, and there's

11   K-rails where the median normally is because they're

12   putting in a carpool lane so --

13            MR. LUNEAU:  Videographer, are you getting

14   this?

15            THE WITNESS:  Both fast lanes have K-rail, and

16   then the car had flipped coming northbound into that

17   middle area between those two K-rail.  So it was

18   technically in the area between the two freeway lanes,

19   if that makes sense.  And it was resting on its roof

20   upside down between the two K-rails inside.

21   BY MR. BAXTER:

22       Q.   All right.  And the K-rails on both sides with

23   respect to the southbound side, did the K-rail directly

24   abut the No. 1 lane?

25       A.   Yes.  So where the center divide or the dirt

DAVID L. ALBRIGHT - 9/10/2015

Page 84

1   shoulder normally is, the K-rail was up against -- I

2   even remember, I believe, that it was hard to get

3   equipment out at one point because we were very close to

4   that K-rail, so there was just K-rail and then fast lane

5   where our engine was.

6       Q.   So no shoulder on the southbound side between

7   the inner edge of the No. 1 lane and the K-rail?

8       A.   Correct, until about -- until you passed the

9   ambulance.   Right where we were stopped there was not.

10      Q.   Okay.   The same description for the northbound

11  side?

12      A.   I don't know because I didn't go over.   I know

13  for a fact where the car was there was K-rail, but I

14  didn't look back to see if it stopped at the same side

15  where ours did.   I don't know.

16      Q.   Now, do you have any recollection as to whether

17  or not there was an additional older cement K-rail

18  center divider in between those two K-rails?

19      A.   I don't.   I know there was one, but I don't

20  remember if I saw one that night.

21      Q.   Okay.

22      A.   Because the construction.   I just don't have a

23  recollection of that.

24      Q.   Looking back now, do you now recall that there

25  was an older center divider in between those two

GREGOIRE - 9/16/2015

Page 66

```
 1    station."

 2         Q    Had he already asked -- yelled out, "Who's

 3    driving this engine?"

 4         A    Yes.

 5         Q    All right.  Did you answer if that was you?

 6         A    Yes.

 7         Q    All right.  How did you -- what did you

 8    specifically say?

 9         A    "I am."

10         Q    All right.  And at this point where were you

11    standing in relation to the patients?

12         A    I'm standing next to the gurney holding the

13    flashlight over the gurney and the patients.

14         Q    All right.  Then how many times did he tell

15    you to move the engine?

16         A    I don't recall the exact number.  He never

17    asked me to move it.  He told me to get in it and go

18    back to the fire station.

19         Q    All right.  And you understood that to mean

20    drive away from the scene?

21         A    To leave.

22         Q    All right.  Did he tell you any reason why?

23         A    Nope.

24         Q    What, if anything, did you say back to him?

25         A    I said, "We're out here" -- I have to review
```

Exhibit

GREGOIRE - 9/16/2015

Page 67

1    my notes again, but something to the effect of, "We're
2    out here trying to help people.  Why are you doing
3    this?"
4         Q    Anything else?
5         A    He said, "If you don't -- if you don't leave
6    now, I'm going to arrest you."
7              And I said, "Well, I can't move the fire
8    engine, so you'll have to arrest me."
9         Q    Did you attempt to consult with
10   Captain Albright at all before you told the officer that
11   you cannot move the engine?
12        A    I did not because he was walking back to the
13   engine getting a cell phone.  I had no opportunity to.
14        Q    All right.  Did you make any other statements
15   to that officer before he told you to come over to be
16   arrested?
17        A    Not that I recall, no.
18        Q    Okay.  And then what did he say next?
19        A    He said, "You're under arrest.  Climb over the
20   wall."
21        Q    All right.  And that's what you did?
22        A    I did.
23        Q    All right.  And then that's where we see you
24   on the news yelling to somebody?
25        A    To my captain --

GREGOIRE – 9/16/2015

Page 72

```
1        A    I asked him if we could please move to the
2   other side of the vehicle and that I would tell him
3   everything I had in my pockets and that I was
4   cooperating, and he obliged.
5        Q    All right.  So the two of you moved to the --
6        A    To the front of the vehicle, I believe.
7        Q    All right.  And did he continue searching you
8   at that point?
9        A    Yes.
10       Q    All right.  How long did that process of
11  searching you last?
12       A    I don't recall.  Maybe a minute or so.
13       Q    All right.  And at this point had you made any
14  complaints about the handcuffs?
15       A    At this point, no.
16       Q    All right.  What happened next?
17       A    Well, when we were to the side of the vehicle,
18  I asked him if he could loosen the handcuffs.
19       Q    When -- after he was done searching you?
20       A    Yes, before he was putting me in the car.
21       Q    All right.  And what, if anything, did he say
22  in response?
23       A    He tightened them.
24       Q    How did he do that?
25       A    I'm not familiar with how handcuffs work, but
```

AER 084

Volume II                    **Confidential - Pursuant to Protective Order**
Sergio Flores                                **Gregoire vs. California Highway Patrol**

1              UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4

   JACOB GREGOIRE,

5

6              Plaintiff,
                                Case No.:
7         vs.                   14-cv-1749-GPC(DHB)

8  CALIFORNIA HIGHWAY PATROL, an
   agency of the State of
9  California; SERGIO FLORES, and
   DOES 1 to 20,

10

11             Defendants.

12 _____

13

14      VIDEOTAPED DEPOSITION OF SERGIO FLORES

15            SAN DIEGO, CALIFORNIA

16          TUESDAY, NOVEMBER 10, 2015

17     VOLUME II, PAGES 93 through 189, INCLUSIVE,

18

19

20

21

22

23  Reported By:
    Linda E. Marquette
24  RPR, CLR, CSR No. 11874

25  Job No.: 10020170

Exhibit
AER 085

Volume II                 Confidential - Pursuant to Protective Order
Sergio Flores                              Gregoire vs. California Highway Patrol

1    upon your arrival?

2        A.    Well, not just in my mind.  In fact I did

3    become incident commander.

4        Q.    Right.  Okay.  So you were interviewed shortly

5    after this by -- by who from the CHP, if you know?

6        A.    I believe it was Sergeant Eglin and I believe

7    Lieutenant Ruano.

8        Q.    Okay.  And I'm going to show you what I'm

9    going to mark as Exhibit 12 and ask you if you've ever

10   seen this summary of three interviews that you were

11   involved in with the CHP regarding this incident.

12             (Exhibit 12 marked for identification

13             by the certified shorthand reporter.)

14       A.    It looks like the -- the one that I reviewed

15   some time ago, yes.

16   BY MR. LUNEAU:

17       Q.    All right.  And I'm looking at -- on page 18

18   of Exhibit 12, which is the second page.  It says in the

19   last sentence of the first paragraph, and I think this

20   is quoting you -- let me back up.

21             When you got to the scene, did you see

22   firefighters helping the paramedics with the two

23   victims, the two injured people?

24       A.    I remember seeing emergency personnel.  It may

25   have been firefighters and/or paramedics.

Volume II                    Confidential -  Pursuant to Protective Order
Sergio Flores                              Gregoire vs. California Highway Patrol

1       A.    I don't know.

2       Q.    How many people were treated at the scene by

3    paramedics and fire -- firefighters, if you know?

4       A.    I remember one specifically being treated.  I

5    don't recall the other.  I believe -- I don't remember

6    the other, second one.

7       Q.    All right.  And that one person, do you recall

8    that -- that person on a gurney?

9       A.    I don't recall.  I believe he was lying down.

10   I don't remember if it was on a gurney or backboard or

11   what.

12       Q.    And on the night of this incident, you gave no

13   medical treatment at all to any of the injured parties,

14   true?

15       A.    True.

16       Q.    And likewise, you were not aware of any CHP

17   officers giving any medical assistance to any of the

18   victims or injured parties on the night of this incident

19   at the scene?

20       A.    I am -- I am not aware of any CHP that may

21   have contacted or provided medical treatment.

22       Q.    All right.  And then on the second paragraph

23   here it says:

24            "He said, in the area to the west

25            of the vehicle, but still within the

Volume II                    Confidential -  Pursuant to Protective Order
Sergio Flores                                Gregoire vs. California Highway Patrol

1        A.    I don't believe it's an infraction.

2        Q.    For that violation.  Let me take it back.  I'm

3   going to reword it.

4              Have you ever given individuals tickets for

5   violation of 148 Penal Code?

6        A.    Again, I don't recall having ever done that.

7        Q.    You have the option of giving someone a

8   written ticket for a violation of -- what you perceive

9   to be a violation of 148, true?

10       A.    I don't -- I don't know specifically if we do.

11  Our practice is to take someone in custody.  And if --

12  if it's determined that just a citation should be

13  issued, then we'll do what's called 849B to release from

14  custody and perhaps issue a citation.

15       Q.    Did you perceive firefighter Gregoire to be

16  some sort of a threat to you at the scene when he

17  refused to move the fire truck?

18       A.    No.  That didn't enter my mind.

19       Q.    Did he in any way -- let me withdraw that.

20             When you told firefighter Gregoire that you

21  were going to arrest him if he didn't move the fire

22  truck, in your mind, do you believe you were threatening

23  him?

24       A.    No.

25       Q.    What was your intent for making that -- that

1  comment?

2      A.    For him to understand the severity of the

3  situation that he was causing and explained to him what

4  the consequences would be for failing to obey the order.

5      Q.    Were you upset with the fire captain for not

6  obeying Officer Colunga's order to move the fire truck?

7      A.    No, not upset.  It was -- it was frustrating.

8      Q.    Did that sort of raise your blood pressure

9  after hearing the captain disobeying the directive by

10  Officer Colunga?

11     A.    No, I don't believe my blood pressure was

12  affected by that.

13     Q.    You're aware of Sergeant Pacheco -- Pacheco?

14     A.    I know who she is.

15     Q.    You're aware that she came to the scene,

16  correct?

17     A.    Yes.

18     Q.    She seemed -- strike that.

19          She told us that when she got to the scene,

20  you seemed like you were agitated or upset.  Were you

21  later upset or agitated at some point?

22     A.    No, no.

23     Q.    So if she in fact said that, she

24  misinterpreted your emotions?

25     A.    I would say so, yes.

arrest you." I replied with "I am sorry but I cannot do that." He replied with "then I am going to arrest you." I replied with "well. I guess you're just going to have to arrest me because I cannot move the engine right now." He then became quite angry, yelling at me to climb over the wall and come to him. I said ok, and asked if I could please at least let my supervisor (Captain Albright) know what was happening as he was about 30 feet away from me walking back to the fire engine. He angrily said "no, you are under arrest." At this point I yelled to my Captain that I am being arrested because I will not move the fire engine. (This is where it appears as though I was telling the media, however I was not). My Captain replied with "OK. I will let the Battalion Chief know. He then grabbed my hands putting them behind my back and at the same time I asked over my shoulder if I could at least notify my Captain of where you are taking me, and again I got the exact same reply "no, you are under arrest."

After he handcuffed me, he began walking me down the construction zone roughly 80-100 yards or so north of the incident to his car. I then asked him, "hey can we just stop and talk about this and work this out?" He replied with "no, you are under arrest." When we got to the front of his car, he walked me to the passenger side and began searching my turnout pockets while standing right in the middle of the #2 lane. I politely asked, "sir, this whole thing to me is about safety, could you please search my pockets and I'll tell you what I have on me, over on the other side of your vehicle"? He said "fine", and kind of maneuvered me over to the other side where he began emptying my pockets onto the hood of his vehicle. I told him that all I had on me is a pocket knife, a small flashlight, and a strap of webbing. He pulled all of those out of my pockets and placed them on the hood of his vehicle. He then wanted to know what I had in my large BA pocket on my chest, I told him that it was my Breathing mask for going into fires, and he said "well I want to see it anyway". At this point he removed my helmet and took my personal radio as well.

I asked him if he would not mind loosening the handcuffs a little as they were extremely tight and that I was not going anywhere and that I am cooperating. He then locked them, which made them tighten down even more. He walked me to the rear passenger door and moved the front passenger seat forward so that I could be put in the car. I asked one last time if he could please loosen the cuffs just a little as they were making my wrists and now shoulders really hurt, and he just closed the door without a reply. He then got into the driver's seat and asked me my name. I spelled it for him, and noticed that he misspelled my last name so I politely said that I think you misspelled it in your computer where he was logging my information. He then asked me my phone number and to confirm my home address. I asked him politely what exactly I was being arrested for and he told me "148" I then said that I did not know what that was and could he explain. He then got a bit confused, said the word "obeying." He then said, "I don't know I will have to ask my supervisor."

At this point I sat rather uncomfortably in the back of the car in amazement of how rude and rough he was with me. I felt like I was being treated as a criminal, which I guess he felt I was. After what seemed like a half hour, he opened my door and said "this is not over yet, you are not being arrested but I am not done with you! You are going to have to answer for your actions." I did not say a word as I felt as though I was being threatened and I was just happy to be getting out of the handcuffs. He said you are free to go but hold on I have some paperwork for you to sign. At this point I politely asked if my crew were in possession of the items he removed from my person, and he told me no that his partner has them for me. His partner (the shorter one) then stepped forward and handed me everything minus my flashlight (which is now gone). I then walked to the construction area and told the BC and my Captain that I was released and asked if we could leave. We then proceeded back to the fire engine and returned to quarters in available status to meet with BC Roberts about a half hour later.

This was a very stressful and extremely embarrassing event in which I hope we can come up with a better way to work together in the field and on the freeway. At this point, I feel confused on how to act in this situation in the future. I believe I acted according to how I was trained in order to keep my crew, the ambulance crew, and all other on-scene personnel safe.
Jake Gregoire
619-247-5296

2

Exhibit

TRACK _____ EXHIBIT 2
DATE __7-16-15__
WITNESS _Coreguire_
___3___ PAGES(S)
JULIA LENNAN, CSR #12843

February 5, 2014

This memorandum is submitted pursuant to the direct order of Deputy Chief Jim Garcia.

On the evening of February 4, 2014 I was driving E52 to an incident on I805S around Telegraph Canyon Road. (Please see Firehouse Report for official dispatch and response information). While driving southbound with my Code 3 lights on and approaching Orange Avenue I listened to radio traffic from USAR53 and SD E6 that they had traveled from Palm to Telegraph northbound and were unable to locate. With this information we decided to proceed southbound and exit Orange Avenue. When I crested a slight hill, I noticed about ¼ mile ahead in the center divide was an ambulance stopped with its lights on. I immediately commented to my Captain that I located the incident and began slowing the Engine with my lights on in the slow lane. When I reached about 5-10 mph, I began watching out my window and rear mirror for traffic to come to a stop as I needed to get across traffic in a relatively short duration. Once the traffic came to a stop, I began to slowly drive across at roughly a 30 degree angle to the lanes. While approaching the rear of the ambulance I noticed a law enforcement vehicle in the fast lane stopped about 50 yards behind me. Believing that they had stopped to give me room, I decided to back up the engine about 10-15 feet to reposition it so that I was out of the #2 lane, only in the #1 lane, and providing roughly a 25 foot safety zone between the front of the engine and the ambulance to protect EMS crew during patient packaging and loading.

After securing the engine, I exited my door and opened the passenger door behind me to put my helmet on to complete my safety gear. As I was putting my radio in my pocket I turned and was immediately confronted by a CHP Officer. ( I don't know is name, and with all respect will call him the shorter one, and his partner the taller one as they were several inches in height apart). This officer immediately began telling me that he didn't like the way I drive, that I am an unsafe driver and that there were cars ¼ mile skidding because of the way I came across the freeway. Being a bit surprised and caught off guard I told him that I felt as though I did the best I could as safely as I could under the circumstances and that this accident was hard to find as we had 2 other fire units drive right past it without seeing it. I then asked him his opinion of what could I have done differently, and without replying he walked away.

==I then walked back to the accident scene to assist with patient care.== I noticed that there were 2 patients already being taken care of by EMS so I proceeded towards the heavily damage vehicle to look for trapped victims along with the FF/PM from E6. While we were just starting to look into the vehicle, the FF/PM assisting me was called back by his Captain and was told that they were leaving. He looked at me and said sorry for not being able to help and left. I then finished searching the overturned vehicle and determined there were no additional trapped victims. I then approached the EMS crews who were helping with patient care, and made the comment to my Captain, who was the Incident Commander and was standing nearby, that one of the CHP officers gave me a hard time about the way I came upon the accident. ==From there I began to assist with patient care helping my co-workers with patient packaging, when I was yelled at by an officer over my left shoulder to move the fire engine.==

I turned to talk to him and said that we would be done shortly and that I was blocking traffic for the safety of the operations about to take place at the back of the ambulance which we've been trained to do. He replied with "move it now"! At this point I realized that this was a different officer than the one who spoke to me initially and that he was significantly taller than the other officer. I soon realized that he was quite upset, so I took a step back and looked down at the positioning of the EMS vehicles to see if I could somehow appease him by moving them a little. I then confirmed that there was no safe way nor area to move either the engine or the ambulance to as there was no shoulder in the center divide due to construction. I stepped back to him and said, "hey, we are all in this together, we are just trying to help, it should only be a couple more minutes and then we will be gone". He said "I want you and your fire engine gone right now and back in your fire station!" It was at this point I began to realize that it was not about my moving of the engine to a different location so he could open up the one tied up traffic lane, but that it was about him actually kicking us off the freeway altogether.

After his statement I asked him if he is going to take over patient care and he replied with "the ambulance will." Then Captain Albright who was standing next to me at this time replied "who is going to take care of these two people one of which is laying in the dirt", the officer replied with "that's not my problem". He then immediately replied again with "if you do not leave right now I will arrest you." I replied with "I am sorry but I cannot do that." He replied with "then I am going to arrest you." I replied with "well, I guess you're just going to have to arrest me because I cannot move the engine right now." He then became quite angry, yelling at me to climb over the wall and come to him. I said ok, and asked if I could please at least let my supervisor (Captain Albright) know what was happening as he was about 30 feet away from me walking back to the fire engine. He angrily said "no, you are under arrest." At this point I yelled to my Captain that I am being arrested because I will not move the fire engine. (This is where it appears as though I was telling the media, however I was not). My Captain replied with "OK, I will let the Battalion Chief know. He then grabbed my hands putting them behind my back and at the same time I asked over my shoulder if I could at least notify my Captain of where you are taking me, and again I got the exact same reply "no, you are under arrest."

After he handcuffed me, he began walking me down the construction zone roughly 80-100 yards or so north of the incident to his car. I then asked him, "hey can we just stop and talk about this and work this out?" He replied with "no, you are under arrest." When we got to the front of his car, he walked me to the passenger side and began searching my turnout pockets while standing right in the middle of the #2 lane. I politely asked, "sir, this whole thing to me is about safety, could you please search my pockets and I'll tell you what I have on me, over on the other side of your vehicle"? He said "fine", and kind of maneuvered me over to the other side where he began emptying my pockets onto the hood of his vehicle. I told him that all I had on me is a pocket knife, a small flashlight, and a strap of webbing. He pulled all of those out of my pockets and placed them on the hood of his vehicle. He then wanted to know what I had in my large BA pocket on my chest, I told him that it was my Breathing mask for going into fires, and he said "well I want to see it anyway". At this point he removed my helmet and took my personal radio as well.

2

I asked him if he would not mind loosening the handcuffs a little as they were extremely tight and that I was not going anywhere and that I am cooperating. He then locked them, which made them tighten down even more. He walked me to the rear passenger door and moved the front passenger seat forward so that I could be put in the car. I asked one last time if he could please loosen the cuffs just a little as they were making my wrists and now shoulders really hurt, and he just closed the door without a reply. He then got into the driver's seat and asked me my name. I spelled it for him, and noticed that he misspelled my last name so I politely said that I think you misspelled it in your computer where he was logging my information. He then asked me my phone number and to confirm my home address. I asked him politely what exactly I was being arrested for and he told me "148" I then said that I did not know what that was and could he explain. He then got a bit confused, said the word "obeying." He then said, "I don't know I will have to ask my supervisor."

At this point I sat rather uncomfortably in the back of the car in amazement of how rude and rough he was with me. I felt like I was being treated as a criminal, which I guess he felt I was. After what seemed like a half hour, he opened my door and said "this is not over yet, you are not being arrested but I am not done with you! You are going to have to answer for your actions."  I did not say a word as I felt as though I was being threatened and I was just happy to be getting out of the handcuffs. He said you are free to go but hold on I have some paperwork for you to sign. At this point I politely asked if my crew were in possession of the items he removed from my person, and he told me no that his partner has them for me. His partner (the shorter one) then stepped forward and handed me everything minus my flashlight (which is now gone). I then walked to the construction area and told the BC and my Captain that I was released and asked if we could leave. We then proceeded back to the fire engine and returned to quarters in available status to meet with BC Roberts about a half hour later.

This was a very stressful and extremely embarrassing event in which I hope we can come up with a better way to work together in the field and on the freeway. At this point, I feel confused on how to act in this situation in the future.  I believe I acted according to how I was trained in order to keep my crew, the ambulance crew, and all other on-scene personnel safe.

Jake Gregoire

619-247-5296

1  David S. Casey, Jr., SBN 060768
   *dcasey@cglaw.com*
2  Thomas D. Luneau, SBN 145804
   *tdl@cglaw.com*
3  **CASEY GERRY SCHENK**
   **FRANCAVILLA BLATT & PENFIELD, LLP**
4  110 Laurel Street
   San Diego, CA  92101
5  Telephone: (619) 238-1811
   Facsimile: (619) 544-9232
6

7  Attorneys for Plaintiff

8

9              **UNITED STATES DISTRICT COURT**

10             **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 JACOB GREGOIRE,                    | CASE NO. 14-cv-1749-GPC (DHB)

13              Plaintiff,            | Judge:  Hon. Gonzalo P. Curiel
                                      | Dept: 2D
14   v.
                                      | **DECLARATION OF JUSTIN**
15 CALIFORNIA HIGHWAY PATROL, an      | **HUTTON**
   agency of the State of California;
16 SERGIO FLORES, and DOES 1 to 20,   | Date:  January 29, 2016
                                      | Time:  1:30 p.m.
17              Defendants.

18

19      I, JUSTIN HUTTON, declare as follows:

20      1.      I make the following declaration of my own knowledge, and if called as a

21 witness in the above-captioned matter, I could testify competently thereto.

22      2.      My date of birth is 1/11/1987.

23      3.      I have been an EMT for three years.  On February 4, 2014 at 9:30 at

24 night, I was in my private vehicle with my girlfriend at the time, Korri E. Mitchell,

25 when I came upon the scene of a traffic collision.

26      4.      I pulled my car into the center divider and began C-spine care of one of

27 the patients on the ground.  The patient was bleeding.  It was dark and there were no

28 street lights.  The ground was wet and cold.

1       5.    Korri Mitchell called 911. The CHP, ambulance, and firefighters all got

2    to the scene. I saw a fireman (later arrested) rendering aid to the other patient. I later

3    learned the name of the fireman was Jake Gregoire.

4       6.    There was one patient standing, one on the ~~were two patients on the~~ ground and I watched Jacob "Jake"

5    Gregoire tending to patient #1 with other EMTs, preparing the C-spine for transfer to

6    the gurney. Jake was fully engaged in the care of patient #1 when a Latino CHP

7    officer approached Jake Gregoire and arrested him, putting him in handcuffs. Jake

8    was hands-on, 100 percent directly involved with patient care when he was placed

9    under arrest by the CHP officer. The gurney was in the low position prior to

10    packaging and moving the patient when this occurred. After the arrest, I was alone

11    with the second patient for about 10 minutes .

12       7.    The Latino CHP officer never consulted with any firemen or EMTs about

13    the status of patient care before affecting this arrest. Jake Gregoire told CHP, "I am

14    treating patients here" when the CHP officer said, "I don't care about your patients,

15    you need to move." I was stunned by this statement. The CHP officer most certainly

16    delayed and obstructed care of both patients by arresting firefighter Gregoire at the

17    scene. During the conversation, the CHP officer ordered the fireman to take the truck

18    back to the fire station.

19       8.    Again, I was in my own car in civilian clothing when I was tending to

20    patient #2 who was certainly unnerved by these circumstances. The patient asked me

21    a couple of times, "Where is the ~~paramedic or EMT~~ ...medic... (Female AMR medic) that was helping me a moment

22    ago?" I reminded the patient that I was a fully certified, working ~~paramedic~~ EMT-B who had

23    come upon the scene.

24       9.    I have been an EMT for three years and estimate that I have been on

25    hundreds of calls and have never seen anything like this before.

26       10.    Because of the arrest of the fireman while he was obviously caring for a

27    patient, in my mind, jeopardized patient care. I lodged an official complaint with the

28    California Highway Patrol.

552                        2                 14-cv-1749-GPC (DHB)

DECLARATION OF JUSTIN HUTTON

1       I declare under penalty of perjury under the laws of the State of California and

2    of the United States of America that the foregoing information is true and correct.

3    Executed on <u>05  Jan  2016</u>     , at San Diego, California.

4

5    

6       JUSTIN HUTTON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

552                 3           14-cv-1749-GPC (DHB)

           DECLARATION OF JUSTIN HUTTON

David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Thomas D. Luneau, SBN 145804
*tdl@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB GREGOIRE, | CASE NO. 14-cv-1749-GPC (DHB) |
| Plaintiff, | Judge: Hon. Gonzalo P. Curiel Dept: 2D |
| v. | **DECLARATION OF AUTUMN MITCHELL FKA KORRI E. MITCHELL** |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | Date: January 29, 2016 Time: 1:30 p.m. |
| Defendants. | |

I, AUTUMN MITCHELL, declare as follows:

1. I make the following declaration of my own knowledge, and if called as a witness in the above-captioned matter, I could testify competently thereto.

2. I no longer go by the name Korri E. Mitchell and have changed my name to Autumn Mitchell. My date of birth is 9/30/1990.

3. On February 4, 2014 at 9:30 at night, I recall arriving on the scene of a rollover collision in the center lane in the car of my boyfriend at the time, Justin Hutton. There was a white Mustang upside down in the center median of the 805 freeway. Justin and I were the first ones on the scene. Justin was tending to one of the victims while I was on the phone with a 911 dispatcher. CHP arrived first, then

555                                    1                    14-cv-1749-GPC (DHB)
DECLARATION OF AUTUMN MITCHELL

1   ambulance, and then firefighters/EMTs.  I recall that two people were injured.

2       4.      The paramedics and firemen were assessing both the injured people.  The

3   injured people were laying on the ground and the firemen and paramedics put them

4   onto backboards and fastened them down.

5       5.      The CHP officer on scene told the fireman that they had to move the

6   truck from the freeway.  The fireman was working on the injured patient at the time.

7       6.      The fireman was kneeling next to the patient and said, "I am in the

8   middle of helping this patient."

9       7.      The CHP officer told the fireman he wanted him to stop caring for the

10  patient and move the fire truck off the freeway and take it back to the fire station.

11      8.      The fireman replied, "What about the patients?"  The CHP officer

12  replied, "I don't care about the patients, I just want you to leave."

13      9.      While at the scene, I never heard the CHP officer ask about the condition

14  of the patients or consult about how long or how many men were needed to help the

15  two patients.

16      10.     The fireman was clearly administrating aid to that patient when the CHP

17  officer approached and put him in handcuffs.  When this occurred, the fireman was

18  kneeling and preparing a backboard for the patient.  It was a heated exchange between

19  the CHP officer and the fireman, but I recall neither of them using profanity and this

20  struck me at the time.

21      11.     I was on the scene for at least one, possibly two hours.

22      I declare under penalty of perjury under the laws of the State of California and

23  of the United States of America that the foregoing information is true and correct.

24  Executed on Dec 30, 2015 , at San Diego, California.

25

26  AUTUMN MITCHELL

27

28

SSS                            2                            14-cv-1749-GPC (DHB)
                    DECLARATION OF AUTUMN MITCHELL

1   David S. Casey, Jr., SBN 060768
    *dcasey@cglaw.com*
2   Thomas D. Luneau, SBN 145804
    *tdl@cglaw.com*
3   **CASEY GERRY SCHENK**
    **FRANCAVILLA BLATT & PENFIELD, LLP**
4   110 Laurel Street
    San Diego, CA 92101
5   Telephone: (619) 238-1811
    Facsimile: (619) 544-9232
6

7   Attorneys for Plaintiff

8

9               UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

12  JACOB GREGOIRE,                    CASE NO. 14-cv-1749-GPC (DHB)

13              Plaintiff,             Judge: Hon. Gonzalo P. Curiel
                                       Dept: 2D
14  v.
                                       **DECLARATION OF JOSHUA REES**
15  CALIFORNIA HIGHWAY PATROL, an
    agency of the State of California;  Date: January 29, 2016
16  SERGIO FLORES, and DOES 1 to 20,   Time: 1:30 p.m.

17              Defendants.

18

19       I, JOSHUA REES, declare as follows:

20       1.   I make the following declaration of my own knowledge, and if called as a

21  witness in the above-captioned matter, I could testify competently thereto.

22       2.   My date of birth is AUGUST 3, 1974            .

23       3.   On February 4, 2014 at approximately 9:45 p.m., acting in my official

24  capacity as a City of Chula Vista Firefighter/Emergency Medical Technician (EMT), I

25  was on the scene of a rollover accident with injuries on I-805 southbound south of

26  Naples. I had arrived at the scene in fire truck #52 driven by Jacob Gregoire or

27  "Jake." Jake and I were working with paramedic units at the scene rendering medical

28  care to two injured patients. Jake was with patient #1. Jake was working with the

548                          1                    14-cv-1749-GPC (DHB)
                   DECLARATION OF JOSHUA REES

1  paramedics to move patient #1 from the ground onto the gurney, using a backboard

2  with straps.  The procedure involves the patient being placed on their side, the board is

3  held against the patient's back, and then they are log-rolled (gently) onto the board.

4  The patient's head, neck, and spine must be kept in line to prevent spinal cord

5  damage. The straps are then attached.  The head and neck are secured and re-checked

6  and then the backboard is moved to the gurney.

7        4.     It was dark that night and Jake Gregoire and the two EMTs were working

8  together as a unit.  Jake was helping to move the patient, supplying light with his

9  flashlight, and securing the gurney for moving the patient into the ambulance.

10        5.     While Jake Gregoire was in the process of rendering aid to the

11  immobilized patient, a CHP officer called him.  I did not hear what was said, however,

12  Jake Gregoire stopped caring for the patient and was then arrested by the officer.

13        6.     I was shocked to see this occur.  I have been a Firefighter/Emergency

14  Medical Technician for over 15 years and been to over 400 similar injury calls and

15  have never seen a peace officer obstruct and delay patient care like the officer who

16  arrested Jake Gregoire.

17        7.     The patient himself stated, "Are you going to fucking leave me here?

18  Are you?"  This was a disturbing situation to watch because the patient care was

19  delayed by the arrest of one of the EMTs (Jake Gregoire) who was clearly essential to

20  the safe transportation of the injured patient.  Equally troubling was the fact that the

21  CHP officer never consulted with any of the paramedics or firefighters/EMTs prior to

22  arresting Jake Gregoire.  Because of the arrest, the entire movement of the patient

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

548

2                                    14-cv-1749-GPC (DHB)
DECLARATION OF JOSHUA REES

AER 100

1   from the scene to the hospital was delayed.  Further, because of the arrest, all fire

2   equipment and personnel were delayed at the scene as well.

3       I declare under penalty of perjury under the laws of the State of California and

4   of the United States of America that the foregoing information is true and correct.

5   Executed on JANUARY 6, 2016 ____, at San Diego, California.

6

7

8                 JOSHUA REES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSHUA REES

1   KAMALA D. HARRIS
    Attorney General of California
2   RICHARD F. WOLFE
    Supervising Deputy Attorney General
3   DOUGLAS E. BAXTER
    Deputy Attorney General
4   State Bar No. 201351
    600 West Broadway, Suite 1800
5    San Diego, CA 92101
    P.O. Box 85266
6    San Diego, CA 92186-5266
    Telephone: (619) 645-2034
7    Fax:     (619) 645-2012
    E-mail: Douglas.Baxter@doj.ca.gov
8   *Attorneys for Defendants State of California*
    *(by and through the California Highway*
9   *Patrol) and Sergio Flores*

10         **IN THE UNITED STATES DISTRICT COURT**

11      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

14 | JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |

15

16           Plaintiff,

| JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
|---|---|
| Plaintiff, | **DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF CLAIMS** |
| v. | |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | Date:     January 29, 2016<br>Time:     1:30 p.m.<br>Courtroom: 2D<br>Judge:    The Honorable Gonzalo P. Curiel |
| Defendants. | |

23       Pursuant to the Chambers Rules of the Honorable Gonzalo P. Curiel and

24 Southern District Civil Local Rule 7.1(f)(1), Defendants State of California (by and

25 through the California Highway Patrol) and Sergio Flores respectfully submit the

26 following Separate Statement of Undisputed Material Facts in Support of

27 Defendants' Motion for Summary Judgment, or, in the Alternative, Summary

28 Adjudication of Claims:

             1

AER 102

I.  **ISSUE 1: THE FIRST CAUSE OF ACTION UNDER 42 U.S.C. § 1983 FOR UNLAWFUL ARREST UNDER THE FOURTH AMENDMENT IS WITHOUT MERIT, AS THE ARREST WAS SUPPORTED BY PROBABLE CAUSE AND DEFENDANT SERGIO FLORES IS ENTITLED TO QUALIFIED IMMUNITY**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 1.  During the evening of February 4, 2014, Officer Eliazar Colunga was on duty for the C-watch (5:00 p.m. to 5:30 a.m.) in his employment as a California Highway Patrol (CHP) patrol officer. | Declaration of Eliazar Colunga in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims [hereafter "Colunga Decl."], p. 1, ¶¶ 1-2. |
| 2.  During this time period, Officer Colunga was wearing a tan CHP uniform that bore CHP patches identifying him as a law enforcement officer. | Colunga Decl., p. 1, ¶ 2. |
| 3.  As of the date of February 4, 2014, Officer Colunga had been a CHP patrol officer for approximately 17 years. | Colunga Decl., p. 1, ¶ 1. |
| 4.  During the evening of February 4, 2014, Defendant Officer Sergio Flores was on duty for the C-watch (5:00 p.m. to 5:30 a.m.) in his employment as a California Highway Patrol (CHP) patrol officer. | Declaration of Sergio Flores in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication of Claims [hereafter "Flores Decl."], p. 1, ¶¶ 1-2. |
| 5.  During this time period, Officer Flores was wearing a tan CHP uniform that bore CHP patches identifying him as a law enforcement officer. | Flores Decl., pp. 1-2, ¶ 2. |
| 6.  Officer Flores has been a CHP patrol officer since July 1994. | Flores Decl., p. 1, ¶ 1. |
| 7.  Just before 9:30 p.m., Officer Colunga responded to a radio call regarding an overturned vehicle in the area of Interstate 805 and Telegraph Canyon Road. | Colunga Decl., p. 2, ¶ 3. |
| 8.  The collisions occurred in the northbound lanes of the I-805, and the vehicle to which Officer Colunga was responding came to rest in a wide construction area between cement k-rail walls that separated the northbound and southbound lanes. | Colunga Decl., p. 2, ¶ 3. |

2

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 103

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 9.  Officer Colunga saw no other on-duty emergency responders at the scene when he arrived and parked his patrol car south of the collision in the center construction area (and out of traffic lanes), where the k-rails on the southbound side ended and the center construction area was accessible. | Colunga Decl., p. 2, ¶ 3. |
| 10.  Based on his training and experience over nearly 17 years as a CHP Officer, Officer Colunga believed that, as the law enforcement officer on scene, he was the Incident Commander when he arrived. | Colunga Decl., p. 2, ¶ 4. |
| 11.  Officer Colunga approached the overturned vehicle and made contact with two civilians (one of whom was an off-duty Emergency Medical Technician [EMT]) who had come upon the accident scene after the accident but before Officer Colunga arrived. | Colunga Decl., p. 2, ¶ 5. |
| 12.  Officer Colunga observed that both of the occupants of the rollover vehicle were already out of the vehicle and that neither of them had required any extraction equipment or on-duty emergency personnel to get them out of the vehicle. | Colunga Decl., p. 2, ¶ 5. |
| 13.  Officer Colunga saw that both of the occupants of the rollover vehicle were conscious, with one lying on the ground and the other standing.  During the evening, Officer Colunga was able to communicate with the two occupants. | Colunga Decl., p. 2, ¶ 5. |
| 14.  Seeing that the off-duty EMT was holding the head of the person on the ground in C-spine position and was without equipment, Officer Colunga went to his vehicle to retrieve a first aid bag that would have a C-spine collar. | Colunga Decl., p. 2, ¶ 5. |
| 15.  On the way to his patrol car, Officer Colunga saw an ambulance from American Medical Response (AMR) arrive and park in the center construction area just south of Officer Colunga's patrol car and out of traffic lanes.  The ambulance had its emergency lights activated. | Colunga Decl., pp. 2-3, ¶ 6; Deposition of Jacob Gregoire [hereafter Gregoire Depo.][1], p. 25, ln. 2 through p. 26, ln. 2; p. 26, ln. 17 through p. 27, ln. 21. |

_____

[1] Excerpts of the Gregoire Transcript are attached as Exhibit A to the Declaration of Douglas E. Baxter in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication of Claims.  All citations to transcript pages are to the pages in the original transcript.

3

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 104

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 16.  Seeing the ambulance crew walking to the rollover vehicle with their gear, Officer Colunga determined that it was not necessary for him to retrieve a first aid bag. | Colunga Decl., p. 3, ¶ 7 |
| 17.  Officer Colunga saw three people from the AMR ambulance, and, at the time, he believed all three were paramedics.  He did not learn until well after the events of the evening that two of them were paramedics and one was an EMT. | Colunga Decl., p. 3, ¶ 7. |
| 18.  Based on the presence of the ambulance crew, Officer Colunga concluded that sufficient medical care was now on scene for the two occupants of the rollover vehicle, so he moved on to engage in other scene management and investigation activities. | Colunga Decl., p. 3, ¶ 7. |
| 19.  Based on his training and experience as a CHP Officer, Officer Colunga considers a CHP Officer's responsibilities as an Incident Commander at a traffic scene to include assessing the entire scene, making sure that medical care has been summoned for any potentially injured parties, making sure that the people on scene (civilians and first responders) are safe and not in the way of traffic or in any type of hazard.  He considers CHP Officers to be responsible for managing the entire scene, which includes controlling where equipment and personnel are located so as to minimize safety hazards to those on scene and to the motoring public nearby or approaching the scene. | Colunga Decl., p. 3, ¶ 8. |
| 20.  Soon after the ambulance arrived, fire trucks began arriving.  Officer Colunga saw Chula Vista Engine 52 arrive and park in the number 1 lane on the southbound side. | Colunga Decl., p. 3, ¶ 8; Gregoire Depo., p. 26, lns. 6-9; p. 86, lns. 18-21. |
| 21.  Two other fire trucks arrived within short succession and parked behind Engine 52, blocking the number 1 and 2 lanes (the lanes closest to the center of the southbound roadway).  A fourth fire truck also came to the scene. | Colunga Decl., p. 3, ¶ 9. |
| 22.  Because he believed that the patients were being attended to by paramedics and that there was no collision scene in traffic lanes, Officer Colunga became concerned about fire trucks blocking traffic lanes. | Colunga Decl., p. 3, ¶ 10. |

4

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 105

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 23.  Officer Colunga believed that there were sufficient medical personnel to tend to the patients, that too many fire crews were on scene, and that the trucks should be moved out of lanes. | Colunga Decl., pp. 3-4, ¶ 10. |
| 24.  Officer Colunga talked to crew members from two trucks and explained that they were not needed and should leave the scene and return to their stations. These two trucks left the scene within a few minutes. | Colunga Decl., p. 4, ¶ 10. |
| 25.  Officer Colunga subsequently had conversations with members of the other two fire crews to ask them to move their trucks to the center median. | Colunga Decl., p. 4, ¶ 10 |
| 26.  Officer Colunga was concerned about unnecessary placement of fire trucks in traffic lanes, as CHP Officers are taught by CHP, and he also knows from his own personal experience in responding to other traffic accidents, that secondary accidents at collision scenes are a serious risk to the motoring public. | Colunga Decl., p. 4, ¶ 10; Declaration of Captain Albright [hereafter Albright Depo.][2] p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24] |
| 27.  Officer Colunga knew and believed that placement of emergency equipment at collision scenes creates a serious risk of causing secondary accidents among other motorists approaching the scene. | Colunga Decl., p. 4, ¶ 10; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. |
| 28.  Officer Colunga knew and believed that an important part of CHP Officers' duties as incident managers is to take appropriate steps to eliminate possible causes of secondary accidents. | Colunga Decl., p. 4, ¶ 10. |
| 29.  For this particular scene, Officer Colunga's analysis of why he believed the placement of the fire trucks was causing a risk of secondary vehicle accidents that could harm the public included the observation that there were four southbound lanes in the immediate area. | Colunga Decl., p. 4, ¶ 11. |
| 30.  Officer Colunga's analysis of the risk of secondary accidents also included the observation that, north of the scene, there were no shoulders in the southbound lanes because of the cement k-rail running adjacent to | Colunga Decl., p. 4, ¶ 11. |

---

[2] Excerpts of the Albright Deposition Transcript are attached as Exhibit B to the Declaration of Douglas E. Baxter in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication of Claims.  All citations to transcript pages are to the pages in the original transcript.

5

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 106

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| the inner edge of the number 1 lane. | |
| 31. Officer Colunga's analysis of the risk of secondary accidents also included the observation that the trucks were blocking the number 1 lane and approximately one-half of the number 2 lane for southbound traffic. | Colunga Decl., p. 4, ¶ 11. |
| 32. Officer Colunga's analysis of the risk of secondary accidents also included the observation that, north of the collision scene, there is a crest in the roadway. Officer Colunga perceived that this would prevent southbound traffic from having a direct line of sight to see the fire trucks from a long distance. Officer Colunga believed there was a short distance between the point where cars would come over the crest and the point where the first trucks were stopped, which would not allow a lot of reaction time for southbound vehicles that could be approaching the scene at high speeds. | Colunga Decl., p. 4, ¶ 11. |
| 33. Officer Colunga's analysis of the risk of secondary accidents also included the knowledge that, on a freeway such as the I-805, vehicles typically travel at high rates of speed. | Colunga Decl., p. 4, ¶ 11. |
| 34. Officer Colunga's analysis of the risk of secondary accidents also included the knowledge that, particularly at the beginning of his time at the scene, he could hear people locking their brakes as they approached the scene. | Colunga Decl., p. 4, ¶ 11. |
| 35. Based on his observations at the scene, Officer Colunga formed the opinion that there was a significant risk of secondary collisions from the placement of fire trucks in the lanes. | Colunga Decl., p. 4, ¶ 11. |
| 36. Officer Colunga also perceived that the collision scene was enclosed in the construction area, with cement k-rails blocking off the scene from southbound and northbound traffic. | Colunga Decl., pp. 4-5, ¶ 11; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo. |
| 37. Officer Colunga determined that there was no debris from the collision in the southbound lanes, as no part of the collision occurred there. | Colunga Decl., p. 5, ¶ 11. |
| 38. Based on his training and experience and assessment of the scene, Officer Colunga formed the opinion (at the traffic scene) that the placement of the fire trucks in lanes was creating a serious risk to the motoring public without apparent reason. | Colunga Decl., p. 5, ¶ 11. |

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 107

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 39.  Based on his analysis and conclusions, Officer Colunga wanted the fire trucks moved out of lanes for public safety, and this was the reason that he asked the crews to move the trucks out of lanes. | Colunga Decl., p. 5, ¶ 12. |
| 40.  Despite his requests to the remaining two Chula Vista Fire crews to move their trucks, the trucks were not moved. | Colunga Decl., p. 5, ¶ 12. |
| 41.  After making his initial requests, Officer Colunga went back to the overturned vehicle to try to gather some information from one of the victims. | Colunga Decl., p. 5, ¶ 12. |
| 42.  Officer Colunga subsequently noticed that the two fire trucks were still parked in lanes, so he went back to speak to the fire crews again and request that they move the fire trucks. | Colunga Decl., p. 5, ¶ 12. |
| 43.  It was at this point that Officer Colunga saw Officer Sergio Flores walk up to where Officer Colunga was standing with the fire fighters, close enough to where, in Officer Colunga's opinion, Officer Flores could have overheard the conversation. | Colunga Decl., p. 5, ¶ 12. |
| 44.  Officer Colunga wanted the fire crews to move the fire trucks when he asked them to do so, and he expected them to comply with his requests.  They did not move the fire trucks in response to his requests. | Colunga Decl., p. 5, ¶ 13. |
| 45.  Since this collision scene was on Officer Flores' beat, Officer Colunga knew that Officer Flores was taking over Officer Colunga's role as Incident Commander (i.e., in charge of scene management) once Officer Flores arrived. | Colunga Decl., p. 5, ¶ 14. |
| 46.  Prior to Engineer Gregoire's arrest, Officer Colunga never witnessed Engineer Gregoire engaging in activities that Officer Colunga perceived to constitute patient care; instead, prior to the arrest, Officer Colunga saw Engineer Gregoire standing with a group of fire fighters in the center median area.  At this time, Engineer Gregoire did not appear to Officer Colunga to be assisting in patient care. | Colunga Decl., p. 5, ¶ 15. |
| 47.  At no time did Officer Colunga see a fire, see smoke, smell smoke, see or smell any leaking gas from the overturned vehicle, see any movement in the overturned vehicle, see any sparking near the overturned vehicle, or detect any other indications that there was a likelihood of fire occurring at the scene. | Colunga Decl., pp. 5-6, ¶ 16. |

7

AER 108

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 48.  At this scene, Officer Colunga did not form a belief that it would be necessary for the fire trucks to remain blocking lanes in order to protect the pathway of the ambulance when it came time for it to leave the scene. | Colunga Decl., p. 6, ¶ 17. |
| 49.  Officer Flores initially became involved in the rollover collision at approximately 9:30 p.m., when he heard radio traffic regarding a collision on Interstate 805, just south of Telegraph Canyon Road. | Flores Decl., p. 2, ¶ 3. |
| 50.  After clearing a traffic stop in Mission Valley, Officer Flores began driving southbound on the I-805 to respond to the accident scene. | Flores, Decl., p. 2, ¶ 3. |
| 51.  Since the accident was in his beat area, Officer Flores's intent was to follow what he understood to be the normal practice amongst CHP Officers and respond to the collision scene to take over the collision investigation and take over as the incident manager (often referred to as Incident Commander). | Flores Decl., p. 2, ¶ 3. |
| 52.  Upon approaching the scene, Officer Flores perceived that traffic was backing up, so he began a traffic break to bring traffic approaching the scene in slowly. | Flores Decl., p. 2, ¶ 4. |
| 53.  Officer Flores came upon a fire truck that was parked mostly in the number 1 lane (i.e., the lane closest to the center median) and partially into the number 2 lane. | Flores Decl., p. 2, ¶ 4. |
| 54.  Where this fire truck was stopped, Officer Flores could see that there was a cement k-rail (also called a Jersey wall) immediately butting up against the east side of the southbound number 1 lane.  Thus, from the rear of the fire truck and proceeding back (i.e., northbound) along the eastern edge of the southbound I-805 for a substantial distance, there was cement k-rail abutting the number 1 lane. | Flores Decl., p. 2, ¶ 4. |
| 55.  Because he saw the fire truck blocking the number 1 lane and part of the number 2 lane, Officer Flores initially believed that the accident must be located in the number 1 lane in front of the fire truck. | Flores Decl., p. 2, ¶ 5. |
| 56.  Officer Flores therefore stopped his patrol car approximately 100 feet behind this fire truck and proceeded to lay a flare pattern on the road, proceeding from the rear of his patrol vehicle in a diagonal pattern moving southbound toward the number 2 lane. | Flores Decl., p. 2, ¶ 5. |

8

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 109

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 57. As he moved his flare pattern close to the fire truck, Officer Flores saw that the actual collision scene was to his left in a construction area on the other side of the k-rails. Officer Flores perceived that the collision scene was between cement k-rails that blocked off a large construction area between the northbound and southbound lanes. | Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo. |
| 58. Officer Flores concluded that the collision scene was not in any traffic lanes. | Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo. |
| 59. Officer Flores saw fire personnel, paramedics, and at least one of the people who had been involved in the collision near the vehicle in this center area. | Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl. |
| 60. Officer Flores determined that the collision had occurred on the northbound side and that the vehicle had come to rest in the construction area. | Flores Decl., p. 3, ¶ 6; pp. 5-6, ¶¶ 12 & 13, & Exhibits A & B to Flores Decl.; Gregoire Depo., p. 47, ln. 3 through p. 50, ln. 19, & Ex. 3 to Gregoire Depo; Gregoire Depo., p. 50, ln. 20 through p. 51, ln. 19, and Ex. 4 to Gregoire Depo. |
| 61. Officer Flores saw paramedics providing medical care to the vehicle occupants. | Flores Decl., p. 3, ¶ 6. |
| 62. Very soon after completing his flare pattern, Officer Flores saw Officer Colunga (who had arrived before Officer Flores) speaking to a group of firefighters. | Flores Decl., p. 3, ¶ 7. |
| 63. Officer Flores heard Officer Colunga asking the group why they had not yet moved their fire engine. | Flores Decl., p. 3, ¶ 7. |
| 64. Officer Flores heard Officer Colunga say that he had told them several times that they needed to move their fire engine. | Flores Decl., p. 3, ¶ 7. |

9

AER 110

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 65.  Officer Flores heard Officer Colunga state that the collision scene was safely within the construction area and that the truck was not providing any protection. | Flores Decl., p. 3, ¶ 7. |
| 66.  Based on his training and experience and his personal observations of the scene, Officer Flores formed the conclusion that having fire trucks parked in lanes was not necessary to protect the scene. | Flores Decl., p. 3, ¶ 8. |
| 67.  Based on his training and experience with having responded to and investigated multiple traffic collisions, Officer Flores formed the belief that the fire truck was presenting an unnecessary risk to the public. | Flores Decl., p. 3, ¶ 8. |
| 68.  Officer Flores knew that CHP Officers were trained that part of their role in managing traffic scenes is to make sure that the placement of vehicles and equipment is done in such a way as to prevent the serious problem of secondary automobile collisions. | Flores Decl., p. 3, ¶ 8. |
| 69.  Officer Flores knew that such accidents occur due to the motoring public's surprise and confusion resulting from suddenly encountering lane blockages from emergency equipment in roadways at accident scenes and that this is a particular risk on freeways, where traffic can come upon accident scenes at high speeds. | Flores Decl., pp. 3-4, ¶8; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. |
| 70.  Clearing lanes at traffic scenes to protect the public is a key part of CHP Officers' responsibilities as traffic incident managers. | Flores Decl., p. 4, ¶ 8. |
| 71.  Officer Flores knew that CHP Officers are responsible for managing the entire scene of a traffic accident to protect the safety of people present at the scene and to protect the motoring public near the scene. | Flores Decl., p. 4, ¶ 9. |
| 72.  Officer Flores's analysis of the scene management issues at this particular traffic scene also included his perception that the ambulance which had responded to treat patients was parked in the center median area and out of traffic lanes. | Flores Decl., p. 4, ¶ 9; Gregoire Depo., p. 25, ln. 2 through p. 26, ln. 2; p. 26, ln. 17 through p. 27, ln. 21. |
| 73.  Officer Flores' analysis of the scene management issues at this scene also included his realization that the collision did not occur in any southbound lanes, so there was no debris field in any southbound lanes. | Flores Decl., p. 4, ¶ 9. |

10

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 111

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 74. Officer Flores had made these observations by the time he was overhearing the conversation between Officer Colunga and the fire fighters. | Flores Decl., p. 4, ¶ 9. |
| 75. Officer Flores formed the belief that having fire trucks parked in lanes was posing a serious risk to the public and that this was not needed to protect the accident scene. He believed the accident scene to be fully shielded in a large center construction area by cement k-rail walls. | Flores Decl., p. 4, ¶ 9. |
| 76. Officer Flores' analysis of the scene management issues at this scene also included the fact that the truck he was trying to get to move was on the I-805, which is a freeway on which people commonly travel at high speeds. | Flores Decl., p. 4, ¶ 9. |
| 77. Officer Flores was concerned about vehicles approaching from the north at high speeds and unexpectedly coming upon stopped emergency vehicles without time to react. | Flores Decl., p. 4, ¶ 9. |
| 78. Officer Flores was concerned about secondary accidents occurring and additional people getting injured or killed. | Flores Decl., p. 4, ¶ 9; Albright Depo., p. 161, lns. 1-24; [for foundation, p. 6, lns. 13-23; p. 61, ln. 6 through p. 62, ln. 22; p. 177, lns. 16-24]. |
| 79. Since he believed this to be his accident scene, Officer Flores assumed he was taking the role of managing the scene upon his arrival. | Flores Decl., p. 4, ¶ 10. |
| 80. In his efforts to get the truck moved, Officer Flores called out to a group of fire fighters and asked who was driving the truck. | Flores Decl., p. 4, ¶ 10. |
| 81. An Engineer (later identified as Jacob Gregoire) stated that he as driving the truck. | Flores Decl., p. 4, ¶ 10. |
| 82. Officer Flores directed Engineer Gregoire to move the truck. | Flores Decl., p. 4, ¶ 10. |
| 83. Engineer Gregoire stated that he was not going to move the truck. | Flores Decl., p. 4, ¶ 10. |

11

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 112

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 84. Officer Flores told Engineer Gregoire that he was giving Engineer Gregoire a direct order to move his fire truck because Officer Flores believed it was causing a hazard. | Flores Decl., p. 4, ¶ 10. |
| 85. Despite Officer Flores repeating the direction to move his truck, Engineer Gregoire continued to state that he would not move it. | Flores Decl., pp. 4-5, ¶ 10. |
| 86. Officer Flores then stated that, if Engineer Gregoire did not move the fire truck, Officer Flores was going to arrest him for disobeying an order and for delaying the officers in their investigation. | Flores Decl., p. 5, ¶ 10. |
| 87. Engineer Gregoire told Officer Flores to go ahead and arrest him. Engineer Gregoire refused to move the truck. | Flores Decl., p. 5, ¶ 10. |
| 88. At this point, Officer Flores believed the following: that Engineer Gregoire was capable of driving the fire truck, that Engineer Gregoire was the driver of the fire truck, that Officer Flores had given Engineer Gregoire an order to move the truck pursuant to Officer Flores' duties to manage the traffic scene for public safety, that Engineer Gregoire was refusing to comply with that order despite several requests, that Officer Flores had warned Engineer Gregoire that he would be arrested if he did not comply, and that Engineer Gregoire was continuing to refuse to comply. | Flores Decl., p. 5, ¶ 11. |
| 89. Based on the circumstances, Office Flores formed the belief that Engineer Gregoire was in violation of California Penal Code § 148(a) and California Vehicle Code § 2800(a), believing that Engineer Gregoire was failing to follow Officer Flores' orders and was hindering/delaying Officer Flores' management and investigation of the accident scene. | Flores Decl., p. 5, ¶ 11. |
| 90. Officer Flores directed Engineer Gregoire to step over a k-rail (one that was between the two k-rails on the northbound and southbound sides of the center portion of I-805). | Flores Decl., p. 5, ¶ 11. |
| 91. Engineer Gregoire stepped over the k-rail, and Officer Flores placed him under arrest. | Flores Decl., p. 5, ¶ 11. |

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 92. Officer Flores placed handcuffs on Engineer Gregoire's wrists and walked him back to Officer Flores' patrol car. | Flores Decl., p. 5, ¶ 11. |
| 93. Prior to arresting Engineer Gregoire, Officer Flores did not see Engineer Gregoire engaging in any activities that Officer Flores perceived to be patient care. | Flores Decl., p. 6, ¶ 14. |
| 94. To Officer Flores, it appeared that Engineer Gregoire was standing with a group of other fire fighters while others were actually treating patients. Still shots of new media video images of the scene demonstrate points just prior to the arrest where there were multiple fire fighters present, including a point just prior to Officer Flores calling out for the driver of the truck where Engineer Gregoire appeared to be standing in a group. | Flores Decl., p. 6, ¶ 14; Albright Depo., p. 128, ln. 21 through p. 131, ln. 4, and Exhibit D to Albright Depo; Gregoire Depo., p. 96, ln. 24 through p. 99, ln. 24, and Exhibit 8 to Gregoire Depo. |
| 95. Prior to ordering Engineer Gregoire to move the fire truck, Officer Flores was aware that the patients were being treated by paramedics from an ambulance. | Flores Decl., p. 6, ¶ 14. |
| 96. Given his belief that the patients were being treated by paramedics, Officer Flores did not perceive a reason why Engineer Gregoire could not move his fire truck. | Flores Decl., p. 6, ¶ 14;. |
| 97. Officer Flores did not see any indication that Engineer Gregoire was engaged in any fire suppression activities, nor did Officer Flores perceive any signs of risk of fire at the scene so as to justify keeping the fire truck in its location. | Flores Decl., p. 6, ¶ 14; |
| 98. Engineer Gregoire and Captain Albright acknowledge they were not involved in fire suppression activities and did not perceive signs indicating a risk of the vehicle catching on fire. | Gregoire Depo., p. 34, ln. 7 through p. 35, ln. 20; Albright Depo., p. 134, ln. 9 through p. 136, ln. 25. |
| 99. Officer Flores' purpose in ordering Engineer Gregoire to move the fire truck was to eliminate a risk that Officer Flores believed it was posing to public safety. | Flores Decl., p. 6, ¶ 14. |

/ / /

/ / /

13

AER 114

II.   **ISSUE 2: THE SECOND CAUSE OF ACTION UNDER 42 U.S.C. § 1983 FOR EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT IS WITHOUT MERIT, AS DEFENDANT SERGIO FLORES DID NOT KNOWINGLY TIGHTEN THE HANDCUFFS AND PLAINTIFF WAS NOT INJURED**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
| --- | --- |
| 100.  The force used in arresting Engineer Gregoire began with Officer Flores directing Engineer Gregoire to step over the k-rail, whereupon Officer Flores placed him under arrest. | Flores Decl., p. 5, ¶ 11. |
| 101.  Officer Flores placed handcuffs on Engineer Gregoire's wrists and walked him back to Officer Flores' patrol car. | Flores Decl., p. 5, ¶ 11; Gregoire Depo., p. 69, ln. 21 through p. 70, ln. 24. |
| 102.  In the course of searching Engineer Gregoire before placing him in the patrol car, Officer Flores double-locked the handcuffs. | Flores Decl., p. 5, ¶ 11. |
| 103.  The point in double locking the handcuffs is to prevent the handcuffs from tightening. | Flores Decl., p. 5, ¶ 11. |
| 104.  At no point did Officer Flores intentionally tighten the handcuffs on Engineer Gregoire. | Flores Decl., p. 5, ¶ 11. |
| 105.  Engineer Gregoire admits that his only two statements he claims to have made to Officer Flores regarding the handcuffs were to ask Officer Flores, in the moments just prior to being placed in the patrol car, whether Officer Flores could loosen the handcuffs. | Gregoire Depo., p. 71, ln. 14 through p. 74, ln. 18. |
| 106.  Engineer Gregoire admits that Officer Flores never said anything like, "No, I'm not going to loosen them?" or "I'm going to tighten them." | Gregoire Depo., p. 74, lns. 19-24. |
| 107.  Engineer Gregoire admits that he does not recall ever checking his wrists between the time of his release from the handcuffs to the next morning to see if there were any marks on his wrists. | Gregoire Depo., p. 75, lns. 3-11. |
| 108.  Engineer Gregoire admits that, between the time of his release from the handcuffs to the time of his deposition on September 16, 2015, he never took any photographs to document any marks that he believed to have been left on either of his wrists from the handcuffs. | Gregoire Depo., p. 75, lns. 18-23. |
| 109.  Engineer Gregoire admits that he never sought any medical care from any type of medical provider for injuries that he attributes to the handcuffs. | Gregoire Depo., p. 75, ln. 24 through p. 76, ln. 2. |

14

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 115

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| 110.  Engineer Gregoire admits that he never showed his wrists to anyone after the point of being released to say, "Hey, look, I've got marks from the handcuffs." | Gregoire Depo., p. 76, lns. 3-7. |
| 111.  The only pain that Engineer Gregoire claims to have encountered after the time the handcuffs were released was as follows: "I think they were sore on my walk back, but I had a lot of adrenaline going on from what had just happened, so I may have put it out of my mind at that time.  It was just a relief to have them off." | Gregoire Depo., p. 76, lns. 8-13. |
| 112.  Engineer Gregoire admits that his wrists were not sore the next morning when he woke up. | Gregoire Depo., p. 76, lns. 14-16. |
| 113.  Engineer Gregoire admits that, since the time he was released from the handcuffs up to the time of his September 16, 2015, deposition, he has not experienced any pain in either wrist where the handcuffs had been. | Gregoire Depo., p. 76, lns. 17-23. |
| 114.  Engineer Gregoire admits that no part of his body was physically hurt as a result of Officer Flores' actions from the point of his first physical contact with Engineer Gregoire in the course of the arrest to the point where Engineer Gregoire was released from the vehicle and let go. | Gregoire Depo., p. 152, lns. 9-18, p. 158, lns. 5-9. |
| 115.  Other than his claim that the handcuffs were too tight, Engineer Gregoire admits that Officer Flores did not engage in any activity that Engineer Gregoire believed to be improper use of force. | Gregoire Depo., p. 157, ln. 25 through p. 158, ln. 4. |
| 116.  Engineer Gregoire remained in custody for approximately 30 minutes before being released. | Flores Decl., pp. 6- 7, ¶¶ 15 & 16. |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 116

III. **ISSUE 3: THE THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTION 52.1 (BASED ON ALLEGED FALSE ARREST) IS WITHOUT MERIT, AS THE ARREST WAS SUPPORTED BY PROBABLE CAUSE**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 99 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | |

IV. **ISSUE 4: THE FOURTH CAUSE OF ACTION FOR BATTERY UNDER CALIFORNIA LAW IS WITHOUT MERIT, BECAUSE THE FORCE USED BY OFFICE SERGIO FLORES WAS REASONABLE AND JUSTIFIED**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 116 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | |

V. **ISSUE 5: THE FIFTH CAUSE OF ACTION FOR FALSE IMPRISONMENT UNDER CALIFORNIA LAW IS WITHOUT MERIT, AS THE ARREST WAS SUPPORTED BY PROBABLE CAUSE**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 99 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | |

/ / /

/ / /

/ / /

/ / /

/ / /

16

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

AER 117

**VI.** **ISSUE 6: THE SIXTH CAUSE OF ACTION UNDER CALIFORNIA LAW FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IS WITHOUT MERIT, BECAUSE DEFENDANT SERGIO FLORES DID NOT ENGAGE IN OUTRAGEOUS CONDUCT**

| UNDISPUTED MATERIAL FACT | EVIDENCE |
|---|---|
| Undisputed Material Facts Nos. 1 - 116 and Supporting Evidence are hereby incorporated by reference herein as though fully set out. | |

Dated:  November 23, 2015

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
RICHARD F. WOLFE
Supervising Deputy Attorney General


s/DOUGLAS E. BAXTER
DOUGLAS E. BAXTER
Deputy Attorney General
*Attorneys for Defendants State of California (by and through the California Highway Patrol) and Sergio Flores*

SD2014707454
81202043.doc

17

DEFS.' SEP. STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT/SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1    KAMALA D. HARRIS
     Attorney General of California
2    RICHARD F. WOLFE
     Supervising Deputy Attorney General
3    DOUGLAS E. BAXTER
     Deputy Attorney General
4    State Bar No. 201351
       600 West Broadway, Suite 1800
5    San Diego, CA 92101
     P.O. Box 85266
6    San Diego, CA 92186-5266
     Telephone:  (619) 645-2034
7    Fax:          (619) 645-2012
     E-mail:  Douglas.Baxter@doj.ca.gov
8    *Attorneys for Defendants State of California*
     *(by and through the California Highway*
9    *Patrol) and Sergio Flores*

10          **IN THE UNITED STATES DISTRICT COURT**

11         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13   | JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
14   | | |
     | Plaintiff, | **DECLARATION OF DOUGLAS E.** |
15   | | **BAXTER IN SUPPORT OF** |
     | v. | **DEFENDANTS' MOTION FOR** |
16   | | **SUMMARY JUDGMENT OR, IN** |
     | | **THE ALTERNATIVE, SUMMARY** |
17   | CALIFORNIA HIGHWAY PATROL, | **ADJUDICATION OF CLAIMS** |
     | an agency of the State of California; | |
18   | SERGIO FLORES, and DOES 1 to 20, | Date:       January 29, 2016 |
     | | Time:       1:30 p.m. |
19   | Defendants. | Courtroom:  2D |
     | | Judge:      The Honorable Gonzalo P. |
20   | | Curiel |

21          I, Douglas E. Baxter, hereby declare as follows:

22          1.  I am an attorney duly licensed to practice law in the State of California.  I

23   am authorized to appear before the United States District Court for the Southern

24   District of California.  I am employed as a Deputy Attorney General for the Office

25   of the Attorney General of the State of California.  I am assigned to represent

26   Defendants State of California (by and through the California Highway Patrol) and

27   Sergio Flores in the above-entitled action.

28

                                        1

1     2.  I conducted the September 16, 2015, deposition of Plaintiff Jacob Gregoire

2  in this action.  Attached herewith as Exhibit A are true and correct copies of those

3  excerpts of the certified transcript of Plaintiff's deposition and exhibits to said

4  transcript that are referenced in Defendants' Separate Statement of Undisputed

5  Material Facts in Support of Defendants' Motion for Summary Judgment, or, in the

6  Alternative, Summary Adjudication.

7     3.  I conducted the September 10, 2015, deposition of Captain David L.

8  Albright in this action.  Attached herewith as Exhibit B are true and correct copies

9  of those excerpts of the certified transcript of Captain Albright's deposition and

10  exhibits to said transcript that are referenced in Defendants' Separate Statement of

11  Undisputed Material Facts in Support of Defendants' Motion for Summary

12  Judgment, or, in the Alternative, Summary Adjudication.

13     I affirm under penalty of perjury under the laws of the State of California that

14  the foregoing information is true and correct of my own knowledge and that this

15  declaration is being executed on this 23rd day of November at San Diego,

16  California.

17

18                        s/DOUGLAS E. BAXTER
                              Douglas E. Baxter

19

20

21

22

23

24

25  SD2014707454
    81202958.doc

26

27

28

DECL. OF DOUGLAS E. BAXTER IN SUPPORT OF DEFS.' MOTION FOR SUMMARY
JUDGMENT OR SUMMARY ADJUDICATION  (14-cv-01749-GPC (DHB))

**EXHIBIT A**



**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

```
                              )
JACOB GREGOIRE,               )
                              )
         Plaintiff,           ) CASE NO.
                              )
    v.                        ) 14-CV-01749-GPC (DHB)
                              )
CALIFORNIA HIGHWAY PATROL, an )
agency of the State of California; )
SERGIO FLORES; and DOES 1 to 20,  )
                              )
         Defendants.          )
                              )
```

VIDEOTAPED DEPOSITION OF JACOB GREGOIRE

SAN DIEGO, CALIFORNIA

SEPTEMBER 16, 2015

REPORTED BY JULIA LENNAN, RPR, CSR NO. 12843

HUTCHINGS NUMBER: 588449

t800.697.3210          www.hutchings.com          400 N. Tustin Ave., Ste 301
Santa Ana, CA 92705

GREGOIRE - 9/16/2015

Page 2

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4       _____
                                         )
        JACOB GREGOIRE,                  )
5                                        )
                 Plaintiff,              ) CASE NO.
6                                        )
            v.                           ) 14-CV-01749-GPC (DHB)
7                                        )
        CALIFORNIA HIGHWAY PATROL, an    )
8       agency of the State of California; )
        SERGIO FLORES; and DOES 1 to 20, )
9                                        )
                 Defendants.             )
10      _____)

11

12

13

14

15

16

17

18

19

20          VIDEOTAPED DEPOSITION OF JACOB GREGOIRE,

21    taken on behalf of Defendants at 1320 Columbia Street,

22    Suite 200, San Diego, California, on Wednesday,

23    September 16, 2015, at 9:31 a.m., before Julia Lennan,

24    RPR, CSR, No. 12843, a certified shorthand reporter in

25    the state of California.
```

GREGOIRE - 9/16/2015

Page 3

```
 1    APPEARANCES:

 2    For Defendants:

 3            Attorney General of California
              By:  Douglas E. Baxter
 4            600 West Broadway, Suite 1800
              San Diego, California  92101
 5            619.645.2034
              douglas.baxter@doj.ca.gov
 6
 7    For Plaintiff:

 8            Law Office of Steve Hoffman
              By:  Steve Hoffman
 9            1320 Columbia Street, Suite 200
              San Diego, California  92101
10            619.577.3015
              shoffmanlaw@gmail.com
11
                          - and -
12
              The Gilleon Law Firm
13            By:  Daniel M. Gilleon
              1320 Columbia Street, Suite 200
14            San Diego, California  92101
              619.702.8623
15            dmg@mglawyers.com

16
17    Also Present:

              Anthony Martinez, Videographer
18
19
20
21
22
23
24
25
```

GREGOIRE - 9/16/2015

Page 5

```
 1            THE VIDEOGRAPHER:  We are on the record.  The
 2   time is 9:31 a.m.  The date is September 16th, 2015.
 3            This is the beginning of Media Number 1 in the
 4   deposition of Jacob Gregoire, Volume 1, taken by the
 5   defense in the matter of Jacob Gregoire versus
 6   California Highway Patrol.  The Case Number is
 7   14-CV-01749-GPC (DHB).
 8            This deposition is being held at 1320 Columbia
 9   Street, suite 200, San Diego, California, 92101.  The
10   court reporter is Julia Lennan.  I am Anthony Martinez,
11   the videographer retained by Hutchings Video &
12   Litigation Services, 400 North Tustin Avenue, Suite 301,
13   Santa Ana, California, 92705.
14            This deposition is being videotaped at all
15   times unless specified to go off the record.
16            Will all present please identify themselves
17   beginning with the witness.
18            THE WITNESS:  Present.
19            THE COURT REPORTER:  Identify yourself.
20            THE WITNESS:  Oh, sorry.  Jacob Gregoire.
21            MR. HOFFMAN:  Steve Hoffman on behalf of Jake
22   Gregoire.
23            MR. GILLEON:  Dan Gilleon.
24            MR. BAXTER:  Doug Baxter for the State of
25   California.
```

GREGOIRE - 9/16/2015

Page 6

```
 1            THE VIDEOGRAPHER:  Thank you.  Will the
 2    witness be sworn in.  Then we can proceed.
 3
 4                    JACOB GREGOIRE,
 5      having been first duly sworn, testifies as follows:
 6
 7                    EXAMINATION
 8    BY MR. BAXTER:
 9        Q     Thank you, Mr. Gregoire.
10              Am I pronouncing your last name correctly?
11        A     Yes.  Gregoire.  Close enough.
12        Q     Good as anybody gets it.
13        A     That's okay.
14        Q     If you could just start off by stating and
15    spelling your full name for the record.
16        A     Yes.  It's Jacob Gregoire, J-a-c-o-b,
17    G-r-e-g-o-i-r-e.
18        Q     Thank you.
19              As I mentioned, I'm with the State of
20    California.  I represent the California Highway Patrol
21    and Officer Sergio Flores regarding the lawsuit that you
22    have filed in relation to the February 4, 2014, incident
23    that took place on the 805 freeway.  I just want to go
24    over kind of some ground rules of what we're doing here
25    today.
```

GREGOIRE - 9/16/2015

Page 25

```
 1        A    No.
 2        Q    Okay.  You said you noticed an ambulance.
 3             Where did you notice an ambulance at?
 4        A    Parked in the center divide.
 5        Q    Could you tell whether that ambulance had any
 6   emergency lights activated?
 7        A    Yes.
 8        Q    And what did you notice?
 9        A    It had its lights on.
10        Q    We've heard in the industry Code 3, Code 2
11   lights.
12             How would you -- how would you describe the
13   type of lights it had on?
14        A    It would -- to the best of my memory, a Code 2
15   would be lights with no siren.
16        Q    Okay.
17        A    Since it's not moving at the time, I don't
18   think -- believe they had their siren on.
19        Q    Okay.  But do you think they had full reds,
20   blues --
21        A    Yes.
22        Q    -- everything going on?
23        A    Typically on our apparatus, it's one switch
24   that turns them all on.
25        Q    Okay.  But I'm trying to find out what you
```

AER 127

GREGOIRE - 9/16/2015

Page 26

1  recall seeing on the ambulance, what was activated.

2      A    The same thing for the ambulance.

3      Q    All right.  And you had your full code lights

4  on?

5      A    Correct.

6      Q    All right.  And where did you park your

7  vehicle in relation to that ambulance?

8      A    In the Number 1 lane roughly 50 -- 25 to

9  50 feet behind it.

10     Q    At that point could you see any other fire

11 engines from any other agency on the scene?

12     A    No.

13     Q    All right.  At that point were you aware of

14 whether there were any other CHP vehicles already

15 stopped at the scene?

16     A    No.

17     Q    Okay.  And you mentioned the ambulance was

18 parked in the center divide?

19     A    Yes.

20     Q    Okay.  And can you describe the layout of --

21 well, actually, where you parked was there any shoulder?

22     A    No.

23     Q    And that, I mean a shoulder on the inside of

24 the freeway.

25     A    No, it was not much.  There was a K-rail

AER 128

GREGOIRE - 9/16/2015

Page 27

```
 1     there, a temporary K-rail, from the construction zone.
 2          Q     So that was abutting right up against the
 3     Number 1 lane?
 4          A     Yes.
 5          Q     Did your vehicle pass the end of that K-rail
 6     at all where the K-rail terminated, or were you still
 7     K-rail from front to back of your vehicle?
 8          A     I'd have to review some video or photos.  I
 9     don't recall exactly how far away the engine was from
10     the K-rail.
11          Q     All right.  To the best of your recollection,
12     the -- there was a center divide where the ambulance
13     was.
14               Does that mean the K-rail ended at some point,
15     that the ambulance was able to go into a center divide
16     area?
17          A     Correct.
18          Q     All right.  Was any part of the ambulance in
19     the Number 1 lane?
20          A     I don't recall.  If they weren't, they were
21     very close to it.
22          Q     All right.  Could you tell if the ambulance
23     was parked at an angle with respect to the K-rail, or
24     did it appear to be parallel to the K-rail?
25          A     I don't recall exactly.
```

GREGOIRE - 9/16/2015

Page 34

1      A     I walked maybe 10 or 15 feet kind of just
2  behind the wrecked vehicle with my flashlight and just
3  eyeballed everything just kind of as quick as -- a brief
4  quick overview.
5      Q     Did you nice any ejected patients?
6      A     I did not.
7      Q     All right.  Did you do anything at that point
8  to assess the vehicle as to whether there was still any
9  apparent fire hazard from that vehicle?
10     A     Other than visually looking at it and had
11  climbed around it, no, I did not notice any fire.
12     Q     Is that part of your respons- -- normal
13  responsibilities as a fire engineer, to try to make that
14  assessment when you first get on scene?
15     A     It's not a desig- --  necessarily a designated
16  responsibility, but it is something that I do.
17     Q     And so did you notice any smoke coming from
18  the vehicle?
19     A     I do not recall any, no.
20     Q     Okay.  Did you notice -- did the vehicle
21  appear to be stationary?
22     A     Yes.
23     Q     Was it still spinning or anything?
24     A     No.
25     Q     All right.  Did you see any sparking coming

GREGOIRE - 9/16/2015

Page 35

```
 1    from the vehicle anywhere?

 2         A    I do not recall any sparking.

 3         Q    Did you make any observations in the immediate

 4    vicinity of the vehicle of any leaking hazardous fluids

 5    coming from the vehicle such as gasoline?

 6         A    Right.  I didn't -- I do not recall seeing any

 7    leaking fluids.

 8         Q    Okay.  Was there anything about that vehicle

 9    based on your training and experience as a fire engineer

10    with the Chula Vista fire department, that led you to

11    believe at that point that that vehicle appeared likely

12    to catch on fire?

13         MR. HOFFMAN:  Objection.  Vague and ambiguous

14    as to "likely."

15    BY MR. BAXTER:

16         Q    Well, were you concerned that the -- as your

17    role, that you needed to do something because that

18    vehicle appeared at risk of catching fire?

19         A    Based on experience, my judgment at the time

20    was no, it would not, but anything could happen.

21         Q    All right.  Did you feel a need to go retrieve

22    any fire extinguishers at that point?

23         A    I did not.

24         Q    Did you feel a need to go pump up the engine's

25    water lines?
```

GREGOIRE - 9/16/2015

Page 47

```
 1            There's copies for counsel.  I thought I had a
 2   fourth one.
 3            (Exhibit 3 marked.)
 4   BY MR. BAXTER:
 5       Q    First of all, let me ask you, do you recognize
 6   anything depicted in that photo?
 7       A    Yes.
 8       Q    What all do you recognize in terms of -- do
 9   you recognize any of the people there?
10       A    Yes.
11       Q    Who do you recognize?
12       A    Myself, Mr. Flores, and John McClintock.
13       Q    All right.  Where are you -- describe where
14   you are in this picture.
15       A    I'm on a closed off freeway lane surrounded by
16   two K-rails.
17       Q    Okay.  And is that Officer Flores behind you?
18       A    To the best of my knowledge, yes.
19       Q    That's the officer that ultimately arrested
20   you, though?
21       A    Yes.
22       Q    And so you are the one standing immediately in
23   the forefront of this picture?
24       A    Correct.
25       Q    And you said Captain McClintock?
```

AER 132

GREGOIRE - 9/16/2015

Page 48

```
1      A    Yes.
2      Q    Is he the one over to the far -- as you're
3    facing the picture, the far right?
4      A    Yes.
5      Q    Appears to have like a ball cap on?
6      A    Yes.
7      Q    And his yellow jacket is open and you can see
8    blue?
9      A    Yes.
10     Q    All right.  Is Captain McClintock from Chula
11   Vista?
12     A    Yes.
13     Q    All right.  Do you know what engine?
14     A    Engine 54.
15     Q    All right.  Now, at this instant I understand
16   that you're not going to know exactly where -- the
17   sequence of this news video, but does this picture
18   appear to fairly and accurately depict events that you
19   recall happening at that night?
20     A    Yes.
21     Q    Now, you see a K-rail taken from your vantage
22   point facing forward.
23          Would you know -- can you tell which direction
24   you were facing at that point?
25          A    In the photo I was facing southbound.
```

GREGOIRE - 9/16/2015

Page 49

```
 1        Q     All right.  So from that vantage point, to
 2   your right do you see a K-rail?
 3        A     Yes.
 4        Q     All right.  Would that be on the southbound
 5   side?
 6        A     Yes.
 7        Q     All right.  And then so to your immediate left
 8   and to Captain McClintock's immediate right, there's
 9   another K-rail.
10        A     Correct.
11        Q     Is Captain McClintock standing in the
12   northbound lanes at that instant?
13        A     No.  He's in another construction zone.
14        Q     All right.  And at that instant do you believe
15   Captain McClintock -- you can't see it in this photo,
16   but he -- the nearby -- the rollover car is nearby in
17   the area where Captain McClintock is standing?
18        A     Yes.
19        Q     Okay.  And can you kind of see far back in the
20   background there's a green sign?
21        A     Yes.
22        Q     Are you able to see another K-rail line back
23   there?
24        A     It's hard to tell, but it's possible.
25        Q     All right.  But to the best of your
```

GREGOIRE - 9/16/2015

Page 50

1    recollection, there was a third K-rail line that

2    demarcated the edge of the northbound lanes over to

3    Captain McClintock's left from where he's facing?

4         A    Yes.

5         Q    All right.  So now based on the vantage point

6    of this picture, would it be correct to say that your

7    fire engine is somewhere off to your right and south of

8    you at that point?

9         A    Yes.

10        Q    All right.  So the rollover vehicle, there

11   would be the southbound K-rail and this open lane that's

12   under construction and then another K-rail before you

13   get to the rollover vehicle if you were walking from the

14   southbound lanes, correct?

15        A    Yes.

16        Q    All right.  And having looked at that, that

17   refreshes your recollection as to kind of how the

18   K-rails were laid out?

19        A    Yes.

20             MR. BAXTER:  All right.  Let me show you

21   another picture that I'm going to mark as Exhibit 4.

22             (Exhibit 4 marked.)

23   BY MR. BAXTER:

24        Q    If you could look at Exhibit 4.

25             Does this depict a portion of the scene of the

GREGOIRE - 9/16/2015

Page 51

```
 1    events from that evening?
 2         A    Yes.
 3         Q    All right.  Facing the picture, the officer to
 4    our left as we face the picture, that's the officer that
 5    arrested you?
 6         A    Yes.
 7         Q    And he's got his arm and that's touching
 8    somebody.
 9              That's you, correct?
10         A    Yes.
11         Q    So that would have been in seconds of you
12    crossing over that K-rail to come to him?
13         A    Yes.
14         Q    All right.  Now, in that picture you can
15    actually see the rollover car, correct?
16         A    Correct.
17         Q    All right.  And that's where it was throughout
18    that evening?
19         A    Yes.
20         Q    Okay.  And do you see some other firefighter
21    personnel?
22         A    Yes.
23         Q    The area where they're all standing, is that
24    where the patient care was occurring?
25         A    Correct.
```

GREGOIRE - 9/16/2015

Page 69

```
 1    that were mostly one-sided on the way back.
 2         Q    All right.  At the point that -- did you
 3    ever -- prior to going over to look at the vehicle, did
 4    you ever activate any lighting on Engine 52 to help
 5    illuminate the patient care scene?
 6         A    No.
 7         Q    All right.  Prior to the point where you're
 8    arrested, were you aware of whether any other fire
 9    apparatus were -- had activated any halogens or other
10    types of lights to help illuminate the patient-care
11    scene?
12         A    At the time I wasn't aware of it, but after
13    reviewing the videos, I see that Engine 54 was in the
14    process of setting up lights.
15         Q    All right.  Prior to the point where you're
16    arrested, were you -- and your -- you -- I guess what
17    I'm trying to understand, were you aware of whether
18    those lights had already been activated and were
19    illuminating the scene?
20         A    No.
21         Q    Okay.  What happened next as he handcuffs you?
22         A    He -- we began -- I was handcuffed, and we
23    began walking back to his car.
24         Q    Okay.  And how did you -- what path did you
25    walk back to his car?
```

AER 137

GREGOIRE - 9/16/2015

Page 70

```
 1        A    The -- down the middle of the -- in between

 2   the two K-rails.

 3        Q    So if we look at a picture, say, Exhibit 3 --

 4        A    Yes.  We turned, and I basically essentially

 5   did a 180 degrees to where we were standing and walked

 6   back.

 7        Q    All right.  How far did you -- did he walk you

 8   to his car?

 9        A    Yes.

10        Q    Where was his car parked?

11        A    About roughly a hundred yards or so back from

12   there.

13        Q    All right.  Do you know where it was -- was it

14   on the southbound side?

15        A    Yes, Number 1 lane.

16        Q    All right.  At this point did you notice any

17   flare patterns in the lanes?

18        A    I did -- I do not recall seeing flares.

19        Q    All right.  Did you walk all the way back to

20   his car between those two K-rails?

21        A    Yes, until we got -- towards the front of his

22   car we climbed over or we -- I think the -- I can't

23   recall if there was an opening we walked through or if

24   we climbed over.

25        Q    All right.  All right.  At this point did you
```

GREGOIRE - 9/16/2015

Page 71

```
 1    say -- during that walk down to the car before you

 2    crossed back over the K-rails to go to his car on the

 3    southbound side, did you -- two of you discuss anything?

 4        A    Yes.  I mentioned to him -- I said, "Can we

 5    talk this out and work this out?"

 6              And he kind of chuckled and said, "No, you

 7    already had your chance."

 8              MR. BAXTER:  Not blocking the camera?

 9              THE VIDEOGRAPHER:  (Shakes head).

10    BY MR. BAXTER:

11        Q    Anything else that was said between the two of

12    you?

13        A    That was it at that point.

14        Q    All right.  All right.  And then what happened

15    once you crossed the K-rails?

16        A    Once we crossed the K-rails, he walked me to

17    the passenger side in the Number 2 lane, which was open

18    with traffic -- cars were swerving out of the way -- and

19    he began going through my pockets.

20        Q    Were you -- you were standing on the passenger

21    side?

22        A    Passenger side of his vehicle, towards the

23    front passenger quarter panel of his vehicle, being

24    searched in the Number 2 lane.

25        Q    Okay.  And then what happened?
```

GREGOIRE - 9/16/2015

Page 72

```
 1        A    I asked him if we could please move to the
 2   other side of the vehicle and that I would tell him
 3   everything I had in my pockets and that I was
 4   cooperating, and he obliged.
 5        Q    All right.  So the two of you moved to the --
 6        A    To the front of the vehicle, I believe.
 7        Q    All right.  And did he continue searching you
 8   at that point?
 9        A    Yes.
10        Q    All right.  How long did that process of
11   searching you last?
12        A    I don't recall.  Maybe a minute or so.
13        Q    All right.  And at this point had you made any
14   complaints about the handcuffs?
15        A    At this point, no.
16        Q    All right.  What happened next?
17        A    Well, when we were to the side of the vehicle,
18   I asked him if he could loosen the handcuffs.
19        Q    When -- after he was done searching you?
20        A    Yes, before he was putting me in the car.
21        Q    All right.  And what, if anything, did he say
22   in response?
23        A    He tightened them.
24        Q    How did he do that?
25        A    I'm not familiar with how handcuffs work, but
```

AER 140

GREGOIRE - 9/16/2015

Page 73

1    they got tighter on my wrists.  So that's how -- that

2    was his response.

3          Q     Did he -- did you see him take out a key or

4    anything to tighten them?

5          A     He was standing behind me.

6          Q     All right.  Did you feel his wrists go around

7    your wrists as he's tightening them or --

8          A     The handcuffs just got tighter.  They weren't

9    his wrists because they were tighter and they stayed

10   tighter until I got out of the car.

11         Q     Okay.  And how long were you in the car for?

12         A     30 to 40 minutes.

13         Q     All right.  Did he get in the car with you at

14   any time?

15         A     Yes.

16         Q     Okay.  How soon after putting you in the car

17   did he get in the car?

18         A     Couple minutes.

19         Q     All right.  And as you are in the car, did you

20   have any conversations with him?

21         A     He was -- he asked me some personal questions

22   and I answered them.

23         Q     What do you mean by personal questions?

24         A     Asked me my name, how to spell it, and my

25   address, and -- I have it written down here as well --

GREGOIRE - 9/16/2015

Page 74

1    maybe my phone number.  I can't remember at the time

2    exactly what he asked me, and then I -- at the

3    conclusion of that, I asked him what I was being

4    arrested for.

5         Q    And what, if anything, did he say?

6         A    148.

7         Q    Anything else?

8         A    Nope.  I asked -- until I ask what a 148 was.

9         Q    And what did he say?

10        A    He said obeying, I believe.  Obeying.

11        Q    All right.

12        A    I said -- and then -- and then after that he

13   said, "I don't know.  I have to talk to my supervisor."

14        Q    All right.  During this time that you're

15   having conversations, did you make any further

16   complaints about the handcuffs being too tight?

17        A    No.  Just right before I got in, I asked him

18   one more time, "Can you please loosen the handcuffs."

19        Q    All right.  Did he ever say anything like,

20   "No, I'm not going to loosen them"?

21        A    No, he just ignored me.

22        Q    Okay.  Did he say anything like, "I'm going to

23   tighten them"?

24        A    Nope.

25        Q    All right.  At some point you got out of the

GREGOIRE - 9/16/2015

Page 75

```
1    handcuffs?
2         A    When he let me out of the car.
3         Q    All right.  Did you have any marks on your
4    wrists after that?
5         A    I did not check my wrists.  I don't know.  I
6    don't recall.
7         Q    So from the time you were released from the
8    handcuffs to the next morning, did you ever check your
9    wrists to look for marks?
10        A    I don't recall looking at my wrists.  I was --
11   I think I was too busy with other stuff.
12        Q    All right.  Did you ever take any photographs
13   of your wrists at any point for purposes of documenting
14   any marks --
15        A    I did not.
16        Q    All right.  If I can just finish.
17        A    Sorry.
18        Q    Did you ever take any photographs from the
19   date -- the time you were released up to today to
20   document any marks that you believe to have been left on
21   either of your wrists from the handcuffs being too
22   tight?
23        A    I did not.
24        Q    Did you ever seek any medical care from any
25   type of medical provider for treatment for injuries that
```

GREGOIRE - 9/16/2015

Page 76

```
1    you attribute to the handcuffs?

2         A    I did not.

3         Q    All right.  Did anyone ever -- did you ever

4    show your wrists to anyone after the point of being

5    released to say, "Hey, look, I've got marks from the

6    handcuffs"?

7         A    I do not recall doing so.

8         Q    All right.  Were you in pain for a period of

9    time after the handcuffs were taken off, in your wrists?

10        A    I think they were sore on my walk back, but I

11   had a lot of adrenaline going on from what had just

12   happened, so I may have put it out of my mind at that

13   time.  It was just a relief to have them off.

14        Q    All right.  Were you sore the next morning

15   when you woke up on your wrists at all?

16        A    I don't recall being so.

17        Q    Okay.  Since the time you've been released

18   from the handcuffs up to today, have you ever

19   experienced any pain in your wrist area where the

20   handcuffs were?

21        A    No.

22        Q    On either wrist?

23        A    No.

24        Q    All right.  Any abrasions left by the

25   handcuffs?
```

GREGOIRE - 9/16/2015

Page 86

```
 1    medical training do you have?

 2         A    An EMT.

 3         Q    An EMT, and that requires some sort of

 4    licensing?

 5         A    Yes.

 6         Q    All right.  When did you get that licensing?

 7         A    I got it, I don't remember, the summer of 2000

 8    I believe.

 9         Q    All right.  Now, in the course of your

10    training and experience to get that licensing and the --

11    your on-the-job training and experience with the fire

12    department, do you have an understanding as to whether

13    or not a paramedic and EMT, one is a higher level of

14    care?

15         A    Yes.

16         Q    What is your understanding?

17         A    That the paramedic is a higher level of care.

18         Q    All right.  With this particular incident, the

19    paramedics from AMR were already on scene prior to the

20    point that you arrived, correct?

21         A    Correct.

22         Q    All right.  As the higher level of care based

23    on your training and experience, between Chula Vista

24    Fire Department and those AMR paramedics, who had the

25    authority for patient care decision making between the
```

GREGOIRE - 9/16/2015

Page 96

```
 1        A     According to the photos, it appears that way.
 2    I do not recall the exact layout of the people.
 3        Q     All right.  And I'm not asking for the exact
 4    layout.  I'm just asking for whether or not when that
 5    paramedic said, "I need help with the gurney," whether
 6    those other Chula Vista Fire Department personnel and
 7    other paramedics or AMR personnel were present?
 8        A     I do not recall.  I feel like the question or
 9    this -- the request was directed to me.
10        Q     And why do you feel like it was directed to
11    you?
12        A     Because it was just a -- the way I felt, the
13    way it sounded.
14        Q     Okay.  But you don't recall that person
15    specifically face to face with you when they said that?
16        A     We were not face to face.
17        Q     Okay.  You don't recall him looking you in the
18    eye and saying that?
19        A     I don't recall.
20        Q     All right.  And other personnel were around
21    you when he said that?
22        A     I don't remember exactly, but referring to
23    your photos, it's possible.
24            MR. BAXTER:  All right.  I'm going to show you
25    a photo that I'm marking as Exhibit 8.
```

GREGOIRE - 9/16/2015

Page 97

```
 1              (Exhibit 8 marked.)
 2   BY MR. BAXTER:
 3       Q    If you could look at that and tell me whether
 4   that depicts any of the events from this incident?
 5       A    Yes.
 6       Q    All right.  I know the majority of the people
 7   are facing the other direction, but are you able to see
 8   yourself in that picture anywhere?
 9       A    Yes.
10       Q    Can you take this red pen and put an "X" on
11   the person you believe to be you on somewhere where
12   it'll show up.
13       A    Yes (indicating).
14       Q    All right.
15            MR. HOFFMAN:  Okay.
16   BY MR. BAXTER:
17       Q    And you feel comfortable just -- even though
18   that person is facing the other direction, you feel
19   certain that's you?
20       A    It's a -- I'm pretty comfortable to say yes,
21   it is.
22       Q    Is that where you recall standing at one
23   point?
24       A    Yes.
25       Q    And what do you believe you were doing at that
```

AER 147

GREGOIRE - 9/16/2015

Page 98

1    point?

2        A    At that point I was lighting the gurney, and I

3    had taken a step back from the gurney and was looking

4    over my shoulder to find out who was yelling at me.

5        Q    All right.  And there's somebody in a fire

6    department uniform to your left from the vantage point

7    of that person.

8            Who's that?  Can you tell?

9        A    I cannot tell.

10       Q    Okay.  Could that have been

11   Captain McClintock?

12           MR. HOFFMAN:  Objection.  Calls for

13   speculation.

14           THE WITNESS:  It could have been.

15   BY MR. BAXTER:

16       Q    Well, do you remember Captain McClintock being

17   in that general area around the point that's being

18   depicted in this photograph?

19       A    My memory, I do not remember, but according to

20   the photos, it appears as though he was.

21       Q    All right.  And I know you can only see part

22   of the right shoulder and like a lower right leg of what

23   appears to be a tan firefighter outfit to your immediate

24   right from your vantage point in this photo.

25       A    Yes.

GREGOIRE - 9/16/2015

Page 99

```
 1        Q     Do you believe that to be another Chula Vista
 2   fire personnel?
 3        A     Unknown on the agency, but firefighter
 4   personnel.
 5        Q     Okay.  So either San Diego or Chula Vista?
 6        A     Yes.
 7        Q     All right.  And to the right of that, you see
 8   a CHP officer?
 9        A     Yes.
10        Q     And then kneeling there's an AMR paramedic or
11   personnel?
12        A     Yes.
13        Q     And then you have a patient on the ground?
14        A     Yes.
15        Q     And then there's a firefighter facing our
16   direction that appears to be partially kneeling,
17   correct?
18        A     Correct.
19        Q     Are you able to tell from this photo who that
20   might be?
21        A     I believe it's Fire Paramedic Andy Matthews.
22        Q     Okay.  Why do you believe that?
23        A     Because he was the firefighter on Engine 54
24   that night.
25        Q     All right.  Is there anything special about
```

GREGOIRE - 9/16/2015

Page 152

```
 1        A    Yeah.  I believe due to lack of sleep, just
 2   achiness and, you know, stiffness of my body.
 3        Q    All right.  Have you been taking any
 4   medications like painkillers to treat that that you
 5   weren't taking before the incident?
 6        A    I would -- whenever -- I guess whenever I'm
 7   sore or stiff, I might take some Advil or some Tylenol
 8   but not on a regular basis.
 9        Q    All right.  Do you believe that you suffered
10   any physical injuries as a result of this incident to
11   any part of your body?
12        A    No.
13        Q    Okay.  Did anything about the process of
14   Officer Flores -- when he first made physical contact
15   with you to the point where you were released from the
16   vehicle and let go, did anything cause you any sort of
17   physical injuries that you attribute to that incident?
18        A    Physical, no.
19             MR. BAXTER:  All right.  Can we just take a
20   break for like five minutes?
21             MR. HOFFMAN:  Sure.
22             THE VIDEOGRAPHER:  Going off the record.  Time
23   is 12:38 p.m.
24             (Recess.)
25             THE VIDEOGRAPHER:  We are back on the record.
```

GREGOIRE - 9/16/2015

Page 157

```
1        A    With his verbal statement as I was getting out
2   of the vehicle.  I didn't know how to accept it.  It was
3   threatening, and I'm not sure if there was harm behind
4   it or not.
5        Q    What statement are you referring to?
6        A    When I got out of the car, he said, "This is
7   not over yet.  You are not being arresting, but I am not
8   done with you."
9        Q    All right.
10       A    "You're going to have to answer for your
11  actions."
12       Q    All right.  And that's the only statement he
13  made to you at that point?
14       A    And then he said something about, "Don't --
15  you have to fill out some paperwork before you leave."
16       Q    All right.  Other than that statement, are you
17  aware of any other statements he made that appear to
18  say, "I'm going to hit you," anything like that?
19       A    Verbally, no.
20       Q    All right.  Did he make any gestures that
21  appeared to you that he was going to strike you in any
22  way?
23       A    Strike, no, but strai- -- or tightening the
24  handcuffs felt -- was threatening.
25       Q    Okay.  So you talked about what you felt was
```

GREGOIRE - 9/16/2015

Page 158

```
1    tightening the handcuffs.
2              Did he do anything else that you said -- that
3    you believed to be improperly using force?
4         A    No.
5         Q    Okay.  And you already said that no part of
6    your body was hurt as a result of this arrest?
7         A    Correct.
8         Q    Okay.  Physically hurt.
9         A    Physically, correct.
10             MR. BAXTER:  Okay.  All right.  All right.  I
11   believe that's all I have.
12             Do you have any questions or --
13             MR. HOFFMAN:  One question.
14
15                      EXAMINATION
16   BY MR. HOFFMAN:
17        Q    Jake, you said previously -- I'm just trying
18   to clarify where you recall the ambulance being parked.
19   You said it was at one point in the center divider.
20             How far away from the edge of Lane 1 was the
21   back of the ambulance?
22        A    It was right -- right next to Lane 1 as far as
23   I can -- it was roughly 25 or so feet -- 25 to 50 or so
24   feet past the end of that open K-rail on the shoulder
25   inches from the first lane, the Lane 1, as far as I can
```

AER 152

GREGOIRE - 9/16/2015

Page 164

```
1    STATE OF CALIFORNIA   )
                           )
2    COUNTY OF SAN DIEGO   )

3

4         I, Julia Lennan, a certified shorthand reporter for

5    the State of California, CSR No. 12843, registered

6    professional reporter, do hereby certify:

7         That the witness in the foregoing deposition was

8    first duly sworn by me to testify to tell the truth in

9    the foregoing cause; that the deposition was taken

10   before me at the time and place herein named; that the

11   said deposition was reported stenographically by me and

12   transcribed through computer-aided transcription under

13   my direction; and that the foregoing is a true record of

14   the testimony elicited.

15        I do further certify that I am in no way interested

16   in the outcome of this action or connected with or

17   related to any of the parties or to their respective

18   counsel.

19        In witness whereof, I have hereunto set my hand

20   this 21st day of September, 2015.

21

22                          _____

23                          JULIA LENNAN, RPR, CSR NO. 12843

24

25
```

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**

**Exhibit: 00003**

  





TRACK_____ EXHIBIT___3___
DATE___9-16-15___
WITNESS___Gregoire___
_____ PAGES(S)
JULIA LENNAN, CSR #12843

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**                                           **Exhibit: 00004**

             



TRACK_____ EXHIBIT___ 4
DATE_____ 9-16-15
WITNESS_____ Gregoire
_____ PAGES(S)
JULIA LENNAN, CSR #12843

# Jacob Gregoire

## Gregoire vs. California Highway Patrol



**Job: 268078**                    **Exhibit: 00008**

  

Case 3:14-cv-01749-GPC-DHB   Document 25-3   Filed 11/23/15   Page 41 of 61





TRACK _____ EXHIBIT 8
DATE 9-16-15
WITNESS Gregoire
PAGES(S)
JULIA LENNAN, CSR #12843

**EXHIBIT B**



**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

```
JACOB GREGOIRE,                    )
        Plaintiff,                 )
    vs.                            ) Case No.:
CALIFORNIA HIGHWAY PATROL, an      ) 14-cv-01749-GPC (DHB)
agency of the State of             )
California; SERGIO FLORES, and     )
DOES 1 to 20,                      )
        Defendants.                )
_____   )
```

VIDEO DEPOSITION OF DAVID L. ALBRIGHT

San Diego, California

September 10, 2015

REPORTED BY:  KIMBERLY A. BROADHURST, CSR NO. 13814

Hutchings Number: 587309

t800.697.3210          www.hutchings.com          400 N. Tustin Ave., Ste 301
                                                  Santa Ana, CA 92705

DAVID L. ALBRIGHT - 9/10/2015

Page 2

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    JACOB GREGOIRE,                    )

4           Plaintiff,                  )

5       vs.                            ) Case No.:

6    CALIFORNIA HIGHWAY PATROL, an     ) 14-cv-01749-GPC (DHB)

7    agency of the State of            )

8    California; SERGIO FLORES, and    )

9    DOES 1 to 20,                     )

10          Defendants.                )

11    _____  )

12

13

14       VIDEO DEPOSITION OF DAVID L. ALBRIGHT, taken by the

15   Defendants, commencing at the hour of 1:02 p.m. on

16   Thursday, September 10, 2015, at 110 Laurel Street, San

17   Diego, California, before Kimberly A. Broadhurst,

18   Certified Shorthand Reporter in and for the State of

19   California.

20

21

22

23

24

25

DAVID L. ALBRIGHT - 9/10/2015

Page 3

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3        CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP
          BY:  THOMAS LUNEAU, ESQ.
 4        110 Laurel Street
          San Diego, California 92101
 5        (619) 238-1811
          Tdl@cglaw.com
 6
              - and -
 7
          LAW OFFICE OF STEVE HOFFMAN
 8        BY:  STEVE HOFFMAN, ESQ.
          1320 Columbia Street, Suite 200
 9        San Diego, California 92101
          (619) 677-3015
10        Shoffmanlaw@gmail.com

11

12    For the Defendants:

13        STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
          BY:  DOUGLAS E. BAXTER, ESQ.
14        OFFICE OF THE ATTORNEY GENERAL
          600 West Broadway, Suite 1800
15        San Diego, California 92101
          (619) 645-2034
16        Douglas.Baxter@doj.ca.gov

17

18

19

20    ALSO PRESENT:

21        MR. RICARDO RAMOS, Videographer

22

23

24

25
```

DAVID L. ALBRIGHT - 9/10/2015

Page 5

```
 1            THE VIDEOGRAPHER:  Good afternoon.  The time on
 2   the record is 1:02 p.m.  Today's date is September 10,
 3   2015.  This begins the deposition of David Albright in
 4   the matter of Jacob Gregoire versus California Highway
 5   Patrol.  The case number is 14-cv-01749-GPC (DHB).
 6            This deposition is taking place at 110 Laurel
 7   Street in San Diego, California 92101.  The court
 8   reporter is Kim Broadhurst.  I am Ricardo Ramos, the
 9   videographer, retained by Hutchings Litigation Services
10   located at 400 North Tustin Avenue, Suite 301, Santa
11   Ana, California 92705.
12            This deposition is being videotaped at all
13   times unless specified to go off the video record.
14            Would all present, please, identify yourselves
15   beginning with the witness, please.
16            THE WITNESS:  Captain David Albright, Chula
17   Vista Fire Department.
18            MR. HOFFMAN:  Steve Hoffman on behalf of Jake
19   Gregoire.
20            MR. LUNEAU:  Thomas Luneau also on behalf of
21   Jake Gregoire, the paramedic/EMT.
22            MR. BAXTER:  Douglas Baxter for the State of
23   California and Officer Sergio Flores.
24            THE VIDEOGRAPHER:  Thank you.  Would the court
25   reporter, please, swear in the witness and we can
```

DAVID L. ALBRIGHT - 9/10/2015

Page 6

```
 1    proceed.
 2            THE REPORTER:  Would you raise your right hand?
 3            Do you state or affirm that the testimony
 4    you're about to give shall be the truth, the whole truth
 5    and nothing but the truth?
 6            THE WITNESS:  I do.
 7            (Witness sworn.)
 8                   DAVID L. ALBRIGHT,
 9    called as a witness herein, having been first duly
10    sworn, was examined and testified as follows:
11                        EXAMINATION
12    BY MR. BAXTER:
13        Q.    Good afternoon, captain Albright.
14        A.    Good afternoon.
15        Q.    Thank you for coming.
16        A.    You're welcome.
17        Q.    Just to -- if you could just, please, state
18    your full name for the record and spell your last name?
19        A.    Full name is David Lee Albright.  Last name is
20    A-l-b-r-i-g-h-t.
21        Q.    All right.  And you mentioned earlier you were
22    a captain with the Chula Vista Fire Department?
23        A.    Correct.
24        Q.    Let me just go over some preliminary things
25    about a deposition.  My name, as I said, is Doug, and
```

AER 165

DAVID L. ALBRIGHT - 9/10/2015

Page 61

```
 1    problems arising out of this incident?  Has he ever
 2    related that to you?
 3         A.   Not that he's told me.
 4         Q.   Let's finally talk about the incident.
 5         A.   Okay.  That's why we're all here.
 6         Q.   Going to the -- the night of the incident, I
 7    just want to walk through a general synopsis of events.
 8              What was your first involvement in that whole
 9    incident starting with the call?  What did you receive,
10    a call?
11         A.   Yeah.  So we're sitting at the fire station, at
12    80 East J Street where we're housed, and the tones go
13    off and we get a call for a vehicle accident on the 805
14    freeway was the initial information that we got.
15         Q.   All right.  And your -- your whole crew
16    responded?
17         A.   Yeah, me, Jake and that night we had a
18    different firefighter than I currently have, but it was
19    the crew assigned to the engine that day, the three of
20    us that were at the fire station.
21         Q.   Is that standard in Chula Vista for three-man
22    crews?
23         A.   On the engines.  The trucks and rescues have
24    four, but the engines all have three.
25         Q.   Do you remember who that other firefighter was?
```

AER 166

DAVID L. ALBRIGHT - 9/10/2015

Page 62

```
 1        A.    Yeah.  His name is Josh Rees, R-e-e-s.

 2        Q.    Had you worked with him before?

 3        A.    I have.

 4        Q.    Okay.  At the time was he an EMT?

 5        A.    He is an EMT, yeah.  He's currently in

 6   paramedics school, but at the time of the incident he

 7   was an EMT.

 8        Q.    At the time you were an EMT?

 9        A.    Yeah, was and currently still am.

10        Q.    And at the time Mr. Gregoire was an EMT?

11        A.    Yep.

12              MR. LUNEAU:  He said engine.  And what else did

13   you say?

14              THE WITNESS:  Trucks and rescues, the ones with

15   the big ladders, and then the rescue has all the tools

16   like Jaws of Life and things, and we keep four people on

17   those just because of the manpower needed to operate the

18   equipment.

19   BY MR. BAXTER:

20        Q.    And you ultimately responded to the scene of

21   this accident?

22        A.    Yes.

23        Q.    You initially had trouble finding it?

24        A.    Yeah.  Initially it was not right where it was

25   reported, and I'm just going off of memory, but I
```

DAVID L. ALBRIGHT - 9/10/2015

Page 128

```
1    be the paramedics from the AMR 411.  I mean, they --
2    they're dressed like AMR paramedics.
3        Q.   They're not Chula Vista --
4        A.   They're not Chula Vista fire employees.
5        Q.   All right.  And then off to the left of the
6    gurney, do you see another person that appears to be in
7    a reflective vest?
8        A.   I do, yes.
9        Q.   Does that appear to be Chula Vista fire wear?
10       A.   No.  That would also be what AMR wears.  So I'm
11   assuming it's that ride-along or EMT, the third person
12   they had with them that night.
13       Q.   Right.  Can you tell -- the person that's in
14   the forefront of the picture that appears to be in a tan
15   firefighter outfit, can you tell whether that's a Chula
16   Vista or San Diego fire person?
17       A.   No, I can't.  I mean, it's just too generic.
18       Q.   All right.
19       A.   It looks like our stuff, but, I mean, yeah, I
20   can't say for sure.
21           (D. Albright Exhibit D was marked for
22           identification.)
23   BY MR. BAXTER:
24       Q.   All right.  Now I'm going to show you what I'm
25   marking as Exhibit D.  It's another photograph.  I have
```

DAVID L. ALBRIGHT - 9/10/2015

Page 129

```
1    a copy for counsel.

2            Do you recognize anyone in the photograph that

3    is shown in Exhibit D?

4       A.   Yes.

5       Q.   Who do you recognize in that photograph?

6       A.   That is Jake closest to us, and just because I

7    know what he look like and his big head of hair and his

8    hat, that is Captain McLintock that is back behind Jake

9    from Engine 54.

10      Q.   All right.

11      A.   That's all.  I can't tell who the other -- the

12   other people are.

13      Q.   All right.  So what I would like you to do is

14   if you can put a red X on the person you recognize to be

15   Jake just somewhere on the yellow uniform.  Does that

16   red X actually show up?

17      A.   Yes.  Yeah.  I'll do it darker, but yeah.

18      Q.   In that picture, Mr. Gregoire appears to be

19   facing the K-rail?

20      A.   Yes.

21      Q.   And on the other side, there's a CHP officer?

22      A.   Correct.

23      Q.   Is that the same CHP officer that you

24   ultimately saw handcuff Mr. Gregoire?

25      A.   Yeah.  It looks like him.
```

DAVID L. ALBRIGHT - 9/10/2015

Page 130

```
 1        Q.   Now, there's a person to the immediate right
 2   from Jake's vantage point.
 3        A.   So north of the freeway?
 4        Q.   Right.
 5        A.   Okay.
 6        Q.   Who is that person?
 7        A.   That's who looks like Captain McLintock just
 8   based on knowing his profile.  That would be John
 9   McLintock from Engine 54.
10        Q.   That's Chula Vista?
11        A.   Yeah.  He's the captain on Engine 54.
12        Q.   All right.  Now, in the background you see the
13   rolled over vehicle, correct?
14        A.   Yes.
15        Q.   All right.  Do you recognize any of those
16   firefighter personnel?
17        A.   Not enough to identify them, no.
18        Q.   Okay.  How many do you see?
19        A.   I see three firefighters.
20        Q.   Do you see any paramedics?
21        A.   I see one just to the right or next to the
22   vehicle in the vest and the blue pants.
23        Q.   All right.  And do you see a CHP officer in
24   that area?
25        A.   Yes, right in the middle.
```

DAVID L. ALBRIGHT - 9/10/2015

Page 131

```
 1       Q.    All right.  And, again, I realize you don't
 2   know exactly when in the sequence of events, but does
 3   this picture appear to be of events from that incident?
 4       A.    Yes.
 5             (D. Albright Exhibit E was marked for
 6             identification.)
 7   BY MR. BAXTER:
 8       Q.    All right.  Now I'm going to show you a
 9   photograph that I'm going to mark as Exhibit E.  Copy
10   for counsel.
11             Do you recognize anyone in that photograph?
12       A.    By name, no.
13       Q.    Okay.  Do you recognize anyone as somebody
14   that's affiliated with your agency?
15       A.    Yeah.  The -- the firefighter that appears to
16   be kneeling down near the white car, he has that
17   orangish shield on his helmet.  That designates a
18   probationary firefighter.  So I recognize that, that
19   that was one of our -- we had a whole group of new
20   people that came on, and that's one of those guys.
21       Q.    Okay.  Was it -- was Mr. Rees probationary?
22       A.    No, no.  That is not -- that is not Josh Rees.
23       Q.    So that person would not be from your engine?
24       A.    He would not be.
25       Q.    All right.  And do you see two people in
```

DAVID L. ALBRIGHT - 9/10/2015

Page 134

1    that -- it's in the same sequence as that same

2    firefighter walking, but you don't recognize -- you

3    can't tell from the uniform?

4        A.   No.  I can't tell who he is.

5        Q.   Could it be Mr. Rees or do you --

6        A.   Yeah, it could be.  I mean, he has a black

7    helmet and yellow turnouts.  I just can't tell you that

8    it is.

9        Q.   All right.  With respect to the vehicle that

10   was overturned, at any point during the incident did you

11   ever have any concerns that there was a fire risk with

12   that vehicle?

13       A.   Well, in the sense that there's always a fire

14   risk with any vehicle accident, we always are taught to

15   check for leaking fluids; and if there's a gas leak, we

16   actually try to plug it.  We carry plugs on the rigs

17   because the tow truck won't tow it while it's leaking

18   fuel.

19            So on every incident, yes.  So somebody did

20   check that.  Typically that's the engineer's job.  So I

21   don't know if Jake ever made it over to check the

22   vehicle.  That would have been one of the things he

23   would have done, but that would have gotten checked by

24   one of the engineers on the scene.  That's typically

25   what they do.  They worry about stabilizing the vehicle,

DAVID L. ALBRIGHT - 9/10/2015

Page 135

```
 1    checking for fuel leaks, disconnecting the battery for

 2    fire hazard reasons.

 3         Q.   All right.  Would that have been the same

 4    responsibility as the engineer from 54?

 5         A.   Yeah.  Typically, that's what engineers do, but

 6    depending on what 54 was doing, they may or may not.

 7    Their engineer may be with them doing patient care.

 8              So in the sense that typically the engineer

 9    from the apparatus is the one that does that, it could

10    be any engineer at the scene that would do it.  I just

11    don't know who did it that night.

12         Q.   You didn't personally witness that?

13         A.   No.

14         Q.   Did you yourself ever personally become aware

15    of any leaking gas from that vehicle?

16         A.   No.  I never got close enough to actually see

17    or smell a gas leak.  I don't know if there was one.

18         Q.   Did you see any smoke coming from the vehicle?

19         A.   Not that I recall, no.

20         Q.   Any sparking?

21         A.   No.  It was already at rest, so there was no

22    sparking.

23         Q.   The vehicle was completely stationary?

24         A.   Yeah.  It wasn't moving.

25         Q.   Were you aware of whether there was any belief
```

DAVID L. ALBRIGHT - 9/10/2015

Page 136

```
1    that there might be other patients in the immediate
2    vicinity besides those two?
3         A.    I do recall there being a concern that there
4    could have been a patient either a third patient or
5    somebody that was in the vehicle that may have been
6    tossed or ejected.  I just heard that come up, and I
7    don't know what led people to believe it, whether they
8    saw three seat belts seat belted.
9              I don't know.  I just remember that being
10   talked about for a brief period, and then it was
11   disregarded as not true or that we didn't have a third
12   patient.  We just had the two that we treated.
13        Q.    Do you know if -- if there was a perception of
14   a fire risk, would the practice be to bring some sort of
15   fire suppression equipment near the vehicle?
16        A.    Yeah.  I mean, yeah.  If you thought there was
17   a fire, you could bring an extinguisher or deploy a hose
18   line.  Sometimes it happens.  Sometimes it doesn't, but
19   that is an option available to us, yes.
20        Q.    Did you ever witness anybody bringing a fire
21   extinguisher near the vehicle?
22        A.    I did not see that.
23        Q.    Did you see anybody even pumping up the truck
24   to deploy a hose line?
25        A.    No, I did not.
```

DAVID L. ALBRIGHT - 9/10/2015

Page 161

1      Q.   Do you agree based on your training and

2   experience that lane blockages by fire trucks sometimes

3   lead to secondarily accidents in traffic?

4      A.   Yes.  I have -- I've seen them.  They do occur,

5   whether it's fire trucks, ambulances or CHP vehicles.

6   Any time you stop traffic or operate on the freeway,

7   there's a good likelihood that there's going to be

8   either skid marks or a second accident in the area.

9      Q.   You agree that that's a recognized risk?

10      A.   I've seen it happen, yes.  It would be a risk.

11      Q.   And your statement was that you would rather

12   have that risk even if it meant someone running into

13   your truck and getting killed as opposed to something

14   happening to your patients that you're responsible for?

15      A.   Yes.  So it's hypothetical.  I would rather

16   block the scene and have someone injured or killed

17   hitting our fire engine than having to wipe out the

18   three or four guys that I'm responsible for and all the

19   patients.  So absolutely.  And it's happened before.  It

20   happened in San Diego on I-8 recently where a fire truck

21   was clobbered and the patient was pinned to the vehicle

22   but no firefighters were injured, and it totaled --

23   totaled the engine.  And that's why we're taught to do

24   what we do in my opinion.

25      Q.   All right.  After you and Mr. Gregoire and

DAVID L. ALBRIGHT - 9/10/2015

Page 177

```
1    BY MR. BAXTER:
2         Q.   Do you recognize anyone in that picture?
3         A.   Yes.  That would be me sitting on the -- the
4    median, and that was my Battalion Chief Darrell who
5    arrived to assist us, as I've talked about.  I believe
6    that's us exchanging information.  I don't remember at
7    what point that was.
8         Q.   All right.  But that was from the night of the
9    incident?
10        A.   That was, yes, the night of the incident after
11   Darrell arrived, whatever point that was.
12             MR. BAXTER:  All right.  Do you have questions?
13             MR. HOFFMAN:  I do.
14                       EXAMINATION
15   BY MR. HOFFMAN:
16        Q.   Tell me about how many total years have you
17   been a firefighter or engaged in or with the fire
18   department.
19        A.   I've been employed by the City of Chula Vista
20   since 1995, so 20 -- 20 years, and I was a reserve
21   firefighter at San Miguel Fire Department for nine
22   months and a fire explorer for Chula Vista for two years
23   prior to that where I was running calls and learning as
24   a student.
25        Q.   Okay.  So employed for 20, running calls and
```

AER 176

DAVID L. ALBRIGHT - 9/10/2015

Page 203

```
 1              C E R T I F I C A T E

 2

 3    I, KIMBERLY A. BROADHURST, Certified Shorthand Reporter

 4    for the State of California, do hereby certify:

 5

 6    That the witness in the foregoing deposition was by me

 7    first duly sworn to testify to the truth, the whole

 8    truth and nothing but the truth in the foregoing cause;

 9    that the deposition was taken by me stenographically and

10    later transcribed into typewriting, under my direction,

11    and that the foregoing contains a true record of the

12    testimony of the witness.

13

14    Dated this   day of September, 2015, at San Diego,

15    California.

16

17

18

19

20

21         KIMBERLY A. BROADHURST

22         C.S.R. NO. 13814

23

24

25
```

AER 177

# David L. Albright

## Gregoire vs. California Highway Patrol



**Job: 265788**

 

**Exhibit: 0000D**





EXHIBIT
D. Albright
D
9-10-15   KB

1   KAMALA D. HARRIS
    Attorney General of California
2   RICHARD F. WOLFE
    Supervising Deputy Attorney General
3   DOUGLAS E. BAXTER
    Deputy Attorney General
4   State Bar No. 201351
     600 West Broadway, Suite 1800
5   San Diego, CA 92101
    P.O. Box 85266
6   San Diego, CA 92186-5266
    Telephone:  (619) 645-2034
7   Fax:         (619) 645-2012
    E-mail:  Douglas.Baxter@doj.ca.gov
8   *Attorneys for Defendant State of California*
    *(by and through the California Highway*
9   *Patrol) and Sergio Flores*

10          **IN THE UNITED STATES DISTRICT COURT**

11          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

12

13

14   | JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |

15

16                              Plaintiff,     **DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF CLAIMS**

17        v.

18   CALIFORNIA HIGHWAY PATROL,
     an agency of the State of California;
19   SERGIO FLORES, and DOES 1 to 20,

20                              Defendants.     Date:        January 29, 2016
                                                Time:        1:30 p.m.
21                                              Courtroom:   2D
                                                Judge:       The Honorable Gonzalo P.
22                                                           Curiel

23          I, Eliazar Colunga, hereby declare as follows:

24          1.  I am employed as a patrol officer for Defendant California Highway Patrol

25   (CHP).  I have been so employed for approximately 17 years.

26          2.  On February 4, 2014, I was working the C-watch, which runs from 5:00

27   p.m. to 5:30 a.m.  During the events related below, I was wearing a tan CHP

28   uniform that bore CHP patches identifying me as a law enforcement officer.

─────────────────────────────────────────────
                             1
DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1    3. Just before 9:30 p.m., I heard a radio call regarding an overturned vehicle
2    in the area of I-805 and Telegraph Canyon Road. I responded from the area of the
3    E Street Nature Center in the City of Chula Vista in my patrol vehicle. I was the
4    first on-duty emergency responder from any agency to arrive on scene. The
5    collision had occurred in the northbound lanes, and the vehicle to which I was
6    responding came to rest in a wide construction area between cement k-rail walls
7    that separated the northbound and southbound lanes. I parked my vehicle south of
8    the collision, where the k-rails on the southbound side ended and the center
9    construction area was accessible. I parked in the center construction area, out of
10   traffic lanes.

11   4. Based on my training and experience, it was my belief that, as the law
12   enforcement officer on scene, I was the Incident Commander.

13   5. Upon approaching the overturned vehicle, I made contact with two
14   civilians (one of whom was an off-duty Emergency Medical Technician [EMT]).
15   They had come upon the accident scene before me, but they had not been involved
16   in the collision. Both of the occupants of the overturned vehicle were already out
17   of the vehicle. Neither required any extraction equipment or on-duty emergency
18   personnel to get them out of the vehicle. They were both conscious. I was able to
19   communicate with them during that evening. At the point I walked up, one was
20   lying on the ground. The other was standing. Although I did not personally see
21   any visible injuries on these two occupants, I went back to my patrol vehicle to
22   obtain a first aid bag. I saw that the off-duty EMT was holding the head of the
23   person who was lying on the ground in C-spine position, and I could see that the
24   off-duty EMT did not have any equipment. Because we have C-spine collars in our
25   first aid bags, I went to get my bag.

26   6. As I was approaching my patrol vehicle, an ambulance from American
27   Medical Response (AMR) arrived. This ambulance arrived within a couple of
28   minutes of my arrival. The ambulance parked in the center construction area just

DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   south of my car, and out of traffic lanes.

2       7. Once I saw the paramedic personnel from the AMR crew walking toward

3   the rollover vehicle with their gear, I determined that it was not necessary to

4   retrieve a first aid bag. There were three people from the AMR ambulance, and I

5   believed at the time that they were all paramedics. (Well after the events of this

6   evening, I later learned that two of them were paramedics and one was an EMT.)

7   Based on the presence of the ambulance crew, I concluded that sufficient medical

8   care was now on scene for the two occupants of the rollover vehicle. I moved on to

9   engage in other scene management and investigation activities.

10       8. Based on my training and experience as a CHP Officer, I know that a CHP

11   Officer's responsibilities as an Incident Commander at a traffic scene include

12   assessing the entire scene, making sure that medical care has been summoned for

13   any potentially injured parties, making sure that the people on scene (civilians and

14   first responders) are safe and not in the way of traffic or in any type of hazard.

15   CHP Officers are responsible for managing the entire scene, which includes

16   controlling where equipment and personnel are located so as to minimize safety

17   hazards to those on scene and to the motoring public nearby or approaching the

18   scene.

19       9. Soon after the ambulance arrived, fire trucks began arriving. One of those

20   fire trucks was Engine 52 from the Chula Vista Fire Department. This truck parked

21   in the number 1 lane on the southbound side. Two other fire trucks arrived within

22   short succession and parked behind Engine 52, blocking the number 1 and 2 lanes

23   (the lanes closest to the center of the southbound roadway). A fourth fire truck also

24   came to the scene.

25       10. Knowing that the patients were being attended to by paramedics and that

26   there was no collision scene in traffic lanes, I became concerned about the presence

27   of fire trucks blocking lanes. I believed that there was sufficient medical personnel

28   to tend to patients, that too many fire crews were on scene, and that the trucks

1  should be moved out of lanes.  I talked to crew members of two trucks and

2  explained that they were not needed and should leave the scene and return to their

3  stations.  These two trucks left the scene within a few minutes.  I subsequently had

4  conversations with members of the other two fire crews to ask them to move their

5  trucks into the center median.  I was concerned about unnecessary placement of fire

6  trucks in traffic lanes, as we are taught at CHP, and I know from my own personal

7  experience with responding to other traffic accidents, that secondary accidents at

8  collision scenes are a serious risk to the motoring public.  Placement of emergency

9  equipment at collision scenes creates a serious risk of causing secondary accidents

10  among other motorists approaching the scene.  An important part of our duties as

11  incident managers at CHP is to take appropriate steps to eliminate possible causes

12  of secondary accidents.

13      11.  At this particular scene, there were four southbound lanes in the

14  immediate area.  North of the scene, there were no shoulders in the southbound

15  lanes because of the cement k-rail running adjacent to the inner edge of lane

16  number 1.  The trucks were blocking the number 1 lane and approximately one-half

17  of the number 2 lane for southbound traffic.  This was causing a hazard for

18  southbound traffic.  Just north of the collision scene, there is a crest in the roadway.

19  As a result, southbound traffic did not have a direct line of sight allowing them to

20  see the fire trucks from a long distance.  There was a short distance between the

21  point where cars would come over the crest and the point where the fire trucks were

22  stopped.  This did not allow a lot of reaction time for southbound vehicles that

23  could be approaching the scene at high speeds.  On a freeway such as the I-805,

24  vehicles typically travel at high rates of speed.  Particularly at the beginning of my

25  time at this scene, I could hear people locking their brakes as they approached the

26  scene.  All of these facts led me to conclude that there was a significant risk of

27  secondary accidents from the placement of fire trucks in the lanes.  I also knew that

28  the entire collision scene was enclosed in the construction areas, with cement k-rails

DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   blocking off the scene from southbound and northbound traffic.  There was no
2   debris from the collision in the southbound lanes, as no part of the collision
3   occurred there.  I saw no reason for the trucks to be parked in the lanes, and I
4   wanted them moved out of lanes.  Based on my training and experience and
5   assessment of the scene, I concluded the trucks were posing a serious risk to the
6   motoring public without apparent reason.  I formed this opinion at the scene, and
7   this was the reason I was asking the fire trucks to move out of lanes.

8       12.  The crews in these latter two trucks were from the Chula Vista Fire
9   Department.  Despite my requests to move the fire trucks, they did not move.  I
10  went back to the overturned vehicle to try to gather some information from one of
11  the victims.  I subsequently noticed that the two trucks were still parked in lanes.  I
12  went back and spoke to the crews again to request that they move the fire trucks.
13  During this last discussion, I saw Officer Flores walking up to where I was standing
14  with the fire fighters.  He got sufficiently close to me that, in my opinion, he could
15  have overheard this conversation.

16      13.  I wanted the fire crews to move the fire trucks when I asked them to do
17  so.  I expected them to comply with my requests.  They did not.

18      14.  Since this collision scene was on Officer Flores' beat, I knew that he took
19  over my role as Incident Commander once he arrived.  He took over the scene
20  management at that point.  This has been the standard practice amongst officers
21  with whom I have worked in the nearly seventeen years I have been with the CHP.
22  It has been the practice between Officer Flores and me for more than 10 years.

23      15.  At no time during my time at the accident scene did I see Engineer
24  Gregoire engaged in activities that appeared to me to constitute patient care.  Prior
25  to his arrest, I did see him standing with a group of fire fighters in the center
26  median area, but he did not appear to me to be assisting in patient care.

27      16.  At no time on the scene did I see a fire.  I saw no smoke.  I did not smell
28  any smoke.  I did not see or smell any gas leaking from the overturned vehicle.  The

DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   overturned vehicle was not moving when I arrived.  I never saw any sparking near

2   the overturned vehicle.  I did not see anything that indicated to me there was a

3   likelihood of a fire occurring at that scene.

4        17.  In my experience of having responded to numerous traffic collisions

5   during my time at CHP, it is common for ambulances departing the scene of traffic

6   collisions to safely merge into freeway traffic without the need for a lane blockage

7   from a fire truck.  At this scene, I did not form a belief that it would be necessary

8   for the fire trucks to remain blocking lanes in order to protect the pathway of the

9   ambulance when it came time for it to leave the scene.

10       I, Eliazar Colunga, affirm under penalty of perjury under the laws of the State

11   of California and of the United States that the foregoing information is true and

12   correct of my own knowledge and that this declaration is being executed on this

13   _19ᵗʰ_ day of November 2015 at San Diego, California.

14

15                     Eliazar Colunga

16

17

18

19

20

21

22

23

24

25

26

27

28   SD2014707454
     81198458.doc                            6

DECLARATION OF ELIAZAR COLUNGA IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1  KAMALA D. HARRIS
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  DOUGLAS E. BAXTER
   Deputy Attorney General
4  State Bar No. 201351
     600 West Broadway, Suite 1800
5  San Diego, CA 92101
   P.O. Box 85266
6  San Diego, CA 92186-5266
   Telephone:  (619) 645-2034
7  Fax:           (619) 645-2012
   E-mail:  Douglas.Baxter@doj.ca.gov
8  *Attorneys for Defendant State of California*
   *(by and through the California Highway*
9  *Patrol) and Sergio Flores*

10           IN THE UNITED STATES DISTRICT COURT

11           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| JACOB GREGOIRE, | Case No.: 14-cv-01749-GPC (DHB) |
|---|---|
| Plaintiff, | **DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF CLAIMS** |
| v. | |
| CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20, | |
| Defendants. | Date:         January 29, 2016<br>Time:         1:30 p.m.<br>Courtroom:  2D<br>Judge:        The Honorable Gonzalo P. Curiel |

23       I, Sergio Flores, hereby declare as follows:

24       1.  I am a Defendant in the above-entitled action.  I am employed as a patrol

25  officer for Defendant California Highway Patrol (CHP).  I have been so employed

26  since July 1994.

27       2.  On February 4, 2014, I was on-duty for the C-watch, which runs from 5:00

28  p.m. to 5:30 a.m.  During all events discussed in this declaration, I was wearing a

1

AER 186

1   tan CHP uniform that bore CHP patches identifying me as a law enforcement
2   officer.

3       3. At approximately 9:30 p.m., I heard radio traffic regarding a traffic
4   collision on Interstate 805, just south of Telegraph Canyon Rd.  At the time, I was
5   working on a traffic stop in the area of Interstate 8 and Texas Street in Mission
6   Valley.  Once I cleared that traffic stop, I began heading southbound on the I-805.  I
7   knew that the collision reported on the radio was located in my beat area, which
8   was the area on I-805 from State Route 94 to where the I-805 merges with the I-5
9   (near the Mexico border).  Since the accident was on my beat, my intent was to
10  respond to the scene and take over the collision investigation.  This was our normal
11  CHP practice – that the beat officer would handle the collision and function as the
12  traffic incident manager (often referred to as the Incident Commander).

13      4. As I neared the scene, I could see that traffic was backing up.  I began a
14  traffic break to bring traffic approaching the accident scene in slowly.  I came upon
15  a fire truck parked mostly in the number 1 lane and partially into the number 2 lane.
16  The number 1 lane is the lane closest to the center median.  Where this fire truck
17  was stopped, there was a cement k-rail (also called Jersey wall) immediately butting
18  up against the east side of the southbound number 1 lane.  This k-rail was there
19  because the center area of the I-805 was under construction.  Thus, from the rear of
20  this fire truck and proceeding back (i.e., northbound) along the eastern edge of the
21  southbound I-805 for a substantial distance, there was cement k-rail abutting the
22  number 1 lane.

23      5. The fact that the fire truck was stopped blocking the number 1 lane and part
24  of the number 2 lane led me to believe that the accident was located in the number 1
25  lane in front of the fire truck.  Therefore, I stopped my patrol vehicle approximately
26  100 feet behind this fire truck.  I exited my vehicle and proceeded to lay a flare
27  pattern on the road proceeding from the rear of my vehicle and in a diagonal pattern
28  moving southbound toward the number 2 lane.

2

DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   6. As I moved my flare pattern close to the fire truck, I saw that the actual
2   collision scene was to my left in the construction area.  It was between cement k-
3   rails that blocked off a large construction area between the northbound and
4   southbound lanes.  Thus, it was not located in any traffic lanes.  I saw fire
5   personnel, paramedics, and at least one of the people who had been involved in the
6   collision near the vehicle in this center area.  I could see that the collision had
7   occurred on the northbound side and that the vehicle had come to rest in the
8   construction area.  I saw paramedics providing medical care to the occupants.

9   7. Very soon after completing my flare pattern, I saw CHP Officer Eliazar
10  Colunga (who had arrived on scene before me) speaking to a group of firefighters.
11  I heard Officer Colunga asking the group who their Fire Captain was and why they
12  had not yet moved their fire engine.  I heard Officer Colunga say that he had told
13  them several times that they needed to move the fire engine.  I heard someone I
14  believed to be the Fire Captain state their truck was there to protect the scene.  I
15  heard Officer Colunga explain that the collision scene was safely within the
16  construction area and that the truck was not providing protection.

17  8. Based on my training and experience and my personal observations of the
18  scene, I formed the conclusion that having fire trucks parked in lanes was not
19  necessary to protect the scene.  Instead, based on my training and experience with
20  having responded to and investigated multiple traffic collisions, I formed the belief
21  that the fire truck was presenting an unnecessary risk to the public.  We are trained
22  as CHP Officers that part of our role in managing traffic scenes is to make sure that
23  the placement of vehicles and equipment is done in such a way as to prevent the
24  serious problem of secondary automobile accidents.  These are accidents that occur
25  due to the motoring public's surprise and confusion resulting from suddenly
26  encountering lane blockages from emergency equipment in roadways at accident
27  scenes.  This is a particular risk on freeways, where traffic can come upon accident
28

3

1  scenes at high speeds.  Clearing lanes at traffic scenes to protect the public is a key
2  part of our responsibilities as traffic incident managers at the CHP.

3      9.  CHP Officers are responsible for managing the entire scene to protect the
4  safety of the people present at the scene and the motoring public near the scene.  In
5  this particular case, the ambulance which had responded to treat the patients was
6  parked in the center median area and out of traffic lanes.  I realized that the
7  collision did not occur in any southbound lanes, so there was no debris field in any
8  southbound lanes.  These were was my perceptions of the scene at the time I was
9  hearing the discussion between Officer Colunga and the firefighters.  I believed that
10  having fire trucks parked in lanes was posing a serious risk to the public and that
11  this was not needed to protect the accident scene (which was fully shielded in a
12  large center construction area by cement k-rail walls).  The truck I was trying to get
13  moved was on the I-805, which is a freeway on which people commonly travel at
14  high speeds.  I was concerned about vehicles approaching from the north at high
15  speeds and unexpectedly coming upon stopped emergency vehicles without time to
16  react.  I was concerned about secondary accidents occurring and additional people
17  getting injured or killed.

18      10.  Since this was my accident scene, I assumed the role of managing the
19  incident scene upon my arrival.  In connection with that role, I believed any fire
20  trucks needed to be moved out of lanes for protection of the motoring public.  I
21  spoke to a person I believed to be a Fire Captain.  I stated that his fire truck was just
22  blocking lanes and was not providing any kind of protection.  I tried to get him to
23  move his fire truck.  He refused and walked away from me.  I then called out to the
24  group of other fire fighters and asked who was driving the truck.  The Engineer
25  (later identified as Jacob Gregoire) said that he was.  I directed him to move the fire
26  truck.  He said he was not going to move it.  I told him that I was giving him a
27  direct order to move his fire truck because I believed it was causing a hazard.
28  Despite repeating my direction to move his truck, Engineer Gregoire continued to

4

DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   state that he would not move it. I then stated that, if he did not move the truck, I
2   was going to arrest him for disobeying an order and for delaying us in our
3   investigation. Engineer Gregoire told me to go ahead and arrest him. He refused to
4   move the fire truck.

5       11. At this time, I believed Engineer Gregoire was capable of driving the fire
6   truck, that he was the driver of the fire truck, that I had given him an order to move
7   the truck pursuant to my duties to manage the traffic scene for public safety, that he
8   was refusing to comply with that order despite several requests, that I had warned
9   him that he would be arrested if he did not comply, and that he still continued to
10  refuse to comply. Therefore, I formed a belief that he was in violation of California
11  Penal Code §148(a) and California Vehicle Code § 2800(a) for failure to follow my
12  orders and for hindering/delaying my management and investigation of the accident
13  scene. Accordingly, I directed Engineer Gregoire to step over a k-rail (this
14  particular k-rail was a third k-rail that was between the two k-rails on the
15  northbound and southbound sides of the center portion of I-805). He stepped over
16  the k-rail, and I placed him under arrest. I placed handcuffs on his wrists and
17  walked him back to my patrol car. In the course of searching Engineer Gregoire
18  before placing him in the patrol car, I double-locked the handcuffs. The point of
19  double locking handcuffs is to prevent the handcuffs from tightening. At no point
20  did I intentionally tighten handcuffs on Engineer Gregoire.

21      12. Attached herewith as Exhibit A is a photograph that fairly and accurately
22  depicts a portion of the scene at the moment just after Engineer Gregoire had
23  stepped over the center k-rail to walk towards me to be placed under arrest. The
24  photograph shows a view from the vantage point of someone facing northward in
25  the center construction area. In the forefront of the picture, Engineer Gregoire is
26  shown in a yellow firefighter's uniform. I am shown immediately behind Engineer
27  Gregoire in the photo. I am just to the west of his position. In this photograph, one
28  can see that the southbound lanes are on the left side of the photograph. The

DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1   cement k-rail at the left of the photograph (west of where Engineer Gregoire and I
2   are shown) is the one that ran between the construction area and the number 1 lane
3   of the southbound lanes.  Looking at the photo, one sees another cement k-rail to
4   the east of where Engineer Gregoire and I are standing.  This is another k-rail that
5   runs through the center of the construction area.  The accident scene was to the east
6   of that k-rail.

7       13. Attached herewith as Exhibit B is another photograph that fairly and
8   accurately depicts the scene just before Engineer was about to step over the center
9   k-rail to be arrested.  This photograph also shows a view from the vantage point of
10  someone facing northward in the center construction area.  In this photo, one can
11  see the accident scene, with the rollover vehicle, fire personnel, another CHP
12  officer, paramedics, and one injured person.  To the right (east) of the vehicle is the
13  third cement k-rail.  This is the one that ran between the construction area and the
14  number 1 lane of the northbound lanes of I-805.

15      14. At no time while I was on the scene did I see Engineer Gregoire engaging
16  in any actions that I perceived to be patient care.  Instead, he appeared to me to be
17  standing with a group of other firefighters while others were actually treating the
18  patients.  Prior to ordering him to move his fire truck, I was already aware that the
19  two patients were being taken care of by paramedics from an ambulance.  Other fire
20  fighters were on the scene, and I perceived no reason why Engineer Gregoire could
21  not move his fire truck out of lanes.  I believed that the patients were being cared
22  for and that his fire truck was posing an unnecessary risk to public safety.  There
23  was no indication to me that Engineer Gregoire was engaged in any fire suppression
24  activities.  I did not perceive any signs of risk of fire at the scene so as to require the
25  truck to stay in its location.  My purpose in ordering Engineer Gregoire to move the
26  fire truck was to eliminate the risk I believed it was posing to public safety.

27      15. Engineer Gregoire remained in custody in my vehicle for approximately
28  30 minutes.  After that point, CHP Sergeant Nicole Pacheco (who had arrived after

6

DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

1    the arrest) instructed me to release Engineer Gregoire.  She asked that I proceed by

2    way of a criminal complaint to be filed.

3       16.  I then released Engineer Gregoire from custody without booking.  I later

4    completed my report of the arrest with a recommendation that criminal charges be

5    filed.

6       I, Sergio Flores, affirm under penalty of perjury under the laws of the State of

7    California and of the United States that the foregoing information is true and correct

8    of my own knowledge and that this declaration is being executed on this 18TH day

9    of November 2015 at San Diego, California.

10

11

12            Sergio Flores

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    SD2014707454

28    81197635.doc

DECLARATION OF SERGIO FLORES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR SUMMARY ADJUDICATION (14-cv-01749-GPC (DHB))

# EXHIBIT A



**EXHIBIT B**



1  KAMALA D. HARRIS
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  MICHAEL P. CAYABAN
   Deputy Attorney General
4  State Bar No. 179252
    110 West A Street, Suite 1100
5  San Diego, CA 92101
    P.O. Box 85266
6  San Diego, CA 92186-5266
   Telephone:  (619) 645-2014
7  Fax:  (619) 645-2012
   E-mail:  Mike.Cayaban@doj.ca.gov
8  *Attorneys for Defendants California
   Highway Patrol and Officer Sergio Flores*

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| **JACOB GREGOIRE,** | CASE NO. : '14CV1749 GPC DHB |
| Plaintiff, | **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(a) [FEDERAL QUESTION]** |
| v. | |
| **CALIFORNIA HIGHWAY PATROL, an agency of the State of California; SERGIO FLORES, and DOES 1 to 20,** | |
| Defendants. | |

22

23

24

25

26

27

28

---

To the Clerk of the Court:

Please take notice that Defendants California Highway Patrol and Sergio Flores remove to this Court the state court action described in this notice.

1.    The state court action is *Gregoire v. California Highway Patrol, et al.*, filed as Case Number 37-2014-00018861 in the Superior Court of California in and for the County of San Diego.

2.    A true and correct copy of a court docket in the state court action as it existed on July 21, 2014, is attached as Exhibit A.

3.    On June 12, 2014, Plaintiff Jacob Gregoire filed a Complaint in the state court action naming the California Highway Patrol and Sergio Flores as defendants.

4.    On or about June 26, 2014, Plaintiff served Defendants with copies of the summons and complaint in the state court action.

5.    On or about July 22, 2014, an answer to complaint was filed in the state court action.

6.    True and correct copies of all documents served on and by Defendants, including the complaint and the answer to the complaint, are attached as Exhibit B.

7.    This is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1441(a) because it arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. (See Exhibit B).

8.    Defendants California Highway Patrol and Sergio Flores are entitled to remove the state court action to this Court pursuant to 28 U.S.C. sections 1441(a) and 1446(b)(2)(C).

9.    The complaint indicates Plaintiff is also asserting causes against unnamed "DOE" defendants.  (See Ex. B).  The Superior Court docket does not

1

AER 198

1    reflect the filing of any amended pleadings and, as of the date of this Notice, the

2    undersigned counsel is unaware of any other named parties in the state-court action.

3

4    Dated:  July 25, 2014                          Respectfully Submitted,

5                                                   KAMALA D. HARRIS
                                                    Attorney General of California
6                                                   RICHARD F. WOLFE
                                                    Supervising Deputy Attorney General
7

8

9                                                   S/MICHAEL P. CAYABAN
                                                    MICHAEL P. CAYABAN
10                                                  Deputy Attorney General
                                                    *Attorneys for Defendants California*
11   SD2014707454                                   *Highway Patrol and Sergio Flores*
     70912518.doc
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              2

1   KAMALA D. HARRIS
    Attorney General of California
2   RICHARD F. WOLFE
    Supervising Deputy Attorney General
3   MICHAEL P. CAYABAN
    Deputy Attorney General
4   State Bar No. 179252
      110 West "A" Street, Suite 1100
5     San Diego, CA 92101
      P.O. Box 85266
6     San Diego, CA 92186-5266
      Telephone:  (619) 645-2014
7     Facsimile:  (619) 645-2012
    *Attorneys for Defendants California Highway Patrol*
8   *and Officer Sergio Flores*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**07/22/2014** at 04:11:00 PM

Clerk of the Superior Court
By Calvin Beutler, Deputy Clerk

9

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11            COUNTY OF SAN DIEGO, CENTRAL DIVISION

12

13   **JACOB GREGOIRE**,                    Case No. 37-2014-00018861-CU-CR-CTL

14                        Plaintiff,        **ANSWER TO COMPLAINT**

15      v.

16

17   **CALIFORNIA HIGHWAY PATROL, an**
     **agency of the State of California; SERGIO**
18   **FLORES, and DOES 1 to 20**,

19                        Defendants.

20

21          Defendants California Highway Patrol and Sergio Flores in response to the complaint on

22   file herein admit, deny, and allege as follows:

23          Under the provisions of section 431.30 of the Code of Civil Procedure of the State of

24   California, Defendants deny generally and specifically each and every allegation contained in the

25   Complaint and the whole thereof, and specifically deny that Plaintiff has been damaged in the

26   sum or sums alleged, or in any sum or sums at all, or that Defendants or any agent or employee

27   thereof, committed any wrongful act or omission which caused Plaintiff any injury or damage

28   whatsoever.

                                                1

1    AS SEPARATE AND AFFIRMATIVE DEFENSES, answering Defendants allege as

2 follows:

3 AFFIRMATIVE DEFENSE NO. 1:

4    The complaint and each cause of action therein fail to allege facts sufficient to state a claim

5 for punitive damages and the claim for punitive damages against public entities such as the State

6 of California is not permitted.  (*City of Newport* v. *Fact Concerts* (1981) 453 U.S. 247, 271; Gov.

7 Code, § 818; Civ. Code, § 3294.)

8 AFFIRMATIVE DEFENSE NO. 2:

9    This action was filed and is maintained without reasonable cause and without a good faith

10 belief that there is a justifiable controversy under the facts and law to warrant the filing of the

11 pleading.  As the proceeding arises under the California Tort Claims Act or is for express or

12 implied indemnity or for contribution in a civil action, defendants are entitled to recover costs,

13 including reasonable attorneys' fees, upon prevailing on summary judgment, judgment before

14 presentation of defense evidence, directed verdict, or nonsuit. (Code Civ. Proc., § 1038.)

15 AFFIRMATIVE DEFENSE NO. 3:

16    At all relevant times, plaintiff failed to mitigate injury and damages.

17 AFFIRMATIVE DEFENSE NO. 4:

18    If and to the extent that the allegations of the complaint attempt to enlarge upon the facts

19 and contentions set forth in the California Victim Compensation and Government Claims Board

20 claim, if any there was, said complaint fails to state a cause of action and is barred by

21 Government Code sections 905.2, 911.2 and 950.2.

22 AFFIRMATIVE DEFENSE NO. 5:

23    The complaint and each cause of action therein for physical injury or mental or emotional

24 distress are barred in that Workers' Compensation is the exclusive remedy for employment

25 injuries and damages.  The complaint and each cause of action therein are barred pursuant to

26 Labor Code sections 2922, 2924, 3202, 3361.5, 3363, 3363.5, 3364.55, 3364.6, 3601, 3864 and

27 5300; Civil Code section 1624 [Statute of Frauds]; Unemployment Insurance Code section 1327;

28 and Government Code section 814.2.

AFFIRMATIVE DEFENSE NO. 6:

The injuries alleged in the complaint occurred, if at all, because of conduct arising out of or in the course of employment of a firefighter.  The complaint and each cause of action therein are therefore barred as Workers' Compensation is the exclusive remedy pursuant to Labor Code sections 3601, 3202, 3864, and 3365; Government Code section 814.2; Public Resources Code sections 4153 and 4436; Penal Code sections 4017, 4125.1 and 6202; and Welfare and Institutions Code sections 883 and 1760.4.

AFFIRMATIVE DEFENSE NO. 7:

To the extent that any force was used in making the arrest or detention, if any there was, alleged in the complaint, it was privileged as necessary to effect arrest.  Only reasonable force and restraint were used in the incident alleged in the complaint.  There is no liability pursuant to Penal Code sections 835 and 835a and Government Code section 815.2.

AFFIRMATIVE DEFENSE NO. 8:

To the extent that any person was restrained or restricted in any way in the incident alleged in the complaint, such restraint and restriction was a lawful detention rather than an arrest.

AFFIRMATIVE DEFENSE NO. 9:

At the time and place alleged in the complaint, defendant  Flores was a peace officer acting in the course and scope of employment.  At all relevant times, defendant had reasonable cause to believe that plaintiff had committed a public offense in an officer's presence, to wit, a violation of the law of the State of California, and so believing, exercised the power, and discharged the duty, of lawful arrest.

AFFIRMATIVE DEFENSE NO. 10:

Neither the State of California nor any of its departments is a "person" within the meaning of the Federal Civil Rights Act, 42 United States Code section 1983 et seq.

AFFIRMATIVE DEFENSE NO. 11:

Answering defendants are entitled to qualified and official and quasi-judicial immunity. Defendants acted at all times herein relevant in good faith, with due care, within the scope of discretion, and pursuant to laws, regulations, rules, and practices reasonably believed to be in

3

Case: 16-55286, 02/16/2017, ID: 10323093, DktEntry: 20-2, Page 181 of 196

1   accordance with the Constitution and laws of the United States.  There is no liability pursuant to

2   the Federal Civil Rights Act where one acts in good faith and entertains an honest, reasonable

3   belief that one's actions are in accord with the clearly-established law.  (*Harlow* v. *Fitzgerald*

4   (1982) 457 U.S. 800, 818 [73 L.Ed.2d 396, 102 S.Ct. 2727].)

5   <u>AFFIRMATIVE DEFENSE NO. 12:</u>

6        There is no liability for any injury or damages, if any there were, resulting from an exercise

7   of discretion vested in a public employee, whether or not such discretion be abused.  (Gov. Code,

8   §§ 815.2, 820.2.)

9        WHEREFORE, Defendants pray that:

10      1.  Judgment be rendered in favor of Defendants and against Plaintiff; and

11      2.  Plaintiff take nothing by the Complaint; and

12      3.  Defendants be awarded costs of suit incurred herein; and

13      4.  Defendants be awarded such other and further relief as the Court may deem necessary

14  and proper.

15  Dated:  July 22, 2014               Respectfully Submitted,

16

17                                  KAMALA D. HARRIS
                                Attorney General of California

18                                  RICHARD F. WOLFE
                                Supervising Deputy Attorney General

19

20

21                                  MICHAEL P. CAYABAN
                                Deputy Attorney General

22                                  *Attorneys for Defendants California*
                                *Highway Patrol and Officer Sergio Flores*

23

24  SD2014707454
    70913878.docx

25

26

27

28

                                4

ANSWER TO COMPLAINT (37-2014-00018861-CU-CR-CTL)

AER 203

1  Daniel M. Gilleon (SBN 195200)
   The Gilleon Law Firm
2  1320 Columbia Street, Suite 200
   San Diego, CA 92101
3  Tel: 619.702.8623/Fax: 619.702.6337
   dmg@mglawyers.com
4
   Steve Hoffman (SBN 237466)
5  1320 Columbia Street, Suite 200
   San Diego, CA 92101
6  Tel: 619.677.3015/Fax: 888.320.9384

7  Attorneys for Plaintiff Jacob Gregoire

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

06/12/2014 at 01:48:20 PM

Clerk of the Superior Court
By Sandra Villanueva, Deputy Clerk

8         **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
                      **(Central Division)**
9

10

11  JACOB GREGOIRE,                      **CASE NO.**  37-2014-00018861-CU-CR-CTL

12              Plaintiff,               **COMPLAINT FOR:**
                                         **(1) UNREASONABLE SEIZURE**
13       vs.                                 **(42 U.S.C. § 1983)**
                                         **(2) EXCESSIVE USE OF FORCE**
14  CALIFORNIA HIGHWAY PATROL,               **(42 U.S.C. § 1983)**
    an agency of the State of California;  **(3) VIOLATION OF CALIFORNIA**
15  SERGIO FLORES, and DOES 1 to 20,        **CIVIL CODE § 52.1**
                                         **(4) BATTERY**
16              Defendants.              **(5) FALSE IMPRISONMENT**
                                         **(6) INTENTIONAL INFLICTION**
17                                           **OF EMOTIONAL DISTRESS**

18                                       **JURY TRIAL DEMANDED**

19       Plaintiff Jacob Gregoire alleges:

20                   **GENERAL ALLEGATIONS**

21       1.    Plaintiff Jacob Gregoire is an individual who, at all times relevant to this compliant,

22  worked as a Fire Engineer for the Chula Vista Fire Department and was a resident of San Diego

23  County.

24       2.    Defendant California Highway Patrol (CHP) is, and at all times mentioned herein

25  was an agency of the State of California.

26       3.    Defendant Sergio Flores is an individual who, at all times relevant to this complaint,

27  was acting in his official capacity as an officer and employee of defendant CHP and is believed to

28  be a resident of San Diego County.

1     4.     The true names and capacities of Does 1 through 20, inclusive, and the facts giving

2  rise to their liability are unknown to Plaintiff at this time.  Plaintiff will amend this complaint once

3  their identities have been ascertained as well as the facts giving rise to their liability.

4     5.     Plaintiff is informed and believes, and thereon alleges, that each of the Doe

5  defendants is responsible in some manner, either by act or omission, strict liability, fraud, negligence

6  or otherwise, for the occurrences herein alleged, and that Plaintiff's harm was legally caused by

7  conduct of the Doe defendants.

8     6.     As a prerequisite to filing this complaint, on or about March 21, 2014, Plaintiff filed

9  a Claim for Damages, pursuant to Government Code section 910, with the California Victim

10  Compensation and Government Claims Board.  The claim was rejected on May 23, 2014.

11                                   **FACTS**

12     7.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same

13  herein.

14     8.     On February 4, 2014, at about 8:00 p.m., a "rollover" automobile accident occurred

15  on Interstate 805 in the City of Chula Vista.

16     9.     Plaintiff was dispatched and responded to the accident in his professional capacity

17  as a Fire Engineer for the City of Chula Vista.

18     10.    Plaintiff drove Chula Vista Fire Engine 52 ("E52") to the accident scene. Chula Vista

19  Fire Department Captain David Albright was on board E52 and assumed Incident Command, in

20  accordance with the Incident Command System ("ICS").  ICS is used by all first responders in

21  California.

22     11.    Upon arriving at the accident scene, Plaintiff positioned E52 in the far left lane (#1

23  lane) approximately 25 feet behind an ambulance that was on the scene.

24     12.    Plaintiff positioned his vehicle in the manner that he had been trained in order to

25  protect the Emergency Medical Service personnel during patient packaging and loading into the

26  ambulance and to provide lighting at the scene.

27     13.    Plaintiff exited E52 and walked to the accident scene to search for trapped victims

28  in the overturned vehicle and to assist with patient care.

1    14.    As Plaintiff was actively involved in treating the patients, Defendant Flores yelled
2  at Plaintiff to move E52.

3    15.    Plaintiff explained to Defendant Flores that he was engaged in the treatment of the
4  patients and that E52 was parked where it was for the safety of the rescue operation.

5    16.    Defendant Flores then told Plaintiff and Chula Vista Fire Captain David Albright,
6  who was standing near Plaintiff, that he wanted all of the fire engines gone and back to the fire
7  station and that he (Defendant Flores) did not want the firefighters involved in patient care.

8    17.    Both Captain Albright, the Incident Commander, and Plaintiff advised Defendant
9  Flores that they would not move the vehicles at that time because they were actively involved in
10  patient care.

11    18.    Defendant Flores responded that the patients "were not his problem" and threatened
12  that if Plaintiff did not leave immediately Defendant Flores would arrest him.

13    19.    Plaintiff responded again that he could not leave.

14    20.    Defendant Flores yelled at Plaintiff to climb over the wall between them and come
15  to him.

16    21.    Plaintiff climbed over the wall and went to Defendant Flores and was handcuffed by
17  Defendant Flores.

18    22.    Plaintiff asked Defendant Flores if they could discuss the matter and "work this out."
19  Defendant Flores responded that Plaintiff had been given an opportunity to follow Defendant Flores'
20  orders and he was now under arrest.

21    23.    Defendant handcuffed Plaintiff. Plaintiff asked Defendant Flores if he could loosen
22  the handcuffs because they were extremely tight.  Defendant Flores tightened the handcuffs.

23    24.    Defendant Flores deliberately placed Plaintiff in harm's way by searching him in an
24  open freeway lane as cars drove by at relatively high rates of speed.  Plaintiff asked Defendant to
25  conduct the search in a safer place out of traffic.  Defendant confiscated Plaintiff's helmet, radio,
26  flashlight, pocketknife and a strap of webbing.

27    25.    Plaintiff again asked if Defendant would loosen the handcuffs, as they were causing
28  pain to both his wrists and shoulders.  Defendant ignored Plaintiff's request and placed Plaintiff in

1   Defendant's patrol vehicle.

2      26.    Plaintiff asked Defendant Flores what he was being arrested for.  Defendant Flores

3   responded "148."  Plaintiff asked what 148 was.  Defendant Flores responded "obeying."

4      27.    Plaintiff was detained in Defendant Flores' police vehicle for approximately 30

5   minutes.  Defendant Flores then opened the vehicle door and told Plaintiff "this is not over yet, you

6   are not being arrested but I am not done with you.  You are going to answer for your actions."

7      28.    At all relevant times Defendant Flores was acting pursuant to his authority as a

8   California Highway Patrol officer and under color of law.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 - Unreasonable Seizure Of A Person**
**(Against Defendant Flores)**

11      29.    Plaintiff realleges paragraphs 1 through 28.

12      30.    42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

17      31.    Plaintiff had a firmly established right under the Fourth Amendment to be free from

18   unreasonable seizure.

19      32.    An arrest without probable cause that a citizen has committed a crime violates the

20   Fourth Amendment prohibition on unreasonable searches and seizure.

21      33.    Defendant Flores willfully seized, arrested and detained Jacob Gregoire on February

22   4, 2014, despite the fact that he had committed no crime.

23      34.    Pursuant to California Vehicle Code § 21055 Plaintiff Gregoire was exempt from

24   nearly all rules of the road, including any rule regarding blocking traffic, "while engaged in rescue

25   operations."

26      35.    Defendant Flores arrested Gregoire for failing to "obey" his unlawful order.

27      36.    Plaintiff suffered economic and non-economic damages, including, but not limited

28   to emotional distress and pain and suffering as a result of Defendant's acts complained of herein.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 - Excessive Use of Force
(Against Defendant Flores)

37.   Plaintiff realleges paragraphs 1 through 36.

38.   Defendant Flores used force in arresting Plaintiff.

39.   The force Defendant used was excessive and was not reasonably necessary under the circumstances.

40.   Defendant was purporting to act in the performance of his official duties in arresting and using force against Plaintiff.

41.   Plaintiff suffered economic and non-economic damages, including, but not limited to emotional distress and pain and suffering as a result of Defendant's acts complained of herein.

**THIRD CAUSE OF ACTION**
California Civ. Code § 52.1 - Bane Act
(Against All Defendants)

42.   Plaintiff realleges paragraphs 1 through 41.

43.   Plaintiff had a firmly established right to be free from arrest without probable cause under the Fourth Amendment to the United States Constitution and Article I, section 7 of the California Constitution.

44.   Defendant intentionally interfered with Plaintiff's civil rights in violation of Section 52.1 by perpetrating the above acts.

45.   Plaintiff suffered economic and non-economic damages, including, but not limited to emotional distress and pain and suffering as a result of Defendant's acts complained of herein.

46.   The conduct of Defendant constitutes oppression, fraud or malice within the meaning of Civil Code §§ 3294 *et seq.* and punitive damages should be assessed against Defendant.

47.   Defendant California Highway Patrol is liable pursuant to California Government Code §815.2.

////

////

////

////

AER 208

## FOURTH CAUSE OF ACTION
### Battery (Against All Defendants)

48. Plaintiff realleges paragraphs 1 through 47.

49. Defendant Flores acted with an intent to cause harmful or offensive contact with Plaintiff and the intended harmful or offensive contact occurred.

50. The harmful or offensive contact was not privileged or consented to.

51. Plaintiff suffered economic and non-economic damages, including, but not limited to emotional distress and pain and suffering as a result of Defendant's acts complained of herein.

52. The conduct of Defendant constitutes oppression, fraud or malice within the meaning of Civil Code §§ 3294 *et seq.* and punitive damages should be assessed against Defendant.

53. Defendant California Highway Patrol is liable pursuant to California Government Code §815.2.

## FIFTH CAUSE OF ACTION
### False Imprisonment
### (Against All Defendants)

54. Plaintiff realleges paragraphs 1 through 53.

55. Defendant arrested Plaintiff without a warrant and without probable cause.

56. Plaintiff suffered economic and non-economic damages, including, but not limited to emotional distress and pain and suffering as a result of Defendant's acts complained of herein.

57. The conduct of Defendant constitutes oppression, fraud or malice within the meaning of Civil Code §§ 3294 *et seq.* and punitive damages should be assessed against Defendant.

58. Defendant California Highway Patrol is liable pursuant to California Government Code §815.2.

## SIXTH CAUSE OF ACTION
### Intentional Infliction Of Emotional Distress
### (Against All Defendants)

59. Plaintiff realleges paragraphs 1 through 58.

60. By engaging in the acts complained of herein, Defendant engaged in outrageous conduct with an intent to cause emotional distress.

////

AER 209

1   61.   Plaintiff suffered severe emotional distress as a direct result of Defendant's outrageous

2   conduct.

3   62.   The conduct of Defendant constitutes oppression, fraud or malice within the meaning

4   of Civil Code §§ 3294 *et seq.* and punitive damages should be assessed against Defendant.

5   63.   Defendant California Highway Patrol is liable pursuant to California Government

6   Code §815.2.

7                          **REQUEST FOR RELIEF**

8   THEREFORE, Plaintiff Jacob Gregoire requests a judgment against Defendant Sergio Flores

9   as follows:

10   a.   Entering judgment for compensatory general and special damages in an amount in

11   accordance with proof.

12   b.   Entering judgment for exemplary damages against defendants in an amount sufficient

13   to punish and to make an example of said defendants, and to deter said defendants and others from

14   engaging in similar conduct.

15   c.   Awarding reasonable attorneys' fees, expenses, and costs of suit.

16   d.   Granting such other and further relief as the Court deems proper.

17                          **DEMAND FOR JURY TRIAL**

18   Plaintiff demands a jury trial.

19

20   Dated:  June 12, 2014                    The Gilleon Law Firm

21

22                                           Daniel M. Gilleon, Attorneys for
                                             Plaintiff Jacob Gregoire

23

24

25

26

27

28

Complaint for Damages
7

APPEAL,ENE,PROTO,SEALDC

## U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:14-cv-01749-GPC-DHB

| | |
|---|---|
| Gregoire v. California Highway Patrol et al | Date Filed: 07/25/2014 |
| Assigned to: Judge Gonzalo P. Curiel | Jury Demand: Both |
| Referred to: Magistrate Judge David H. Bartick | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: USCA, 16−55286 | Jurisdiction: Federal Question |
| Superior Court, San Diego County, Central Division, 37−02014−00018861−CU−CR−CTL | |
| Cause: 42:1983cv Civil Rights Act − Civil Action for Deprivation of Rights | |

**Plaintiff**

**Jacob Gregoire**                    represented by **Daniel Mark Gilleon**
The Gilleon Law Firm
1320 Columbia Street
Suite 200
San Diego, CA 92101
(619) 702−8623
Fax: (619) 702−6337
Email: dmg@mglawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy K. Robinson**
Casey Gerry Schenk Francavilla Blatt and Penfield
110 Laurel Street
San Diego, CA 92101−1419
(619)238−1811
Email: jrobinson@cglaw.com
*ATTORNEY TO BE NOTICED*

**Steve Hoffman**
Law Office of Steve Hoffman
1320 Columbia St., Suite 200
San Diego, CA 92101
(619)677−3015
Fax: (888)320−9384
Email: shoffmanlaw@gmail.com
*ATTORNEY TO BE NOTICED*

**Thomas D Luneau**
Casey Gerry Schenk Francavilla Blatt and Penfield
110 Laurel Street
San Diego, CA 92101−1419
(619) 238−1811
Fax: 619−544−9232
Email: tdl@cglaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**California Highway Patrol**              represented by **Douglas E Baxter**
*an agency of the State of California*                     State of California, Office of the Attorney General
Civil

AER 211

600 West Broadway
Suite 1800
San Diego, CA 92101
(619) 738−9567
Fax: (619) 645−2012
Email: douglas.baxter@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael P Cayaban**
Office of the Attorney General
600 West Broadway
Suite 1800
San Diego, CA 92101
(619)645−2014
Fax: (619)645−2012
Email: Mike.Cayaban@doj.ca.gov
*TERMINATED: 02/13/2015*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sergio Flores**                          represented by **Douglas E Baxter**
                                           (See above for address)
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

                                           **Michael P Cayaban**
                                           (See above for address)
                                           *TERMINATED: 02/13/2015*
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1 to 20**                           represented by **Michael P Cayaban**
                                           (See above for address)
                                           *TERMINATED: 02/13/2015*
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2014 | 1 | NOTICE OF REMOVAL With Jury Demand From Superior Court, County of San Diego − Central Division, case number 37−2014−00018861−CU−CR−CTL. (Filing fee $400 receipt number 0974−7236940), filed by California Highway Patrol, Sergio Flores (t/w Complaint and Answer in Removal). (Attachments: # 1 Exhibit A − B (partial) − State Complaint, # 2 Exhibit B (continued) − Answer, # 3 Proof of Service, # 4 Cover Sheet). <br><br>The new case number is 3:14−cv−1749−GPC−DHB. Judge Gonzalo P. Curiel and Magistrate Judge David H. Bartick are assigned to the case. (Cayaban, Michael)(ATTNY MAINT)(dls)(jrd) (Entered: 07/25/2014) |
| 07/25/2014 | 1 | ANSWER to Complaint by California Highway Patrol, Sergio Flores.(no document attached)(dls)(jrd) (Entered: 07/25/2014) |
| 07/25/2014 | 2 | NOTICE AND ORDER For Early Neutral Evaluation Conference: An Early Neutral Evaluation Conference is set for 9/12/2014 at 02:00 PM in the chambers of Magistrate Judge David H. Bartick, 333 W. Broadway, Suite 1080, San Diego. Signed by Magistrate Judge David H. Bartick on 7/25/2014. (mdc) (Entered: 07/25/2014) |
| 08/11/2014 | · 3 | Joint MOTION to Continue *Early Neutral Evaluation* by California Highway Patrol, Does 1 to 20, Sergio Flores. (Cayaban, Michael)Attorney Michael P Cayaban added to |

AER 212

| | | party Does 1 to 20(pty:dft) (srm). (Entered: 08/11/2014) |
|---|---|---|
| 08/13/2014 | 4 | ORDER granting 3 Joint Motion to Continue Early Neutral Evaluation Conference. Early Neutral Evaluation cont to 9/26/2014 02:00 PM before Magistrate Judge David H. Bartick. The parties shall submit ENE statements to chambers no later than 9/19/2014. Signed by Magistrate Judge David H. Bartick on 8/13/14. (kas) (Entered: 08/13/2014) |
| 09/19/2014 | 5 | NOTICE by Jacob Gregoire *of Association of Counsel* (Attachments: # 1 Proof of Service)(Hoffman, Steve)Attorney Steve Hoffman added to party Jacob Gregoire(pty:pla) (kas). (Entered: 09/19/2014) |
| 09/26/2014 | 6 | Minute Entry for proceedings held before Magistrate Judge David H. Bartick: Early Neutral Evaluation Conference held on 9/26/2014. The case did not settle. Order to follow.(Plaintiff Attorneys Thomas Luneau, Dan Gilleon, Steve Hoffman). (Defendant Attorneys Richard Wolfe, Michael Cayaban). (Plaintiff Jacob Gregoire). (Defendant Sergio Flores). (Defendants' representatives Carolyn Lloyd, Kim Hunter).(no document attached) (mbr) (Entered: 09/26/2014) |
| 09/26/2014 | 7 | Order Following ENE. Early Neutral Evaluation Conference held on 9/26/2014.Telephonic Case Management Conference set for 11/21/2014 09:30 AM before Magistrate Judge David H. Bartick. Signed by Magistrate Judge David H. Bartick on 9/26/2014.(sjt) (Entered: 09/26/2014) |
| 11/21/2014 | 8 | Minute Entry for proceedings held before Magistrate Judge David H. Bartick: Case Management Conference held on 11/21/2014. Scheduling Order to follow.(Plaintiff Attorney Steve Hoffman, Tom Luneau). (Defendant Attorney Michael Cayaban). (no document attached) (mbr) (Entered: 11/21/2014) |
| 11/21/2014 | 9 | SCHEDULING ORDER: a telephonic Case Management Conference was held on November 21, 2014. Mandatory Settlement Conference set for 12/4/2015 at 10:00 AM before Magistrate Judge David H. Bartick. Proposed Pretrial Order due by 1/15/2016. Final Pretrial Conference set for 1/22/2016 at 1:30 PM before Judge Gonzalo P. Curiel. Signed by Magistrate Judge David H. Bartick on 11/21/2014. (srm) (Entered: 11/21/2014) |
| 02/13/2015 | 10 | NOTICE OF APPEARANCE by California Highway Patrol, Sergio Flores *Notice of Change of Responsibility for Representation of Defendants* (Baxter, Douglas)Attorney Douglas E Baxter added to party California Highway Patrol(pty:dft), Attorney Douglas E Baxter added to party Sergio Flores(pty:dft) (QC email sent re incorrect event used; updated docket text) (dls). (Entered: 02/13/2015) |
| 05/01/2015 | 11 | Joint MOTION for Extension of Time to Complete Discovery *to Extend Certain Discovery Deadlines* by California Highway Patrol. (Attachments: # 1 Memo of Points and Authorities in Support of Joint Motion by Parties to Extend Certain Discovery Deadlines, # 2 Proof of Service)(Baxter, Douglas) (dlg). (Entered: 05/01/2015) |
| 05/04/2015 | 12 | ORDER Granting 11 Joint Motion by Parties to Extend Certain Discovery Deadlines. The May 21, 2015 fact discovery cutoff shall be continued to July 6, 2015. The June 26, 2015 expert disclosure deadline shall be continued to July 20, 2015. The July 24, 2015 rebuttal expert disclosure deadline shall be continued to August 20, 2015. The August 21, 2015 expert discovery cutoff shall be continued to September 14, 2015. Signed by Magistrate Judge David H. Bartick on 5/4/15. (dlg) (Entered: 05/04/2015) |
| 07/07/2015 | 13 | Joint MOTION to Continue *Discovery and Motion Filing Deadlines* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Memo of Points and Authorities, # 2 Proof of Service)(Baxter, Douglas) (srm). (Entered: 07/07/2015) |
| 07/10/2015 | 14 | NOTICE of Change of Address by Douglas E Baxter (Baxter, Douglas) (dlg). (Entered: 07/10/2015) |
| 07/10/2015 | 15 | ORDER Granting in Part 13 Motion to Continue Discovery and Motion Filing Deadlines: The January 15, 2016 deadline to lodge the proposed pretrial order shall be continued to February 26, 2016. The final pretrial conference before the Honorable Gonzalo P. Curiel shall be continued from January 22, 2016 to March 4, 2016 at 1:30 p.m. Signed by Magistrate Judge David H. Bartick on 7/9/15. (dlg) (Entered: 07/10/2015) |

| | | |
|---|---|---|
| 07/29/2015 | 16 | Joint MOTION for Protective Order *Regarding Peace Officer Personnel Files* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Proof of Service Certificate of Service)(Baxter, Douglas) (srm). (Entered: 07/29/2015) |
| 07/30/2015 | 17 | ORDER Granting 16 Joint Motion for Entry of Protective Order Regarding Peace Officer Personnel Files. Signed by Magistrate Judge David H. Bartick on 7/30/2015. (srm) (Entered: 07/30/2015) |
| 08/13/2015 | 18 | Joint MOTION for Discovery *TO ALLOW DEPOSITION OF CERTAIN WITNESSES AND MEDICAL EXAMINATION AFTER DISCOVERY DEADLINE* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Proof of Service)(Baxter, Douglas) Modified on 8/13/2015, QC Mailer sent re all caps in docket text (srm). (Entered: 08/13/2015) |
| 08/14/2015 | 19 | ORDER Granting 18 Parties' Joint Motion to Allow Deposition of Certain Witnesses and Medical Examination after Discovery Deadline. Signed by Magistrate Judge David H. Bartick on 8/14/2015. (srm) (Entered: 08/14/2015) |
| 11/05/2015 | 20 | Joint MOTION for Extension of Time to File *Motions* by California Highway Patrol, Sergio Flores. (Baxter, Douglas) (srm). (Entered: 11/05/2015) |
| 11/05/2015 | 21 | ORDER Granting 20 Joint Motion to Extend Deadline to File Motions. The deadline to file motions (other than in limine motions) is extended from November 9, 2015, to November 23, 2015. Signed by Judge Gonzalo P. Curiel on 11/5/2015. (srm) (Entered: 11/05/2015) |
| 11/20/2015 | 22 | Ex Parte MOTION for Leave to Appear Telephonic *Appearance of CHP Representative at Mandatory Settlement Conference* by California Highway Patrol. (Attachments: # 1 Memo of Points and Authorities in Support of Defendants' Ex Parte Application to Allow Telephonic Appearance of CHP Representative at Mandatory Settlement Conference, # 2 Declaration Declaration of Douglas E. Baxter in Support of Defendants' Ex Parte Application to Allow Telephonic Appearance of CHP Representative at Mandatory Settlement Conference)(Baxter, Douglas) (srm). (Entered: 11/20/2015) |
| 11/20/2015 | 23 | CERTIFICATE OF SERVICE by California Highway Patrol re 22 Ex Parte MOTION for Leave to Appear Telephonic *Appearance of CHP Representative at Mandatory Settlement Conference* (Baxter, Douglas) (srm). (Entered: 11/20/2015) |
| 11/23/2015 | 24 | ORDER Granting 22 Defendants' Ex Parte Application to Allow Telephonic Appearance of CHP Representative at Mandatory Settlement Conference. The Court requests that Ms. Lloyd appear telephonically. Signed by Magistrate Judge David H. Bartick on 11/23/15. (dlg) (Entered: 11/23/2015) |
| 11/23/2015 | 25 | MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Memo of Points and Authorities Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims, # 2 Statement of Facts Defendants' Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims, # 3 Declaration Declaration of Douglas E. Baxter in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims, # 4 Declaration Declaration of Eliazar Colunga in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims, # 5 Declaration Declaration of Sergio Flores in Support of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims, # 6 Proof of Service Certificate of Service)(Baxter, Douglas) (dlg). QC email sent re submitting courtesy copies (dlg). (Entered: 11/23/2015) |
| 11/30/2015 | 26 | ORDER Setting Briefing Schedule re 25 MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims* : Responses due by 12/18/2015 Replies due by 1/8/2016. Signed by Judge Gonzalo P. Curiel on 11/30/2015.(kcm) (Entered: 11/30/2015) |
| 12/04/2015 | 27 | Minute Entry for proceedings held before Magistrate Judge David H. Bartick: Mandatory Settlement Conference held on 12/4/2015. The case did not settle.(Plaintiff |

| | | |
|---|---|---|
| | | Attorneys Daniel Gilleon, Steve Hoffman, Thomas Luneau). (Defendant Attorney Douglas Baxter). (Plaintiff Jacob Gregoire). (Defendant Sergio Flores).(no document attached) (mbr) (Entered: 12/04/2015) |
| 12/08/2015 | 28 | Joint MOTION for Extension of Time to File Response/Reply by Jacob Gregoire. (Attachments: # 1 Proof of Service)(Hoffman, Steve) (dlg). (Entered: 12/08/2015) |
| 12/08/2015 | 29 | ORDER Granting in Part 28 Joint Motion to Respond to Motion for Summary Judgment: The time for Plaintiff to respond to the motion for summary judgment is extended until January 8, 2016 and the time for Defendants to reply to the response is extended to January 15, 2016. Signed by Judge Gonzalo P. Curiel on 12/8/15. (dlg) (Entered: 12/08/2015) |
| 01/05/2016 | 30 | Joint MOTION for Extension of Time to File Response/Reply as to 25 MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims* by Jacob Gregoire. (Attachments: # 1 Proof of Service)(Luneau, Thomas) (dlg). (Entered: 01/05/2016) |
| 01/06/2016 | 31 | ORDER Granting 30 Joint Motion for Extension of Time and Rescheduling Hearing Date on Defendants' 25 MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims*: The time for Plaintiff to respond to the motion for summary judgment is extended until January 19, 2016 and the time for Defendants to reply to the response is extended to February 2, 2016. The Court reschedules the hearing date on the motion for summary judgment from January 29, 2016 to February 19, 2016 at 1:30 p.m. in Courtroom 2D. Signed by Judge Gonzalo P. Curiel on 1/6/16. (dlg) (Entered: 01/06/2016) |
| 01/19/2016 | 32 | MOTION to File Documents Under Seal (Hoffman, Steve). Modified on 1/20/2016 − No Proof of Service (jah). (Entered: 01/19/2016) |
| 01/19/2016 | 33 | (Denied on 1/20/2016 per Order 34 ) SEALED LODGED Proposed Document re: 32 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (With attachments)(Hoffman, Steve). (jah). Modified on 1/20/2016 − Edited to reflect as denied to sealing (jah). (Entered: 01/19/2016) |
| 01/20/2016 | 34 | ORDER denying 32 Joint Motion to File the Opposition to Dft's Motion for Summary Judgment Under Seal. Signed by Judge Gonzalo P. Curiel on 1/20/2016. (jah) (Entered: 01/20/2016) |
| 01/20/2016 | 35 | RESPONSE in Opposition re 25 MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims* filed by Jacob Gregoire. (Attachments: # 1 Statement of Facts Separate Statement of Facts, # 2 Declaration Declaration of Thomas D. Luneau, # 3 Declaration Declaration of Justin Hutton, # 4 Declaration Declaration of Autumn Mitchell, # 5 Declaration Declaration of Joshua Rees, # 6 Proof of Service)(Hoffman, Steve) (dlg). (Entered: 01/20/2016) |
| 01/20/2016 | 36 | MOTION to File Documents Under Seal (With attachments)(Hoffman, Steve). (jah). Modified on 1/21/2016 − Motion and judge association termed. Amended Motion 38 filed (jah). (Entered: 01/20/2016) |
| 01/20/2016 | 37 | SEALED LODGED Proposed Document re: 36 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Hoffman, Steve). Modified on 1/21/2016 − Amended Motion 38 and Sealed Proposed Documents 39 filed on 1/21/2016 (jah). (Entered: 01/20/2016) |
| 01/21/2016 | 38 | MOTION to File Documents Under Seal (With attachments)(Hoffman, Steve). (jah). (Entered: 01/21/2016) |
| 01/21/2016 | 39 | [FILED AS SEALED DOCUMENT ON 1/21/2016] SEALED LODGED Proposed Document re: 38 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (With attachments)(Hoffman, Steve). (jah). (Main Document 39 replaced on 1/21/2016) (jah). Modified on 1/21/2016 − Added file date of lodgment (jah). (Entered: 01/21/2016) |
| 01/21/2016 | 40 | ORDER granting Plaintiff's 38 Amended Motion to File Documents Under Seal. Signed by Judge Gonzalo P. Curiel on 1/21/2016. (jah) (Entered: 01/21/2016) |

| 02/02/2016 | 42 | REPLY – Other re 35 Response in Opposition to Motion,, 25 MOTION for Summary Judgment *Notice of Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Claims* filed by California Highway Patrol, Sergio Flores. (Attachments: # 1 Defendants' Objections to Plaintiff's Evidence Offered in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, # 2 Declaration of Douglas E. Baxter in Support of Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment)(Baxter, Douglas). (Entered: 02/02/2016) |
| --- | --- | --- |
| 02/02/2016 | 43 | CERTIFICATE OF SERVICE by California Highway Patrol, Sergio Flores re 42 Reply – Other,, *Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment; Defendants' Objections to Plaintiff's Evidence Offered in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Declaration of Douglas E. Baxter in Support of Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment* (Baxter, Douglas) (dlg). (Entered: 02/02/2016) |
| 02/05/2016 | 44 | Pretrial Disclosures by California Highway Patrol, Sergio Flores (Baxter, Douglas) (dlg). (Entered: 02/05/2016) |
| 02/05/2016 | 45 | Pretrial Disclosures by Jacob Gregoire (Attachments: # 1 Proof of Service)(Hoffman, Steve) (dlg). (Entered: 02/05/2016) |
| 02/16/2016 | 46 | ORDER Granting in Part and Denying in Part 25 Defendants' Motion for Summary Judgment. The Court grants Defendants' motion for summary judgment on the cause of action for intentional infliction of emotional distress, and denies Defendants' motion for summary judgment on the remaining causes of action. The hearing date set for February 19, 2016 is vacated. Signed by Judge Gonzalo P. Curiel on 2/16/16. (dlg) (Entered: 02/17/2016) |
| 02/17/2016 | 47 | Joint MOTION for Extension of Time to File *Objections to Pretrial Disclosures* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Memo of Points and Authorities in Support of Joint Motion for Extension of Time to File Objections to Pretrial Disclosures)(Baxter, Douglas) (dlg). (Entered: 02/17/2016) |
| 02/17/2016 | 48 | CERTIFICATE OF SERVICE by California Highway Patrol, Sergio Flores re 47 Joint MOTION for Extension of Time to File *Objections to Pretrial Disclosures and Memorandum of Points and Authorities in Support of Joint Motion for Extension of Time to File Objections to Pretrial Disclosures* (Baxter, Douglas) (dlg). (Entered: 02/17/2016) |
| 02/18/2016 | 49 | ORDER Granting 47 Joint Motion for Extension of Time to File Objections to Pretrial Disclosures. The parties' deadline to file and serve written objections to pretrial disclosures is continued to February 24, 2016. Signed by Magistrate Judge David H. Bartick on 2/18/2016. (srm) (Entered: 02/18/2016) |
| 02/24/2016 | 50 | OBJECTION by California Highway Patrol, Sergio Flores re 45 Pretrial Disclosures . (Baxter, Douglas) (Entered: 02/24/2016) |
| 02/24/2016 | 51 | OBJECTION by Jacob Gregoire *to Defendants' Pretrial Disclosures*. (Attachments: # 1 Proof of Service)(Luneau, Thomas) (Entered: 02/24/2016) |
| 02/25/2016 | 52 | NOTICE OF APPEAL to the 9th Circuit as to 46 Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, by California Highway Patrol, Sergio Flores. (Filing fee $ 505 receipt number 0974–8830979.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Attachments: # 1 Representation Statement, # 2 Certificate of Service)(Baxter, Douglas). (Modified on 2/25/2016 to edit docket text re linked Order.) (akr). (Entered: 02/25/2016) |
| 02/26/2016 | 53 | USCA Case Number 16–55286 for 52 Notice of Appeal to 9th Circuit, filed by Sergio Flores, California Highway Patrol. (akr) (Entered: 02/26/2016) |
| 02/26/2016 | 54 | USCA Time Schedule Order as to 52 Notice of Appeal to 9th Circuit, filed by Sergio Flores, California Highway Patrol. (akr) (Entered: 02/26/2016) |
| 02/29/2016 | 55 | ORDER Vacating Pretrial Conference Date and Setting Briefing Schedule. The Court directs Plaintiff to address whether the appeal is frivolous on or before March 11, 2016. Defendant shall file a response on or before March 18, 2016. The Court also vacates the pretrial conference set on March 4, 2016. Signed by Judge Gonzalo P. Curiel on 2/29/16.(dlg) (jao). (Entered: 02/29/2016) |

| 03/11/2016 | 56 | Brief re RESPONSE re 55 Order,, Terminate Deadlines and Hearings, *Plaintiffs Brief re: Whether the Appeal by the State of California is Frivolous* filed by Jacob Gregoire. (Attachments: # 1 Proof of Service)(Luneau, Thomas) (dlg). (Entered: 03/11/2016) |
|---|---|---|
| 03/11/2016 | 57 | NOTICE of Appearance by Jeremy K. Robinson on behalf of Jacob Gregoire (Attachments: # 1 Proof of Service)(Robinson, Jeremy)Attorney Jeremy K. Robinson added to party Jacob Gregoire(pty:pla) (dlg). (Entered: 03/11/2016) |
| 03/15/2016 | 58 | Ex Parte MOTION for Extension of Time to File *Opposition to Request to Declare Appeal Frivolous* by California Highway Patrol, Sergio Flores. (Attachments: # 1 Memo of Points and Authorities in Support of Defendants' Ex Parte Application for Extension of Time to File Opposition to Request to Declare Appeal Frivolous, # 2 Declaration of Douglas E. Baxter in Support of Defendants' Ex Parte Application for Extension of Time to File Opposition to Request to Declare Appeal Frivolous, # 3 Certificate of Service)(Baxter, Douglas) (dlg). (Entered: 03/15/2016) |
| 03/16/2016 | 59 | ORDER Granting 58 Defendants' Ex Parte Motion for Extension of Time. Defendants' deadline to file an Opposition to Plaintiff's Brief re: Whether the Appeal by the State of California is Frivolous (Doc. 56) is extended to March 24, 2016. Signed by Judge Gonzalo P. Curiel on 3/16/16. (dlg) (jao). (Entered: 03/16/2016) |
| 03/24/2016 | 60 | RESPONSE re 56 Response − Other − *Defendants' Opposition to Plaintiff's Brief Re: Whether the Appeal By the State of California is Frivolous* filed by California Highway Patrol, Sergio Flores. (Baxter, Douglas) (dlg). (Entered: 03/24/2016) |
| 05/13/2016 | 61 | ORDER Re Defendants' Interlocutory Appeal on Issue of Qualified Immunity. Based on the above, the Court concludes that Defendants' appeal of the Court's order on qualified immunity is not frivolous. Signed by Judge Gonzalo P. Curiel on 5/13/2016. (akr) (Entered: 05/13/2016) |
| 06/27/2016 | 62 | NOTICE *OF CHANGE OF PHONE NUMBER* by California Highway Patrol, Sergio Flores (Baxter, Douglas) (dlg). (Entered: 06/27/2016) |

# CERTIFICATE OF SERVICE

Case Name:   **Gregoire v. CHP**               No.   **A16-55286**

I hereby certify that on **February 16, 2017**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**1.    APPELLANT'S OPENING BRIEF**

**2.    APPELLANTS' EXCERPTS OF RECORD – VOL. 1 of 2**

**3.    APPELLANTS' EXCERPTS OF RECORD – VOL. 2 of 2**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **February 16, 2017**, at San Diego, California.

J. L. Hall
Declarant

Signature

SD2016700257
81594726.doc